UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANDRE BISASOR,
Plaintiff,

v.

NEW HAMPSHIRE JUDICIAL BRANCH,
NEW HAMPSHIRE ADMINISTRATIVE OFFICE OF THE COURTS
NEW HAMPSHIRE SUPREME COURT,
JUSTICE MARY BETH COUNTWAY,
JUSTICE PATRICK DONOVAN,
JUSTICE JAMES BASSETT,
KAREN GORHAM,
TIMOTHY GUDAS,
JOHN FORMELLA,
NEW HAMPSHIRE PROFESSIONAL CONDUCT COMMITTEE,
NEW HAMPSHIRE ATTORNEY DISCIPLINE OFFICE,
NEW HAMPSHIRE ATTORNEY GENERAL OFFICE,
NEW HAMPSHIRE SUPERIOR COURT,
TYLER TECHNOLOGIES INC.,
Defendants.

Case No. _____

## PLAINTIFF'S MOTION FOR IMMEDIATE INJUNCTIVE RELIEF AND FOR PRELIMINARY INJUNCTION

1. Plaintiff Andre Bisasor and Plaintiff Natalie Anderson ("Plaintiffs") hereby moves this Court for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a) to enjoin the above captioned defendants ("Defendants") from denying Plaintiff's requests for reasonable accommodations under the Americans with Disabilities Act ("ADA"), including an extension of time to file his appellate brief due to disabilities, and from violating Plaintiff's rights under the ADA and the United States Constitution, and to enjoin Defendants from continuing to violate his rights under the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act, 42 U.S.C. § 1983, and other federal laws as well as to enjoin the Defendants from imposing prior restraints on his First Amendment rights as a party Plaintiff in ongoing proceedings before that court.

2. The Plaintiffs further moves this court to issue a preliminary injunction pursuant to Fed. R. Civ. P. 65(a) against Defendants, seeking declaratory and injunctive relief, to enjoin the New Hampshire Supreme Court and its Justices from:

   a) Denying Plaintiffs' requests for reasonable accommodations under the Americans with Disabilities Act (ADA), including denial of accommodation requests to extend time to file brief, and to file reconsideration, due to disabilities, as well as denial of accommodation requests to exceed word limits for briefs due to disabilities, to obtain allowance of remote access to court proceedings including remote filing of critically important confidential documents in support of their ADA requests due to disabilities, to allow intervention of spouse to assist with disabilities, and to allow access to the court's own pro bono counsel program to assist with disabilities;

   b) Dismissing (permanently) Plaintiff Bisasor's pending appeal (Case No. 2023-0520) based on denials of ADA accommodation requests;

   c) Denying Plaintiff Anderson's pending appeal (Case No. 2021-004) based on denials of ADA accommodation requests; and based on permanently striking Plaintiff's reply brief in denying Plaintiff's ADA accommodation requests;

d) Violating Plaintiffs' rights under the ADA, Section 504 of the Rehabilitation Act, 42 U.S.C. § 1983, the Due Process Clause, and the Equal Protection Clause of the Fourteenth Amendment;

e) Retaliating against Plaintiffs for raising concerns about discrimination, animus, bias hostility based on protected categories of race and/or disability;

f) Discriminating against Plaintiffs based on protected categories of race and/or disability;

g) Subjecting plaintiffs to arbitrary and capricious standards and violating plaintiffs' right to due process, and equal treatment before the law;

h) Continuing to adjudicate Plaintiffs' appeals given the demonstrated bias and conflicts of interest of the remaining Justices; and

i) Imposing prior restraints on their First Amendment rights as party Plaintiffs in ongoing proceedings before that court.

3. As set forth below, Plaintiff meets all requirements for preliminary injunctive relief. Plaintiff is likely to succeed on the merits of his claims, will suffer irreparable harm absent an injunction, and the balance of equities and public interest favor granting the requested relief.

4. This is an action for equitable relief against the Court, and others, in their official capacity; and damages against defendants, in their personal or individual capacity, on behalf of Plaintiffs. Plaintiffs were denied reasonable accommodation and were discriminated against by the Defendants, as is hereinafter more specifically asserted, because of their race, Black and/or African American. The Plaintiffs seeks equitable relief including as follows: to order defendants to comply with the ADA. In addition, Plaintiff seeks to enjoin defendants from retaliating against them.

5. For the reasons set forth below, Plaintiff respectfully requests that this Court grant this motion and enter a preliminary injunction. In support of this motion, Plaintiffs respectfully presents the following.

## I. INTRODUCTION

### Summary

6. This case arises from Defendants' denial of Plaintiff's requests for reasonable accommodations under the ADA in connection with his pending appeal before the New Hampshire Supreme Court ("NHSC"). The Defendants' persistent denial of Plaintiff's rights as a litigant with disabilities, and its biased handling of Plaintiff's pending appeal requires federal court intervention. Specifically, Defendants have denied Plaintiff's requests for an extension of time to file his appellate brief and other accommodations necessitated by his disabilities. Despite Plaintiff's documented disabilities and repeated requests for reasonable accommodations, the NHSC has refused to grant necessary extensions of time and threatens to permanently dismiss Plaintiff's appeal for failure to meet deadlines he cannot meet without accommodation. The NHSC's actions violate the ADA, Section 504, and Plaintiff's constitutional rights to due process and equal protection. Defendants' actions violate Title II of the ADA, Section 504 of the Rehabilitation Act, and Plaintiff's constitutional rights to due process and equal protection. Immediate injunctive relief is necessary to prevent irreparable harm to Plaintiff and to preserve his ability to meaningfully participate in the appellate process.

7. Moreover, the limited panel of three Justices remaining to hear Plaintiff's appeal after two recusals has demonstrated clear bias against Plaintiffs and refuses to address serious conflicts of interest. This bias threatens Plaintiff's right to a fair and impartial tribunal. Federal intervention is necessary to prevent irreparable harm to Plaintiff's fundamental rights and to preserve the integrity of the judicial process.

8. This motion further seeks to address and remedy the grave and immediate threat of impermissible prior restraint posed by the NHSC's orders dated October 4, 2024, and October 10, 2024. Plaintiffs contend that the cumulative effects of the restrictions imposed by the NHSC amount to unconstitutional prior restraint, severely impeding their rights to freedom of speech, to petition the courts for redress under the First Amendment, and to due process under the Fourteenth Amendment of the United States Constitution. Federal intervention is necessary to protect Plaintiffs' constitutional rights, as the restrictions imposed by

the NHSC go beyond reasonable case management and significantly impair Plaintiffs' ability to present their case effectively.

9. Protecting people with disabilities against discrimination from public entities is one of Congress's motivating factors in passing the Americans with Disabilities Act ("ADA"). 42 U.S.C. § 12101(a)(3).

10. The importance of ensuring access to justice for individuals with disabilities cannot be overstated. As the Supreme Court has recognized, "The unequal treatment of disabled persons in the administration of judicial services has a long history, and has persisted despite several legislative efforts to remedy the problem of disability discrimination." Tennessee v. Lane, 541 U.S. 509, 531 (2004). This case presents an opportunity for this Court to reaffirm the fundamental principle that individuals with disabilities must be afforded equal access to the courts.

11. Plaintiff, a person with disabilities as defined by the ADA, seeks emergency injunctive relief to prevent irreparable harm resulting from the NHSC denial of reasonable accommodations under the ADA and the imminent threat of permanent dismissal of his appeal.

12. Plaintiff Bisasor is an individual with disabilities that make it difficult or impossible to effectively prepare, read or write lengthy filings without a reasonable accommodation of time.

13. It should be noted that Plaintiffs did not want to file this lawsuit but were effectively forced to do so because of the exigent circumstances. Moreover, after exhausting all attempts to obtain relief and to plead with the defendants to be reasonable, even the ADA grievance coordinator told the plaintiff that he should litigate this matter, ostensibly meaning to file for relief in federal court since there is no other court to litigate this matter in as it pertains to the state of New Hampshire. The fact that even the ADA grievance coordinator has encouraged the plaintiff to seek federal intervention should tell this Court all that it needs to know.

14. Moreover, plaintiffs did not want to file suit in this court but was left no choice because of the extraordinary circumstances.

## Emergency Relief Sought

15. This case involves egregious violations of federal disability rights laws and constitutional protections by the NHSC in its handling of Plaintiff's pending appeal. The NHSC has repeatedly denied Plaintiff's requests for reasonable accommodations under the ADA, retaliated against him for asserting his rights, and engaged in a pattern of discriminatory conduct that threatens to deprive Plaintiff of meaningful access to the courts.

16. Plaintiff seeks emergency injunctive relief to prevent irreparable harm to his legal rights and interests in the pending state court appeal. Without this Court's intervention, Plaintiff faces imminent dismissal of his appeal as well as disclosure of his confidential medical information in violation of federal law. The balance of equities and public interest strongly favor granting an injunction to vindicate important federal rights and ensure equal access to justice.

17. Plaintiffs are likely to succeed on the merits of their claims under Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131 et seq., and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794 et seq. that Defendants discriminate against him because they effectively require that he forfeit his right to privacy or forfeit the right to seek accommodation under the ADA.

18. Absent a preliminary injunction, Plaintiffs will suffer immediate, irreparable harm.

19. The issuance of a preliminary injunction enjoining Defendants will provide such remedy pending a determination on the merits.

20. Plaintiff seek to enforce important federal rights or public interests in order to exercise fundamental rights.

## Other Factors

21. The underlying appeal in the NHSC involves important right-to-know issues and right to public access constitutional issues, which require skilled legal analysis and advocacy. The issues are novel because these have not been presented to or ruled on by the NHSC before and thus represents a case of first impressions and it goes to critically important rights for all citizens, whether from NH or from outside of NH (including from neighboring states like Massachusetts where its citizens of travel to, work in, conduct business or interact in the state of NH), and is thus a consequentially important public interest case. It should be of particular importance to this federal court how its citizens are treated and whether they are being systematically stripped and deprived of their federally protected civil rights simply because they interact

with NH. This is the kind of case that the citizenry and other stakeholders care deeply about, and it should not be dismissed on mere technicalities, thus avoiding the merits, or by elevating form over substance. Also, because the appeal has been dismissed on a technicality, and not on the merits, the matter is potentially curable with federal court intervention while it is in the reconsideration period.. These circumstances further support federal court intervention as will be further delineated below.

22. Similarly, the ADA issues is an important area of law that appears to be novel for the NHSC. These ADA issues affects many citizens who would seek access to the NHSC and to the courts of NH. This is a timely issue of great concern and public importance that should align with the interests of the federal court in protecting federal civil rights throughout the states.

23. Title II of the ADA prohibits discrimination against individuals with disabilities in the services, programs, or activities of public entities, including state courts. 42 U.S.C. § 12132; Tennessee v. Lane, 541 U.S. 509, 531 (2004).

24. The ADA requires public entities to make reasonable modifications to policies, practices, and procedures when necessary to avoid discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(7).

25. Plaintiff's diagnosed disabilities qualify as disabilities under the ADA, as they substantially limit one or more major life activities. 42 U.S.C. § 12102(1)(A).

26. Federal court intervention would ensure the fair/efficient administration of justice by ensuring that important legal rights are preserved and to ensure that the merits of the legal issues are fully briefed in the NHSC.

27. Notice has or will be provided to the defendants about this action.

28. NB: If this Court requires further argument or clarification of these important issues, Plaintiffs request an opportunity to be heard in oral argument.

## II. JURISDICTION AND VENUE

29. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, as this action arises under the Constitution and laws of the United States, including the ADA and 42 U.S.C. § 1983.

30. Plaintiff's claims relate to deprivation of his rights secured under the First and Fourteenth Amendments to the Constitution of the United States. Plaintiff's claim is further authorized by 28 U.S.C. §§ 2201,2202, 42 U.S.C. §§ 1971-73, 42 U.S.C. §§ 1983, 1985.

31. This Court has jurisdiction specifically delegated to it by act of the United States Congress in the Americans with Disabilities Act. This action seeks to redress the deprivation under State and federal law of rights, privileges, and immunities secured by the United States Constitution and the laws of the United States.

32. It should be noted that the ADA allows individuals to bring lawsuits directly in federal court without first going through an administrative process. This flexibility in filing suits helps ensure that individuals with disabilities can promptly address violations of their rights under the ADA. In Tennessee v. Lane (2004), the Supreme Court held that individuals may sue states directly to require them to make courts and judicial services accessible under Title II of the ADA. For injunctive relief, the plaintiffs must demonstrate that they are being subjected to discrimination or have reasonable grounds to believe they will be subjected to discrimination. This includes ensuring courts and their facilities are accessible and usable by individuals with disabilities.

33. Furthermore, the jurisdiction of this Court is invoked pursuant to the Constitution of the United States, 28 U.S.C. §1343 and 28 U.S.C. §1331. The rights, privileges, and immunities sought herein to be redressed are those secured by the Fourteenth and Thirteenth Amendments of the United States Constitution ,including but not limited to the "badges and incidents of slavery", and provisions against racial discrimination pursuant to 42 U.S.C. §1981 as remedied by 42 U.S.C. §1983.

34. This court has federal question jurisdiction because the claims herein primarily involve federal claims under the ADA and the Rehabilitation Act.

35. Jurisdiction and Venue is similarly proper in this district pursuant to 28 U.S.C. § 1391(b) because the plaintiff resides in this district, and is a citizen of Massachusetts, and most of the events described herein primarily took place while plaintiff was physically in Massachusetts. Also, the defendants have directed their communications and notices to plaintiff while plaintiff was physically in Massachusetts, including but not limited to directing communications to plaintiff's Massachusetts address and to plaintiff's Massachusetts' phone number, and have conducted telecommunications activities with plaintiff while he was physically in Massachusetts., and because a substantial part of the events giving rise to the claims affects or impacts the rights of the plaintiffs in this district.

36. Jurisdiction and Venue is also proper because one of the defendants, Tyler Technologies Inc., conducts significant business in the state of Massachusetts and in this district.

37. Jurisdiction and Venue is also proper because on information and belief the individual defendants have ties to the state of Massachusetts and travel to and/or conduct business in the state of Massachusetts.

38. Venue and jurisdiction is also proper because the plaintiff cannot obtain a fair hearing in the courts of New Hampshire and because the state of New Hampshire and its judicial branch are defendants in this case. Furthermore, the justices in NH are biased and conflicted. The NH legal community is small and incestuous. At least 5 judges in the judicial branch have had to recuse, including two on the supreme court, and the remaining justices are biased and conflicted in such a manner and extent that it would be impossible to have a fair trial.

39. NB: Filing in Massachusetts is further proper because NH federal court is improper venue because one of the defendants, Karen Gorham, who was the court administrator for the NH judicial branch, is now the clerk of the NH federal court. The entire NH federal court must be disqualified because it is impossible for any justice to hear the claims without a conflict or appearance of conflict. The NH federal court is thus an improper forum to hear this case and if filed there would necessitate transfer to this forum in any event. Given the urgency of the matter, it saves time, expedience and expense to file directly into this court, which is critically important for and impactful on the pro se plaintiffs in this case. [NB: The transfer of cases between federal district courts is governed by 28 U.S.C. § 1404. This statute provides the legal basis for transferring cases when conflicts or other issues arise that make it difficult or impossible for a case to be heard in its original venue. The geographical proximity of these districts makes such transfers logistically feasible. The District of Massachusetts, with its larger number of judges and multiple divisions (Boston, Worcester, and Springfield), is well-positioned to handle cases transferred from New Hampshire when necessary. Such transfers are done to maintain the integrity of the judicial process and ensure that all parties receive a fair and impartial hearing, which is a fundamental principle of the U.S. justice system. There are cases that have been transferred between these districts in the past, as well as with Maine, due to reasons outlined in this case. Se also, for example,  Mateo v. Univ. Sys. of N.H.

---

## III. PARTIES

---

40. Plaintiff Andre Bisasor ("Plaintiff Bisasor" or "Bisasor") is an adult citizen of the United States, is a citizen of Massachusetts and currently is located in Massachusetts. He is a Black and or African American male.

41. Plaintiff Natalie Anderson ("Plaintiff Anderson" or "Anderson") is an adult citizen of the United States, is a citizen of Massachusetts and currently is located in Massachusetts. She is a Black and or African American female. [NB: Plaintiff Bisasor and Plaintiff Anderson are spouses to each other].

42. Defendant Honorable Patrick Donovan (Justice Donovan) is a Justice of the NHSC. He is also the chair of the New Hampshire advisory committee on rules and is responsible for promulgating rules which govern all courts of New Hampshire as well as the court's committees and offices including the attorney discipline office and the professional conduct committee, and regulates and controls the activities of the rules committee and the rules of the court. He is sued in his individual and official capacity. He is a white male. He is also identified as a Republican. At all times relevant or material hereto Defendant Justice Donovan acted under color of law.

43. Defendant Honorable Mary Beth Countway (Justice Countway) is a Justice of the NHSC. She was recently appointed to the NHSC bench earlier this year, coming from a NH Circuit Court. She is sued in her individual and official capacity. She is a white female. She is also identified as Republican. At all times relevant or material hereto Defendant Justice Countway acted under color of law.

44. Defendant Honorable James Bassett (Justice Bassett) is a Justice of the NHSC. He is also the chair of the New Hampshire Access to Justice Commission which oversees the NH Judicial Branch's pro bono counsel program. He is sued in his individual and official capacity. He is being sued in his official capacity for equitable and or injunctive relief; and individually for compensatory and punitive damages. He is a white male. He is also identified as a Republican. At all times relevant or material hereto Defendant Justice Bassett acted under color of law.

45. Defendant Karen Gorham was an employee of the New Hampshire Judicial Branch at all times relevant to the claims against her in this action. She was a supervising Court Administrator for the New Hampshire Judicial Branch. She recently left her position with the New Hampshire Judicial Branch to become the clerk of the Federal District Court of New Hampshire. She is being sued in her official capacity for equitable and or injunctive relief; and individually for compensatory and punitive damages. She is a white female. At all times relevant or material hereto she acted under color of law.

46. Defendant Timothy Gudas is both the clerk of the NHSC as well as the secretary of the NHSC advisory committee on rules. He is sued in his official capacity for equitable and or injunctive relief; and individually for compensatory and punitive damages He is a white male. At all times relevant or material hereto he acted under color of law.

47. The New Hampshire Judicial Branch hereinafter ("NH Judicial Branch") is the organizing entity that contains all the judicial bodies in the state of New Hampshire. It is a public entity acting under the color of law, at all times relevant or material hereto. It is being sued in its official capacity for equitable and or injunctive relief.

48. The New Hampshire Administrative Office of the Courts is part of the New Hampshire Judicial Branch and houses the executive and administrative functions of the New Hampshire Judicial Branch in conjunction with the NHSC. It is being sued in its official capacity for equitable and or injunctive relief.

49. The NHSC ("NHSC") is the highest court in New Hampshire. It is an entity that provides the public with an accessible route for appellate review. It is the only court of appeals in New Hampshire as there is no intermediate appeals court like in most other states. It is also the main body that administratively heads up or oversees the Judicial Branch in New Hampshire. It makes both judicial and administrative decisions for the entire NH Judicial Branch in conjunction with the  New Hampshire Administrative Office of the Courts. NHSC is the ultimate administrative and judicial authority for the NH Judicial Branch.  In addition to judges, the work for the NHSC is performed by its legal and administrative staff, including but not limited to law clerks, administrators, secretaries and court officers. The NHSC is being sued in its official capacity for equitable and or injunctive relief. NB: NHSC is also referred to as "NHSC" or "NHSC" herein. It is also referred to as the limited NHSC because it only has 3 remaining (out of 5) justices who have not recused themselves though grounds for their recusal has been presented and requested but denied. This limited NHSC is a hobbled court because the other justices can never rule on any case involving the current parties and the 5 court bench allows for more diversity in the process, which with only 3 justices it is deprived of, to the prejudice of the plaintiffs.

50. NHSC Advisory Committee on Rules ("Rules Committee") is the body responsible for promulgating rules which govern the attorney discipline office and the professional conduct committee, and regulates and controls the activities of the rules committee and rules of the court. It is being sued in its official capacity for equitable and or injunctive relief.

51. The New Hampshire Professional Conduct Committee ("PCC") is a committee of the NHSC and is a government body that is part of the enforcement of the rules of professional conduct for attorneys in New Hampshire. It is being sued in its official capacity for equitable and or injunctive relief.

52. The New Hampshire Attorney Discipline Office ("ADO") is an office that is part of the attorney discipline system in the state of New Hampshire. It is similar to the bar of overseers in other states but not exactly as

there is a separate NH Bar Association in New Hampshire. The ADO is a special creation that is authorized by the NHSC as a governmental body that is part of the enforcement of the rules of professional conduct for attorneys in New Hampshire. It is not a committee like how the PCC is a committee. It is being sued in its official capacity for equitable and or injunctive relief.

53. The New Hampshire Attorney General Office ("AG" or "AGO"), also known as the New Hampshire Department of Justice ("NHDOJ"), is the chief law enforcement office of the state of New Hampshire. It is being sued in its official capacity for equitable and or injunctive relief.

54. John Formella is the New Hampshire Attorney General and the chief legal officer, and chief law enforcement officer of the state of New Hampshire. He is being sued in his official capacity for equitable and or injunctive relief.

55. The New Hampshire Superior Court ("NHSUPC") is the main trial court in New Hampshire. It also makes both judicial and administrative decisions for its own court in conjunction with the NH Judicial Branch and/or the New Hampshire Administrative Office of the Courts. In addition to judges, the work for the NHSC is performed by its legal and administrative staff, including but not limited to law clerks, administrators, secretaries and court officers. The NHSUPC is being sued in its official capacity for equitable and or injunctive relief.

56. Tyler Technologies Inc. ("Tyler") is a systems services provider for the Judicial Branch of New Hampshire. It provides and facilitates access to court records and filings in the electronic systems of the NH Judicial Branch. It conducts significant business in the state of Massachusetts.

## IV. FACTUAL BACKGROUND

### Plaintiff's Disabilities and Accommodation Requests

57. Plaintiff Andre Bisasor is an African-American individual with disabilities as defined by the ADA. He is currently a party Plaintiff in Case No. 2023-0520, pending before the NHSC.

58. The NHSC is a public entity subject to Title II of the ADA. 42 U.S.C. § 12131.

59. In connection with his pending appeal, Plaintiff has made multiple requests to the NHSC for reasonable accommodations under the ADA, including extensions of time to file briefs and other documents due to his medical conditions.

60. Plaintiff has multiple disabilities that substantially limit one or more major life activities, including his ability to prepare legal filings within standard timeframes. These disabilities are documented by medical professionals.

61. On 8-22-24, Plaintiff submitted an initial request for an ADA accommodation in the form of a 60-day extension to file his appellate brief. This extension of time to file his appellate brief was presented as an accommodation for his disabilities in Case No. 2023-0520.

62. This request was supported by Plaintiff's sworn affidavit attesting to his qualifying disabilities. The defendants assented to the accommodation requested by the Plaintiff.

63. On 8-27-24, Justice Countway denied Plaintiff's initial ADA request without providing an opportunity to submit medical documentation or explaining the basis for the denial, and set a deadline for the brief to be 9-6-24.

64. On 8-30-24, the plaintiff then sought emergency clarification on whether the court was barring the plaintiff from providing medical documentation, and if not, then he was also seeking permission to file the medical information under seal ex parte, to protect Plaintiff's privacy rights. Plaintiff requested clarification on filing confidential information and requested ex parte sealing emphasizing the privacy of the information and the danger and prejudice if shared with other adversaries.

65. On 8-30-24, Justice Countway stated that plaintiff would be allowed to file medical documentation under seal ex parte, but she did not provide a deadline to do so. [NB: The plaintiff understood this order to have suspended the 9-6-24 deadline because allowance was ostensibly being made for medical documentation to

be submitted and no deadline was set to do so. Also, the order said nothing about the need to file a renewed motion thereafter.].

66. On 9-4-24, Plaintiff submitted medical documentation supporting his ADA request. The medical documentation identified several medical conditions for the plaintiff and stated that Plaintiff should be excused from "court matters... at least, for the next 10 weeks, as he undergoes evaluation and treatment." It also identified confidential information relating to the plaintiff's spouse and another non-party.

67. On September 4, 2024, Justice Countway issued an order that restyled plaintiffs' medical documentation that he submitted, as a "renewed request for an extension of time", and then she presented Plaintiff with a Hobson's choice: either (1) withdraw his ADA request entirely, or (2) agree to have his confidential medical information disclosed to third parties, including a private citizen intervenor in the case who was a hostile contentious adversary in other unrelated litigation.

68. The September 4 order gave Plaintiff less than two days to make this decision, despite the sensitive nature of the medical information at issue.

69. On September 6, 2024, Plaintiff sought clarification and reconsideration of the September 4 order, requesting at minimum that any medical information be redacted before disclosure, or otherwise resubmitted so that confidential private sensitive information could be removed]. Justice Countway summarily denied this request.

70. On September 6, 2024, the plaintiff attempted to retrieve records from the court's electronic records system for filings and cases for the NH judicial branch, but was stripped of access to the system's case records. The plaintiff contacted the electronic filing court administrator and was told that the matter will be looked into by the court's e-filing administration and a ticket opened for Tyler Technologies to look into it as well. No relief was provided. To this day, no relief has been provided. [NB: Plaintiff formally notified the NHSC of this problem but the NHSC has ignored this notification to this day.]. This was at the very least negligence. The fact that plaintiff's access has still not been restored by the defendants to this day, suggests it was intentional.

71. After September 6, 2024, therefore the brief due date passed without Plaintiff filing a brief or being able to file a brief regardless of whether the brief was completed or not.

72. On September 13, 2024, the NHSC, via Countway, issued an order that facilitated a drawn out extended process that turned over the plaintiffs' confidential medical information/documentation to the opposing parties. (NB: The court's position is essentially that everything and anything will be shared with others no matter what is filed as confidential in any ADA request, or otherwise it has no process  or method for determining if it should be shared with others.).

73. The 9-13-24 order also allowed input/response from the opposing parties on the plaintiff's ADA medical documentation by September 23, 2024. Countway did not allow or provide for the plaintiff to reply to such input or response. The defendants who assented to the plaintiff's accommodation previously did not provide any response. The hostile intervenor did make several responses.

74. The plaintiff's spouse, Anderson, sought to intervene in the appeal to assist Bisasor and to protect her own interest in the case sand to protect her own medical records in the case. Anderson and Bisasor had to seek permission to reply to the hostile intervenor because of the unfair response that sought to mislead and prejudice the plaintiffs.

75. But the NHSC, via Countway, then blocked plaintiff from filing responses to the intervenor's objections, leaving plaintiff with no ability or opportunity to address all of the filings of the hostile intervenor, giving the intervenor priority over the plaintiff in the plaintiff's own ADA request process.

76. On October 4, 2024, with three limited justices (Donovan, Countway and Bassett) remaining after recusal of two other justices (Chief Justice Nelson MacDonald and Justice Anna Hanz Marconi), the NHSC issued an order denying Plaintiff's requests for accommodations, including the extension of time to file his brief. The NHSC dismissed Plaintiff's appeal for failure to file a brief by the September 6, 2024 deadline, despite Plaintiff's pending requests for ADA accommodations. The NHSC also denied every relief requested by Bisasor or Anderson relating to the ADA.

77. So, although Plaintiff timely filed his requests for accommodation under the ADA, seeking extensions of time to file a brief and although these requests were filed before the expiration of the brief deadline, the NHSC denied these ADA requests on 10-4-24.

78. Because the 10-4-24 order was a lengthy complex 6-page omnibus order with numerous orders contained in the order and with numerous citations, the plaintiffs then filed requests for extra time, under the ADA, to file motions for reconsideration of the 10-4-24 orders, due to plaintiff's disabilities, beyond the short time provided by the rules.

79. Further consistent with its draconian intent, the limited NHSC, through its orders of October 10, 2024, has now imposed a series of restrictions on Bisasor's and Anderson's ability to participate effectively in the appeal process. These restrictions include:

    a) Restricting the plaintiffs from filing separate motions for reconsideration to address the separate motions or requests filed by the plaintiff but ruled on in one omnibus order and then limiting the one motion for reconsideration to only 3000 words .Each order, one for Bisasor's appeal, and one for Anderson's appeal, were omnibus orders with 6 and 5 pages respectively containing orders on several individual separate motions or requests. Each omnibus order totaled approx. 2500 words each. It is unfair and severely restricting to require that plaintiffs must respond to a 2500 word order with multiple citations and legal arguments by the NHSC, in only 3000 words. [NB: The typical order by the NHSC is no more than one page. 5 or 6 pages for a non-merits order is highly unusual and atypical]; The NHSC should allow the plaintiffs to file a separate motion for reconsideration for each motion or request that was denied in the omnibus order. This is a violation of due process and a capricious change of the rules to harm the plaintiffs. The plaintiffs should not be penalized because of the fact that the NHSC chose to include each denial of separate motions/requests in one order. It is even more harmful with respect the denial of the 3 or more separate ADA requests because these are under the protection of the ADA. Restricting motion to reconsideration to only one 3000 word motion for all ADA requests also implicates the very disabilities for which the plaintiffs requested ADA accommodations, which further "puts salt in the wound", proverbially speaking.

    b) Prohibiting the presentation of new evidence for plaintiff's ADA requests or new issues relating to the ADA or new ADA requests, in motion for reconsideration;

    c) Refusing to consider any parts of motions that seek reconsideration of portions of previous orders that denied reconsideration of earlier orders; otherwise, threatening that the entire motion for reconsideration, not just the portion that could be intertwined, will not be considered or acted upon, which is the equivalent of striking the motion.

    d) Imposing a strict 3,000-word limit on the motion for reconsideration in conjunction with the above restrictions creating an impermissible prior restraint on the speech of the plaintiffs;

    e) Denying Bisasor and Anderson's requests for an extension of time to file a motion for reconsideration as an accommodation under the ADA.

    f) Prohibiting the attaching of any proposed reply to any motion to reply by the plaintiffs, which is standard practice in the NHSC, after an opposing party files a response or objection to the motion for reconsideration;

    g) Denying Bisasor's request for pro bono counsel due to disability under the ADA;

80. These restrictions collectively create an environment that stifles the ability to present complete arguments, thus amounting to a prior restraint on speech and petition. Moreover, the cumulative effect of these restrictions creates a situation where Bisasor is at risk of being sanctioned by the court for violating the order on restrictions, including the possibility of the court not ruling on the entire motion if any part of it violates these restrictions. The plaintiffs are unable to know what they can file because of the intertwining of the NHSC order with respect to the multiple orders contained in it. The plaintiffs are thus paralyzed and seeking clarification or reconsideration on the above is likely to be futile in light of the hostile punitive biased approach and attitude of the limited NHSC.

81. The plaintiffs has filed or will file additional ADA requests today seeking accommodation to file more than one motion for reconsideration and to not be restricted to only 3000 words and also reconsideration of the

extension request for reasonable additional time to file motions for reconsideration and for allowance of remote access for confidential filings (and also allowance for intervention to assist due to disabilities and for pro bono counsel to assist due to disabilities). But given the discriminatory and retaliatory animus of the limited NHSC, the NBHSC will likely be intransigent on these ADA requests.

82. The NHSC will therefore deny any and all pending ADA requests, and will therefore take further action to effectuate the permanent dismissal of Bisasor's appeal and the denial or dismissal of Anderson's appeal, as of or by tomorrow .

83. Immediate federal intervention is necessary to prevent imminent irreparable harm to Bisasor and Anderson, to preserve the status quo and to allow the federal court to determine the need for further injunctive relief. Without this federal intervention now, the defendants will likely try to argue that it is too late for the federal court to intervene. Whether or not this court will agree or not agree that it would be too late for the federal court to intervene, the bottom line is that it will be harmful to allow the defendants to gain the right to make that argument to this very court as a basis to prejudice or circumvent the rights of the plaintiffs. Either way, the imminency, the stakes and the risk of harm implicated by the above, warrants the immediate stay of the NHSC proceedings until this court can more fully address the matter.

## Timeline of Denials

84. 8-22-24 – First ADA request filed
85. 8-27-24- First ADA request denied
86. 9-4-24 – ADA medical documentation filed
87. 9-13-24 – ADA medical records divulged to other persons/parties
88. 9-23-24 – Second ADA request for newly identified previously undiagnosed disability filed
89. 9-23-24 – Third ADA request regarding basic remote access to court/court proceedings filed
90. 10-3-24 – ADA request in related appeal denied.
91. 10-4-24 – All ADA requests denied and appeal dismissed because ADA requests were denied.
92. 10-10-24 – ADA request for extension to file reconsideration denied.
93. 10-15-24- ADA request to exceed word limit on reconsideration is pending.
94. 10-15-24 – Reconsideration of ADA request for remote access is pending.
95. 10-15-24 – Reconsideration of ADA request for extension of time for filing brief is pending.
96. 10-15-24 – Letters to the Chief Justice of the NHSC and the head of the NH Administrative Office of the Courts seeking review of ADA requests are pending.
97. 10-16-24 – Bisasor's appeal will be permanently dismissed; Anderson's related appeal will be denied or dismissed.

## The NHSC blatantly violated several key aspects of the ADA.

98. The NHSC blatantly violated several key aspects of the ADA.
   a) The NHSC engaged in an extensive and demanding analysis and a grueling demeaning burdensome arbitrary process.
   b) The NHSC did not provide an interactive process
   c) The NHSC did not offer any alternative accommodation.
   d) In denying the ADA requests, the NHSC did not show that the requested accommodations would fundamentally alter the court program or activity. It did not even address it.
   e) The NHSC put the plaintiff on trial without any due process or procedural safeguards.
   f) The NHSC substituted it's medical opinion for the medical opinion of expert doctors at MGH and Harvard, by ignoring the medical documentation provided by the plaintiff doctor and providers.
   g) The NHSC did not address the plaintiff's disabilities. It sidestepped arriving at a conclusion in order to avoid the requirements of the ADA and to protect itself in pending litigation on the same issue
99. The NHSC violated other aspects of the ADA which will be outlined further in this document.

## The NHSC Provided No Interactive Process For The ADA Request

100.    Plaintiff filed ADA requests with the NHSC.

101.    The first was related to disabilities, that were recently diagnosed/developed, that warrant accommodations of an extension of time to file the appellate brief and appendix.

102.    The second was related to disabilities that warrant accommodations of allowance of remote access for filing confidential documents that otherwise are required to be filed conventionally in person at the court.

103.    The third was related to disabilities that were recently identified but were previously undiagnosed and untreated, that were affecting the plaintiff in times prior to the recent identification.

104.    All three ADA requests were denied.

105.    Additional ADA requests were filed related to accessing the court's own pro bono counsel program/initiative and allowing plaintiff's spouse to intervene in the case to assist plaintiff with the case (as well as to protect her own interest in the case including the privacy of her own medical records). Those were also denied.

106.    The NHSC sought no information, no interactive process, no inquiry, no clarification, had no hearing, no evidence with respect to any of the ADA requests.

107.    The NHSC did not provide an interactive process whatsoever for any of the requests.

108.    The NHSC did not tell plaintiff he could file supporting documentation.

109.    The NHSC did not inquire about alternative accommodations.

110.    The NHSC did not inquire about the limitations of plaintiff's disabilities.

111.    The NHSC showed no interest in accommodating the plaintiff.

112.    The NHSC at one point ordered the plaintiff to not provide information to the NHSC/blocked plaintiff from providing information to the NHSC.

113.    The most recent order by the NHSC contains as warning not to provide any new information or new disabilities to the NHSC. The NHSC has essentially ordered a permanent ban on the plaintiff from seeking any accommodation for any disability he currently has or may be diagnosed with in the future.

### The NHSC Unnecessarily Dragged Out The Process To The Harm of The Plaintiff

114.    It took 44 days to get an answer from the NHSC on the initial ADA request seeking extension of time for the brief. This is by no means a timely process.

115.    This is notwithstanding the fact that the Plaintiff requested emergency expedited ruling and emphasized the importance of ruling on the request prior to the expiration of the brief deadline. The first ADA request was requested over two weeks prior to the deadline, which gave the NHSC more than adequate time to review and rule on or grant the ADA request.

116.    But it took 8 days to rule on and deny the initial request and then another 38 days to rule on the subsequently provided medical documentation which the NHSC wrongly construed as a renewed request for an extension of time.

117.    The NHSC then let the deadline pass without ruling on the ADA request while giving the impression that the deadline was or would be suspended if plaintiff agreed to turn over ADA information to adversaries. The NHSC then against plaintiff's will turned over the confidential information to adversaries, after the deadline passed, and then the NHSC for the first time announced that plaintiff's appeal would be dismissed for missing the deadline, even though the ADA request was not decided yet and even though it was giving an extended opportunity to the adversaries to challenge the ADA request, without giving plaintiff an opportunity to reply to the adversaries.

118.    This is fundamentally unfair.

### The NHSC Initially Sought Tio Ignore Plaintiff's Initial ADA request

119.    First, the NHSC tried to ignore plaintiff's ADA request by treating it only as a request for extension of time without the added requirements of complying with the ADA.

120.    It was only after the plaintiff filed a motion to clarify why the NHSC was doing that, that the NHSC told the plaintiff it was treating the request for an extension of time along with the ADA request (though there was no mention of the ADA in its initial denial).

121.    This is fundamentally unfair and is a violation of the ADA.

122.    If plaintiff did not persist in seeking clarification, then the plaintiff would have been stuck with a denial of his initial ADA request.

### The NHSC erred in denying the initial ADA request.

123.     Plaintiff informed the NHSC that he had medical conditions that impaired his ability to prepare legal documents and that plaintiff needed 2 months.

124.     The NHSC had no basis to deny the request.

125.     The NHSC didn't inform plaintiff of the right to provide additional information and what exactly it needed plaintiff to provide. It left plaintiff in the dark to figure out by himself.

126.     The NHSC didn't provide opportunity to submit documentation.

127.     The NHSC didn't inform plaintiff of his rights or on what to obtain relief.

128.     The NHSC intended to block the plaintiff from seeking and obtaining ADA relief.

129.     The NHSC intended to circumvent the ADA and deprive plaintiff of his rights under the ADA.

130.     The NHSC then was hoping the plaintiff would just go away and abandon the request for ADA accommodations.

131.     The NHSC contradicted itself by saying Plaintiff could do it by the deadline and then stated that plaintiff can't do it by any extended deadline, and used that as basis for denying the ADA request. But this is contradictory. If plaintiff cannot complete the brief by a new extended deadline, then the plaintiff couldn't have completed the brief by the earlier deadline. It cannot be had both ways.

### The NHSC then engaged in a rigged process designed to hurt and dissuade the plaintiff

132.     As the facts will show, the NHSC then engaged in a rigged process designed to hurt the plaintiff, to dissuade the plaintiff from pursuing his ADA request and to embarrass and overburden the plaintiff.

133.     It was rigged because the NHSC never intended to grant any ADA request whatsoever but misled the plaintiff to think it was possible to obtain relief when in fact it was impossible for plaintiff to obtain any relief from the NHSC. This sham process has scintilla or a smidgen of the appearance of an ADA process but it was not for plaintiff benefit, it was for the adversaries benefit and to provide pretext for the NHSC ultimate goal which was to deny plaintiff's ADA request and to create cover for doing so.

134.     As the facts will show, the NHSC decided from the start that it didn't want to grant any accommodation to plaintiff for any reason regardless of plaintiff's disabilities. It was biased and intended to deny any ADA request against plaintiff.

135.     The NHSC didn't want to hear about plaintiff disabilities and it didn't want to entertain any ADA request from plaintiff. This is a violation of the ADA.

136.     Further, the NHSC sought ways to circumvent or evade the ADA and it's requirements under the law.

137.     The NHSC looked at the plaintiff request and the law and spent its time trying to outmaneuver the plaintiff so as to deprive him of his ADA rights.

138.     The NHSC finally just gave up on trying to cloak its intentions and just came out with blatantly unfair discriminatory retaliatory statements as it denied the plaintiff ADA request without good reason and then uses the denial of the ADA request to justify dismissal of the plaintiff appeal.

### The NHSC prejudged the ADA request without hearing the full facts of the ADA request

139.     The NHSC prejudged the ADA request without hearing the full facts of the ADA request because it was biased against the plaintiff from the git-go.

140.     This bias stemmed from racial bias, judicial bias, socio economic bias and conflict of interest with the adversaries. It also has a bias because plaintiff has sued the NHSC committee for professional conduct and because the plaintiff had a pending lawsuit against the NHSC and it's justices in federal NHSC.

141.     Further it has a bias because the issue of the appeal was taken up by one of the Justices (Donovan) at the rules committee of which he is chair and the chair became embroiled in personal animus and criticism with the plaintiff over the issues in the appeal.

142.     Donovan has a vested interest in undermining the plaintiff and his credibility and in ensuring the plaintiff loses his appeal.

143.     Donovan should recuse himself from the case because he was sued on the ada issues prior to the issue arising in this NHSC. He cannot rule on an ada request from plaintiff who previously sued him for violating the ADA in another case when his victory in the lawsuit depends on defeating plaintiff's ADA claims against

him. These claims related to his conduct in a non judicial context where as chair of a rules meetings committee, he administratively violated the ada and discriminated against the plaintiff. He cannot possibly be impartial in ruling on the ada request in this current matter. This is a violation of judicial ethics.

144.    That Donovan did not recuse himself when he knows this further demonstrates that he is violating several rules in order to violate the plaintiff's ADA rights.

145.    The NHSC has a bias against plaintiff and a stereotype of plaintiff that attributes bad motives to him when plaintiff is unable to meet deadlines when it's his disability that prevents him from doing so.

### The NHSC Has Sought To Intentionally Evade or Circumvent The Requirements of the ADA

146.    The NHSC has been seeking to evade the requirements for the ADA.

147.    The NHSC has changed the ADA request to a simple request for an extension of time and avoided addressing the ADA analysis.

148.    The NHSC has changed the rules to require withdrawal of ADA request.

149.    The NHSC has refused to do interactive process.

150.    The NHSC has refused my request to redact or resubmit or amend the confidential information.

151.    The NHSC has retroactively warned of dismissal after the fact and after the relevant deadline passed when the NHSC issued several orders prior to the deadline but never warned of dismissal but instead gave the impression that the deadline was suspended pending review of pending ADA requests.

152.    This shows active intent to game or rig the system against a party and to find anything to use to hurt that party.

153.    The NHSC are opposing parties in a lawsuit over the same issues.

154.    The NHSC has behaved like an opposing party in how the NHSC reviewed handled and decided these issues in this appeal.

155.    The NHSC has reviewed public information about the lawsuit ruling that indicated plausibility of claims against the NHSC.

156.    The NHSC has are mad at the plaintiffs for filing that lawsuit.

### Further Acts of the NHSC

157.    The NHSC is a covered entity under Title II of the ADA.

158.    The plaintiff is a person with disabilities as defined by the ADA.

159.    The plaintiff submitted two ADA requests to the NHSC, an initial one that was denied, and a second filing that was construed as a renewed ADA request with medical documentation.

160.    The NHSC refused to grant reasonable accommodation for the initial ADA request.

161.    The NHSC delayed ruling on plaintiff's initial ADA request.

162.    The NHSC tried to avoid ruling on plaintiff's initial ADA request.

163.    The NHSC denied plaintiff's initial ADA request.

164.    The NHSC engaged in unwarranted stereotyping, bias against the plaintiff.

165.    The NHSC failed to provide plaintiff an opportunity to provide medical documentation to support his initial ADA request.

166.    The NHSC failed to provide reasonable accommodation regarding submission of medical documentation.

167.    The NHSC is trying to dissuade plaintiff from asserting and/or pursuing his rights under the ADA.

168.    The NHSC is trying to use clever means to cause plaintiff to withdraw his ADA request.

169.    The NHSC is not protecting the privacy of the medical documentation provided by plaintiff to the

170.    NHSC as part of the ADA accommodation process.

171.    The NHSC has essentially threatened the plaintiff with exposing his private sensitive medical information to others who are defendants in the case unless plaintiff withdraws his ADA requests.

172.    The NHSC is making it unnecessarily difficult to seek and obtain reasonable accommodation under the ADA.

173.    The NHSC is not following the ADA law and its requirements including its due process and privacy requirements.

174.    The NHSC is not following its own ADA policy.

175.    The NHSC is engaging in arbitrary and capricious actions that cause discrimination against the plaintiff as a person with disabilities.

176.    The NHSC has engaged in retaliation because plaintiff raised concerns about discrimination in violation of the ADA.

177.    The NHSC is engaging in discrimination and retaliation in violation of the ADA.

178.    The defendants in the case have assented to the accommodation requested by the plaintiff.

179.    Other courts have granted the reasonable accommodation requested by the plaintiff. There are at least 4 courts that have granted the reasonable accommodation including a NH superior court, a MA superior court, the MA appeals court and the NH federal court.  The NHSC is the only court that has not granted the reasonable accommodation.

180.    The NHSC actions are unreasonable, discriminatory, biased, unfair and unjust.

181.    Out of the 5 justices on the NHSC, 2 have been recused for conflict or bias. Other justices have conflicts and bias as well, but refuse to recuse themselves. They have refused to address concerns raised in more than one motion to recuse except a blanket denial of conflict, bias or the need to recuse.

182.    The NHSC has engaged in discriminatory practices, including:
   a)    Refusing to grant reasonable accommodations;
   b)    Delaying and avoiding ruling on ADA requests;
   c)    Failing to provide an opportunity to submit medical documentation;
   d)    Threatening to expose Plaintiff's private medical information;
   e)    Retaliating against Plaintiff for raising ADA concerns;
   f)    Engaging in unwarranted stereotyping and bias against the Plaintiff;
   g)    Failing to follow its own ADA policy and the requirements of the ADA law.

183.    Other courts, including a NH superior court, a MA superior court, the MA appeals court, and the NH federal court, have granted similar accommodations to Plaintiff.

184.    Out of the 5 justices on the NHSC, 2 have been recused for conflict or bias. Other justices have conflicts and bias as well but refuse to recuse themselves.

185.    The NHSC has engaged in a pattern of conduct that demonstrates bias and animus against Plaintiff, including:
   a)    Denying nearly every motion or request filed by Plaintiff while granting similar requests by other parties;
   b)    Imposing onerous procedural requirements on Plaintiff not applied to other litigants;
   c)    Threatening to dismiss Plaintiff's appeal for raising legitimate concerns about judicial conflicts of interest;
   d)    Refusing to address documented instances of opposing counsel's misconduct;
   e)    Making disparaging comments about Plaintiff's pro se status.

186.    Plaintiff has reason to believe the NHSC intends to imminently and permanently dismiss his appeal and/or disclose his confidential medical information.

187.    The actions of the NHSC have caused Plaintiff significant harm, including exacerbation of his medical conditions, denial of meaningful access to the courts, and violation of his privacy rights.

188.    The NHSC failed or refused to provide reasonable accommodations to Plaintiff Bisasor in violation of the ADA, which thus constitutes disability discrimination.

189.    The Defendants' actions constitute discrimination in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulations at 28 C.F.R. pt. 35.

190.    The Defendants have violated and continues to violate the ADA and, accordingly, has injured the plaintiff by (a) administering and delivering its services in a manner that deprived or denied him of the opportunity to participate in the benefits of state services aa result of their medical disabilities, and (b) failing to reasonably modify its administration and delivery of these services in a manner that would avoid discrimination against the plaintiff and of such individuals with said medical disabilities.

191.    Plaintiff is likely to succeed on the merits of his claims under Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131 et seq., and Section 504 of the Rehabilitation Act of 1973 ("Section

504"), 29 U.S.C. § 794 et seq. that Defendants discriminated against him because they effectively require that he forfeit his right to privacy or forfeit the right to seek accommodation under the ADA.

### Mary Beth Countway

192.    Justice Countway and the NHSC retaliated against me for raising concerns about ADA discrimination.

193.    Justice Countway and the NHSC has taken adverse action against me shortly after I raised concerns about ADA discrimination.

194.    Justice Countway and the NHSC has not adhered to or followed its own rules and policies regarding the ADA.

195.    Justice Countway and the NHSC has discriminated against me under the ADA.

196.    Plaintiff is in danger of suffering irreparable harm from the NHSC who is about to rule against plaintiffs on pending ADA requests.

197.    Plaintiff is in danger of suffering irreparable harm from the NHSC who has disclosed and is about to disclose plaintiff's private HIPAA-protected medical information that was provided to the NHSC as part of the ADA accommodation process.

### Timothy Gudas

198.    Gudas is refusing to communicate with the plaintiff after the plaintiff raised concerns about violation of the ADA.

199.    Gudas refused to provide copy of rules meeting due to disability.

### Patrick Donovan

200.    Donovan has been engaging in numerous acts of hostility, discrimination, retaliation. This will be outlined further below.

### Karen Gorham

201.    Gorham required that every case that plaintiff had in NH at the time and that every case that plaintiff files in the future for the rest of his life he is prohibited from contacting any court in the state of New Hampshire. This extraordinarily drastic practice was only applied to plaintiff and then to plaintiff's wife. It was not applied to any of the defendants in any of plaintiff's cases.

202.    It was not fair. Plaintiff did nothing to deserve this. And it was discrimination against plaintiff. Plaintiff should have been free to contact the clerk at any NH courthouse for his case directly.

203.    Plaintiff requested several times to be released from this restriction but she refused, even when it was impeding plaintiff's ability to address matters in his cases. Plaintiff requested that a complaint of discrimination based on race and based on having raised concerns about race discrimination in 2021, which is what resulted in her taking over to prohibit plaintiff from contacting the court clerk office directly, be referred to the chief judge but she refused to do so. She instead tried to direct plaintiff to go to the NH Administrative Office of the Courts.

### Tyler Technologies Inc.

204.    Tyler has engaged in negligence and a breach of duty or care.

205.    Tyler's actions or inactions has resulted in harm to me because it has prevented or impeded the plaintiff's ability to comply with the NHSC requirements.

### PCC, ADO and AGO

206.    The ADO, the PCC and AGO have violated ADA by failing to comply with the ADA when plaintiff requested accommodations under the ADA with respect to remote access to the ADO records since 2020. The ADO and PCC have worked in collaboration with each other to orchestrate a concerted effort to deprive the plaintiff of reasonable accommodation under the ADA in order to restrict access to records that plaintiff is entitled to, under the right-to-know law and under the state's constitutional right to public access. The plaintiff provided medical information to these entities to support his request for accommodation but these entities have played games for years seeking to run out the clock to allow the hostile party to seek maneuvers to block the plaintiff from obtaining the records. These entities have sought to set up barriers to the plaintiff obtaining ADA accommodations and ultimately the requested records. These three entities have worked, behind the scenes with the hostile individual party (an attorney Craig

Donais with his counsel Russell Hilliard) whose records were sought, to frustrate and deprive plaintiff's ADA requests for accommodation.

207.    They have also worked with the NHSC, the administrative office of the courts and the rules committee to effectuate an elaborate scheme to deprive the plaintiff of his right to ADA accommodation in order to block the plaintiff's access to the requested public records.

**Rules Committee**

208.    The NH judicial branch and Donovan engaged in disparate treatment of the plaintiffs in public rules committee meetings by doing the following:

209.    The NH judicial branch and Donovan squelched plaintiff's speech in rule meeting, cut off time.

210.    The NH judicial branch and Donovan didn't allow Bisasor to speak when others are allowed to speak.

211.    The NH branch and Donovan wrongly and unfairly conflated Bisasor and his wife Anderson as the same person.

212.    The NH judicial branch and Donovan publicly chided Bisasor for his wife Anderson.

213.    The NH branch and Donovan allow others to file comments right before meeting, block or chide Bisasor for it

214.    The NH judicial branch and Donovan allow extension on reconsideration for others not me

215.    The NH judicial branch and Donovan allow word limit excess for others not me

216.    The NH judicial branch and Donovan allow mitigation for others by same medical condition (see Mesmer case) but not for plaintiffs.

217.    The NH judicial branch and Donovan allowed accommodation for surgery for others but not for plaintiffs.

218.    The NH judicial branch and Donovan denied ADA requests even when assented to by defendants.

219.    The NH judicial branch and Donovan changed the rules of the court.

220.    The NH judicial branch and Donovan changed the rules about contacting affected parties.

221.    The NH judicial branch and Donovan changed rule about remote participation.

222.    The NH judicial branch and Donovan changed rule about speaking time limit.

223.    The NH judicial branch and Donovan changed policy to prevent plaintiffs from copying ADO records.

224.    The NH judicial branch and Donovan changed policy to prevent plaintiffs from getting copies ADO correspondence with public.

225.    The NH judicial branch and Donovan changed rule so that plaintiff cannot get copies of ADO files.

226.    The NH judicial branch ignored or circumvented the law.

227.    The NH judicial branch and Donovan did not adhere to its own policy.

228.    The NH judicial branch and Donovan does not follow its own rules.

229.    The NH judicial branch and Donovan engaged in selective enforcement of rules.

230.    The NH judicial branch and Donovan engaged in stereotyping of plaintiffs me i.e. that plaintiffs are seeking ADO files to cause trouble.

231.    Hilliard stereotypes plaintiffs and then the NH judicial branch and Donovan adopts the stereotype of the plaintiffs to the prejudice of the plaintiffs.

232.    Two of the five Justices on the NHSC have recused themselves from Plaintiff's case due to conflicts of interest, leaving only three Justices to hear the appeal. The remaining Justices, particularly Justice Patrick Donovan, have demonstrated clear bias against Plaintiff.

233.    The NH judicial branch changed rule to allow single justice to rule on reconsideration

234.    The NH judicial branch and Donovan allowed 3rd party to take over the case.

235.    The NH judicial branch and Donovan allow others, including a former client of Craig Donais, to enter as a party on an appeal, without representation and without filing for intervention.

**AMERICANS WITH DISABILITIES ACT**

**Purpose of the ADA/ Operation of the ADA**

236.    As a disability accommodation request, an extension of time is an accommodation that prevents discrimination against those with disabilities so that they are not disadvantaged or prejudiced in court

16

proceedings. The right to not be so prejudiced, discriminated against, disadvantaged or harmed because of a disability is a fundamental basic right under the law including the fourteenth amendment of the constitution and the Rehabilitation Act of 1973, the ADA and the court's own policy. It should be noted that my ADA issues should be broadly construed under the ADA and other courts have in fact construed my ADA issues broadly as shown by the NH superior court order, as was attached as an exhibit to my original ADA request-related filings.

237.    Title II's requirement of program accessibility, is congruent and proportional to its object of enforcing the right of access to the courts. The unequal treatment of disabled persons in the administration of judicial services has a long history, and has persisted despite several legislative efforts to remedy the problem of disability discrimination.

238.    A failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion. This duty to accommodate is perfectly consistent with the well-established due process principle that, "within the limits of practicability, a State must afford to all individuals a meaningful opportunity to be heard" in its courts. Boddie, 401 U.S., at 379.

239.    Title II seeks to enforce this prohibition on irrational disability discrimination. But it also seeks to enforce a variety of other basic constitutional guarantees, infringements of which are subject to more searching judicial review. See, e.g., Dunn v. Blumstein, 405 U.S. 330, 336—337 (1972); Shapiro v. Thompson, 394 U.S. 618, 634 (1969); Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 541 (1942). These rights include some, like the right of access to the courts at issue in this case, that are protected by the Due Process Clause of the Fourteenth Amendment.

240.    Individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society." 42 U.S.C. § 12101(a)(7).

241.    Invoking "the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce," the ADA is designed "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." §§12101(b)(1), (b)(4).

242.    The standard, under these circumstances of an ADA request, is not simply inability to complete the brief. The standard is does Plaintiff have a disability and does it require accommodation at all. The answer based on the medical records, showing impairment, is affirmative. Thus, the court must ignore intervenor's attempt to shift focus away from the requirements of the ADA.

243.    Plaintiff has been undergoing treatment during the past weeks, which is part of what Plaintiff's doctors stated (i.e., at least 10 weeks) is needed for Plaintiff to be able to participate in court proceedings. This is the regimen/recommendation that Plaintiff's doctors have stated is necessary for Plaintiff's health.

244.    By having to engage in litigation around his ADA requests, Plaintiff has been harmed/injured. All of this depletes energy and resources. Plaintiff isn't superhuman. Plaintiff has used up his energy while he still is undergoing treatment; this burdensome ADA process has interfered with Plaintiff's treatment/health.

245.    The effects of a person's disabilities will continue to affect a person even after it is reported or treatment begins. This reflects a misunderstanding about disabilities by the intervenor; rather than an indictment, it adds grounds for needed accommodation.

246.    This court has not dismissed similarly situated appeals where there was a pending ADA request before the relevant deadline and where the party did not abandon the appeal or clearly slacked off on their obligations.

247.    The bottom line is that dismissal of this appeal would be grossly unjust. Moreover, Plaintiff implores the court to not elevate form over substance.

248.    This court has consistently emphasized the importance of deciding cases on their merits rather than dismissing them on procedural or technical grounds or by the rigid application of procedural rules. See American Express Travel v. Moskoff, 148 N.H. 446, 450 (2002)("It is important that cases be decided on

their merits, that a party have his day in court and that rules of practice and procedure shall be tools in aid of the promotion of justice rather than barriers and traps for its denial." Douglas v. Douglas, 143 N.H. ___, ___, 728 A.2d 215, 219 (1999).").

249.    It is still worthy of note that the named defendants, who are main parties, have not opposed the relief requested by Plaintiff but in fact assented to it.

250.    NB: Plaintiff is up against the power of the state, with the NH Attorney General's ("AG") office making arguments on the merits, and Plaintiff has to take on both the AG and multiple other attorneys including from the ADO/PCC, comprised of lawyers, as well as the intervenor/his counsel, both lawyers, with support of both their law firms. Ostensibly, there are at least 7-8 lawyers involved in this case.

251.    Plaintiff's ADA request for extension is made in good faith.

252.    The ADA is a bridge to ensure that justice is accessible to all, regardless of ability.

### E. Proof of disability

253.    Plaintiff provided proof of his disabilities by way of medical information and medical documentation/records from his medical providers. The ADA indicates that appropriate documentation for a requested accommodation includes a letter from a doctor. See Petition of Rubenstein, 637 A.2d 1131, 1137 (Del. 1994) ("The ADA Handbook suggests that appropriate documentation for a requested accommodation "might include a letter from a physician or other professional." Id.").

254.    Plaintiff also provided confirmation of disability via another form of certification, which the date on the certification and the certification itself, indicates both proof of disability and substantial impairment. NB: The ADA regulations state that such certification constitutes evidence of disability.

255.    By finding that the medical documentation was confidential, this court found that it was valid medical information/documentation. The court would be hard-pressed to now state that although it was convinced that the medical records are confidential, it's still somehow not convinced that the records are valid. This is also supported by the extended deliberation process that the court set in motion. If there wasn't at least a prima facie case of validity of the ADA request, then why would the court go through the charade of an extended process when it already knows it thinks the records are not valid? Why not simply deny the 9-4-24 ADA documentation as insufficient or unpersuasive on 9-4-24, in similar fashion to the initial ADA request?

256.    Other courts including the NH superior court has found that Plaintiff has disabilities. The NH Superior Court and the ADA office of the NH Judicial Branch were privy to/involved with that accommodation request process. Thus, the NH Judicial Branch has regarded plaintiff as having disabilities warranting at least 10 weeks of reasonable accommodation to be excused from court obligations during this time period in order safeguard Plaintiff's health. The fact that other courts such as the NH superior court and the MA appeals court have granted reasonable accommodation to Plaintiff for the same issues presented to this court, means that Plaintiff has been 'regarded as' having these disabilities, and is to be, at a minimum, so treated by this court, under "the regarded as" prong of the ADA.

257.    This court has also previously regarded Plaintiff as having disabilities necessitating remote attendance at hearings (i.e., advisory rules committee hearings, etc.).

258.    The above constitutes proof of disability under the ADA, which also is unrebutted.

### F. Substantial Limitation

259.    Plaintiff's disability/impairment is further established by the "10 weeks" and/or "2 months" timeframe that his doctors indicated for his reasonable accommodation and for treatment/further evaluation. This shows substantial limitation by the impairment. Similarly, the doctor's diagnosis of Plaintiff's conditions as "severe" further indicates substantial limitation.

260.    Plaintiff's doctors didn't offer mere diagnosis but went further to describe the impact on Plaintiff's major life activities, and even further recommended accommodation of about a two-month time period to evaluate/treat multiple conditions, without which it was warned that there'd be severe consequences for Plaintiff's health. This proves both disability and substantial impairment.

### G. Accommodation Reasonable

261.    34. Title II applies to courts including state supreme courts. Petition of Rubenstein, 637 A.2d 1131, 1136 (Del. 1994) ("The Board, as an instrumentality of this Court, constitutes a public entity within the meaning of Title II. See 42 U.S.C.A. § 12131(1)").

262.    A court, such as this one, must make reasonable modifications to standard administrative or other operating procedures that results in the de facto exclusion of persons with disabilities. See Petition of Rubenstein, 637 A.2d 1131, 1136 (Del. 1994) ("As a public entity, the [court] must make reasonable accommodations to prevent the de facto exclusion "which may occur when disabled but otherwise qualified individuals are limited by standard administrative or other operating procedures....""").

263.    ADA regulations provide that additional time is a specific accommodation envisioned by the ADA, in order to place persons with disabilities on equal footing. Petition of Rubenstein, 637 A.2d 1131, 1137 (Del. 1994) ("The regulations…specifically state that "[r]equired modifications…may include changes in the length of time..." 28 C.F.R. § 36.309(b)(2)…."The regulations implementing the ADA recognize additional time…as one of the specific accommodations"). See also D'Amico v. New York State Bd. of Law Examiners, 813 F.Supp. at 221("The purpose of the ADA "is to place those with disabilities on an equal footing..."").

264.    Plaintiff's request for accommodation is thus reasonable under the ADA.

265.    The court's own ADA policy, on page 1 of its FAQs page, states that "Eligibility requirements for participation in court programs must not unnecessarily exclude persons with disabilities…". Plaintiff's conditions clearly meet eligibility requirements for disabilities under the ADA. Moreover, the accommodation of time requested wouldn't result in a fundamental alteration in the nature of a service, program, or activity of the court. An extension of time is a recognized legitimate type of accommodation that's allowable under the ADA and that's been recognized and allowed by this court. For example, on page 1 of the court's ADA FAQs page, it states that common accommodations by the court include "modification of court procedures, such as allowing remote appearances and extensions of time for filing papers." That means this is an already accepted category of relief allowable by this court. Hence, there's no fundamental alteration to the nature of the court, by granting extension of time to file documents. The only issue is the appropriate length of time for extension but the medical records indicate objective basis for the time accommodation.

266.    The court's ADA policy states that: *"The court will give primary consideration to the request of the individual but may offer an alternative accommodation that allows the individual to effectively participate."* Plaintiff requested accommodation of 60 days extension of time to file brief, supported by Plaintiff's doctors recommendations.

### H. Plaintiffs' Prior And Current ADA Requests Shouldn't Be Denied

267.    The plaintiffs' ADA requests shouldn't be denied. There is no logical basis to deny the ADA requests.

268.    Other courts have said that the decisions regarding an ADA request, even by a court/judicial body, must be consistent with a logical and orderly deductive process. See Petition of Rubenstein, 637 A.2d 1131, 1138 (Del. 1994) ("the Board's ultimate decision does not reflect that it was the product of an orderly and logical deductive process. In re Green, 464 A.2d at 887. ").

269.    See also Accord Petition of Nenno, Del.Supr., 472 A.2d 815, 818 (1983) (Board's decision must be supported by substantial evidence).

270.    See again Petition of Rubenstein, 637 A.2d 1131, 1139 (Del. 1994) ("the Board's decision to deny Rubenstein any additional time…was not supported by the record. That decision was not the product of a logical deductive reasoning process and was manifestly unfair to Rubenstein.").

271.    Plaintiff's ADA request should not have been denied. If the court was going to deny it, it should've denied it on 9-4-24, so that Plaintiff could know where things stood before the passing of the 9-6-24 deadline. And if the court was going to deny it, then why prolong the process as of 9-4-24 and then hide the intent to do so, from Plaintiff, while engaging this extended process, divulging medical records and giving 10 days for more input?

19

272.    It was a cruel game for the court to go through all of this, only to deny the ADA requests, at the end of it. It was misleading to let Plaintiff think he had a chance to obtain accommodation pursuant to his ADA request (i.e., the only reason to give more time (i.e., 10 days) for input from other parties is because the NHSC must have been convinced that the medical documentation proved Plaintiff had a disability and the NHSC was inclined to treat Plaintiff's ADA request as valid, warranting accommodation.)

273.    There are at least 4 courts that granted reasonable accommodation including the NH superior court, NH federal court, MA superior court, and MA appeals court. The NHSC is the only court that hasn't granted the reasonable accommodation, thus far. This further demonstrates that the ADA requests shouldn't have been denied.

## Unfair Burdensome Process/Extensive Demanding Analysis

274.    To allow a person with proven disabilities to be subjected to the above by a hostile party is outrageous. It is simply inhumane.

275.    The hostile opposing intervenor shouldn't have been allowed to try to scandalize, oppress, beat down on plaintiff for seeking ADA accommodation, using his attacks for tactical advantage to try to obtain dismissal, and to essentially mock/scoff at plaintiff Bisasor's disabilities, subjecting him to emotional distress/harassing personal attacks. In fact, the NHSC has not protected plaintiff from wanton gratuitous attacks by the opposing intervenor in the appeal. In fact, the NHSC, by creating an extended process of input and by allowing the opposing intervenor multiple opportunities to object to plaintiff's ADA requests, has effectively given a signal to the opposing intervenor to go after plaintiff, by stating, after the passing of the relevant deadline, that dismissal is possible if the ADA request is not granted, which warning was never given prior to the deadline but only after it had passed, thus ensuring that it was too late for plaintiff to do anything about it. This appeared to be a signal by the court to the opposing intervenor to just give the NHSC something to use to deny the ADA request and the case will be dismissed. It was effectively declaring 'open season" on plaintiff Bisasor and it was a de facto invitation by the court for the opposing intervenor to seek to go on the attack against plaintiff Bisasor because he dared to seek ADA accommodation. This effectively encourages harassing gratuitous attacks by the opposing intervenor and the opposing intervenor has took advantage.  Thus, the NHSC has provided no protection for plaintiff Bisasor as one who has disabilities and as one who has sought accommodation under the ADA.

276.    It might be difficult to see the unseemly discriminatory nature of allowing this to happen because persons with disabilities are often not seen or treated as a real protected class and the ADA is often not treated seriously or as involving real discrimination issues or harm. But in any other context of discrimination, whether race, gender, LGBT, or sexual harassment, etc., the opposing side would not be allowed to run roughshod over the protected class person to publicly try to humiliate them regarding their injuries or their medical records. Imagine if a sexual assault victim was subjected to this. The NHSC should not have turned over plaintiff's medical records (nor mine for that matter) to the opposing parties when a) the defendants themselves did not want to see them and they had already agreed to the accommodation of an extension , b) the medical records were provided to the court under seal ex parte in order to provide medical proof/documentation of disabilities and  c) the court had adequate information to grant the plaintiff's ADA request as of 9-4-24, prior to the passing of the relevant deadline.

277.    The fact that the NHSC prolonged the process further in order to give the opposing intervenor a second opportunity to object to the Plaintiff's ADA request, and then effectively invited the intervenor to "go gunning" for a possible dismissal, created a harmful perverse incentive where the opposing intervenor could now fervently seek outright dismissal of the case (which he has now done) by attacking plaintiff's ADA requests or his disabilities, without any real proof that plaintiff is not a person with disabilities or that his ADA requests are not valid.

278.    Further, by invoking a possible retroactive dismissal, the NHSC created a process that has effectively converted a basic ADA accommodation process into a convoluted motion to dismiss (dispositive) process. This should not have been allowed. So instead of addressing the ADA request under the ADA in the normal course under the protections of the ADA, the NHSC has instead created a de facto motion to dismiss situation, without proper prior notice to plaintiff before the passing of the relevant deadline. This is a gross

injustice. Moreover, in order to dismiss a case, a hearing should be first held in order to provide due process, or a proper opportunity for briefing on the dismissal issues should be provided. That has not been provided in the circuitous unclear cumbersome process so far. If the determination of the ADA request is linked to a possible dismissal, then due process requires notice and a hearing.

279.    Similarly, by allowing the deadline to pass without ruling on the ADA request and by allowing the intervenor a second opportunity to object to the ADA request, the court set in motion a process where the process was prolonged and that if/when plaintiff responds to any objection by intervenor, or otherwise seeks any supporting relief during that prolonged process, the opposing intervenor could use it against him, retroactively, to say he was not disabled as of the relevant deadline. The court set this process in motion, subjecting plaintiff to these unseemly unfair dynamics.

280.    The NHSC refused to protect plaintiff, under the protections of the ADA.

281.    The NHSC has constantly move the goalpost, making it impossible to hit the target or criteria.

282.    First the NHSC said it was denied for insufficient documentation. Then when plaintiff provided sufficient documentation, the NHSC changed the criteria to something else, including that the plaintiff provided too ADA documentation/filings in response to the NHSC's orders, that plaintiff missed the deadline while awaiting the NHSC's ruling, and that plaintiff's disabilities can act up at any time and so plaintiff should not be accommodated for disabilities thar are permanent or ongoing.

## ADA Requirements for Courts

283.    The Americans with Disabilities Act requires courts to provide reasonable accommodations for individuals with disabilities to ensure equal access to court proceedings2. This includes making modifications to rules, policies, or practices when necessary to accommodate a person's disability.

284.    The ADA emphasizes that courts should focus on whether they have complied with their obligations to provide accommodations, rather than extensively analyzing whether an individual meets the definition of disability. The primary consideration should be honoring the individual's choice of accommodation unless it would result in a fundamental alteration or undue burden.

285.    There is recognition in federal courts that disabilities may impact litigation timelines. For instance, one case mentions that stress can exacerbate cognitive problems affecting memory, processing speed, and other functions relevant to legal proceedings for some individuals with disabilities.

286.    Courts have ruled that in "regarded as" cases, only medical evidence known to the employer at the time of the alleged discrimination is relevant. Additional medical records obtained later cannot be used to justify the employer's actions after the fact.

287.    The ADA applies to all aspects of the judicial process, including preparation of legal arguments. See Tennessee v. Lane, 541 U.S. 509 (2004) (holding that Title II of the ADA applies to state judicial services).

---

# CONFIDENTIALITY

---

## VIOLATING ADA CONFIDENTIALITY
## LEGAL BASIS

288.    The ADA mandates strict confidentiality of medical information obtained in connection with ADA accommodations (42 U.S.C. § 12112(d)(3)(B)).

289.    Title II of the ADA applies to state and local courts and requires them to provide accommodations to ensure equal access to court services, programs, and activities for individuals with disabilities.

290.    Courts have recognized the need to protect the privacy of litigants' medical information in ADA contexts (Doe v. Deer Mountain Day Camp, Inc., 682 F. Supp. 2d 324 (S.D.N.Y. 2010)).

291.    The confidentiality requirements under Title I of the ADA for employers provide a useful analogy for how courts should handle such information, requiring that medical records be kept separate and confidential.

292.    Disclosure of medical records obtained through the ADA modification process is prohibited by the ADA and the Rehabilitation Act.

a) See 42 U.S.C. § 12112 ("B) information obtained regarding the medical condition or history…is treated as a confidential medical record").

b) See also 29 U.S.C. § 791 ("(9) Ensure that agencies' systems of recordkeeping track the processing of requests for reasonable accommodation and maintain the confidentiality of medical information received in accordance with applicable law and regulations").

c) See McCarthy v. Brennan, 230 F. Supp. 3d 1049, 1066-67 (N.D. Cal. 2017) ("Some courts have found actionable violations of disability-related disclosure laws").

d) See also Franklin , 936 F.Supp.2d at 711 ("confidential disclosure claim is most typically asserted by a plaintiff as part of a more general disability discrimination lawsuit.").

e) See In re Nat'l Hockey League Players' Concussion Injury Litig. , 120 F.Supp.3d 942, 950 (D. Minn. 2015)(citing "tangible injury" for the purposes of an improper disclosure claim.)

f) See Franklin , 936 F.Supp.2d at 711 (noting success on a Section 12112(d) disclosure claim through obtaining medical information through a disability-related inquiry).

293.    Doe v. U.S. Postal Service, 317 F.3d 339, 344 (D.C. Cir. 2003) states:

"Doe revealed his medical diagnosis to the Postal Service only after the Service, through his direct supervisor, told him in writing that he would face disciplinary proceedings unless he completed either the FMLA form or a medical certificate explaining "the nature of [his] illness." Even if Doe can be said to have submitted the FMLA request voluntarily, as the district court found and the Postal Service now insists, that hardly means he volunteered his medical diagnosis. The Postal Service conditioned Doe's receipt of FMLA leave on his submission of supporting medical documentation, as the FMLA authorized it to do. See 29 U.S.C. § 2613(a), (b)(3). It was thus the Postal Service, acting pursuant to this statutory authorization, not Doe, that initiated the inquiry into his medical condition by asking for this medical certification. It is true, as the Postal Service suggests, that Doe could have avoided disclosing his medical condition by forgoing his statutory entitlement to FMLA leave. If accepted, however, that view would force employees to choose between waiving their right to avoid being publicly identified as having a disability and exercising their statutory rights — including the rights to FMLA leave and to "reasonable accommodations" for their disabilities, see 42 U.S.C. § 12112(b)(5)(A) — that may depend on disclosure of their medical conditions. Such a result would run directly counter to Congress's purpose in enacting the ADA, which was, at least in part, to permit employers to inquire into employees' medical conditions in order to provide reasonable accommodations, while avoiding subjecting employees to the "blatant and subtle stigma" that attaches to "being identified as disabled." H.R. REP. No. 101-485, pt. 2, at 75 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 357-58; see also 29 C.F.R. pt. 1630 app. (section 12112(d) and accompanying regulations "permit employers . . . to make inquiries or require medical examinations necessary to the reasonable accommodation process"). Section 12112(d)'s confidentiality requirement balances these two competing interests by ensuring that the information disclosed pursuant to an employer's medical inquiry spreads no farther than necessary to satisfy the legitimate needs of both employer and employee. **The Postal Service's theory would destroy that balance, returning employees to the very bind Congress sought to avoid by enacting the confidentiality requirement.**"

294.    The US Supreme Court has generally interpreted the ADA broadly to provide comprehensive protection for individuals with disabilities. This broad interpretation extends to protecting the confidentiality of medical information in court proceedings. Courts have recognized the importance of confidentiality in ADA cases.

295.    The ADA requires that medical information obtained by covered entities be kept confidential. This suggests that courts should take reasonable steps to protect the privacy of medical information submitted as part of ADA accommodation requests.

296.    Maintaining the confidentiality of medical information is considered part of the ADA request process. Sealing sensitive medical information is a common practice under the ADA.

297.    Disclosing an individual's disability or medical condition is considered to be discrimination, which the ADA aims to prevent.

298.    The ADA generally requires that medical information obtained during the accommodation process be kept confidential and maintained in separate files.

299.    Forcing disclosure of private medical details to a third party violates this confidentiality requirement.

300.    Also, the court's ADA policy provides for confidentiality of medical records/information. This policy or administrative rule can be found on Page 5 of the NH Judicial Branch ADA handbook which states "Medical documents acquired through the process of requesting a modification should not be made part of the public court files". This ADA policy operates as an administrative rule of the court. See N.H. Sup. Ct. R. 12(1)(b)(5)("…records of cases that are confidential by statute, administrative or court rule, or court order.").

301.    The ADA requires courts to engage in an interactive process to determine reasonable accommodations. Forcing withdrawal of an accommodation request disrupts this mandated process.

## Further Argument Pertaining Confidentiality

302.    Disclosure of plaintiffs' confidential medical information to other parties in the case potentially stigmatizes the Plaintiffs and infringe upon plaintiffs' right to privacy regarding medical conditions and attendant medical records.

303.    Maintaining this information ex parte is necessary to preserve the plaintiff's privacy rights and encourage individuals to seek necessary accommodations without fear of public exposure of their medical information.

304.    The plaintiff's interest in privacy outweighs any interest other parties may have in accessing these specific medical records.

305.    It is not necessary to share the information with the other parties. The defendants have indicated that they do not need to see the information and in fact assented to the requested ADA accommodation. The defendants have not objected to the relief requested.

306.    The NHSC didn't and doesn't have to divulge medical records to other parties. Plaintiff requested the medical records be kept ex parte from "all" other parties.

307.    The disclosure of plaintiff's confidential medical information impairs the privacy interests attached thereto, as it contained private medical information that plaintiff did not want disclosed (as that would be prejudicial to him). Plaintiff wanted to protect his HIPAA rights of privacy and plaintiff should not have to sacrifice his medical information privacy in order to get relief under the ADA. Moreover, medical records are presumptively confidential. Similarly, it would be both unfair as well a violation of plaintiff rights under the ADA if, on the one hand, the NHSC deems plaintiff ADA request insufficient because of lack of medical documentation, but then, on the other hand, bars plaintiff from protecting the confidentiality of such medical documentation if submitted under the ADA via ex parte sealing.

308.    Plaintiff didn't want to share any confidential medical information with other parties, in particular the opposing intervenor who is contentious and will misuse plaintiff's private HIPAA medical information and who is a hostile party who is a belligerent adversary in other current litigation.

309.    Grounds to keep the records ex parte includes the fact of the extremely sensitive nature of plaintiff's records, of plaintiff's spouse and another non-party including that of a minor. This fact alone should've caused the court to, at a minimum, consider allowing redaction of records of plaintiff and of the non-party minor. Other grounds for keeping the records ex parte is the fact defendants indicated that they didn't need to see the records, and that defendants assented to this extension request. This goes towards the fact the NHSC could have kept the records ex parte. There was no need for any other party to see the medical records, as that wouldn't change the facts or analysis regarding whether plaintiff had a disability or is entitled to reasonable accommodation as a matter of law.

310.    The opposing intervenor is a hostile party. The opposing intervenor is not an employee of the NHSC. The opposing intervenor has no ability to evaluate plaintiff's medical conditions/disabilities. The NHSC is the only entity that can determine if plaintiff meets the definition of having a disability or whether the requested accommodation is reasonable or should be allowed. The defendants have already weighed-in and indicated their assent.

## Example of Why Ex Parte Sealing Should Be Not Be Divulged

311.    The medical information is sensitive. The disclosure of this information exposes plaintiff to harm/injury.

312.    The opposing intervenor has bad motives. He will find a way to misuse and disclose the information to others or publicly.

313.    Sharing medical information with other parties against the consent of plaintiff has harmed/will harm the plaintiff and the plaintiff's spouse. It subjects plaintiff to stigmatizing conduct by hostile parties. A clever lawyer can manipulate the rules and the system to obtain a perverse result using his knowledge of the most private sensitive medical details of the plaintiff. This has already began to happen in the appeal. The intervenor has engaged in hostile attacks on the plaintiff, using insinuations and innuendo without really showing anything. It is meant to taunt and heap scandalization on the plaintiff.

314.    In the appeal, the NHSC previously disclosed medical records to other parties against plaintiff's consent. This was a violation of the ADA.

315.    The NHSC orchestrated a Hobson's choice, depriving plaintiff of any real choice and thus depriving him of his rights.

### Harm From Violation of Privacy In Related Appeal

316.    The NHSC hasn't adequately protected the privacy of medical documentation provided by plaintiff as part of the ADA accommodation process, in the related appeal.

317.    The NHSC hasn't ordered other parties, in particular the intervenor, to maintain confidentiality of any sealed matters they become privy to. This point is highlighted by the fact that the intervenor stated in his 9-19-24 response that he may comment on medical information at a later time, without any indication that it'll be under seal. The cavalier carelessness afforded plaintiff's medical information is evident in the single justice's 9-13-24 ruling.

318.    Material harm was suffered by plaintiff (and plaintiff's spouse), in having confidential private/sensitive medical information, including actual medical records, immediately divulged to other parties based on the single justice's 9-13-24 order, which also ignored requests to redact or resubmit medical information. Why subject plaintiff (and plaintiff's spouse), to that harm and then subject him to dismissal too? No matter what was done, plaintiff could/would be "screwed." The lesson here seemed to be that plaintiff shouldn't seek to obtain ADA accommodation from the NHSC, because he will be set up to be punished with retroactive dismissal before even knowing if the NHSC, granted his ADA request.

319.    If every person with disabilities will have their case subject to dismissal, before an ADA request is even decided, even when the NHSC requests medical documentation from such persons, then that represents a significant systemic violation of the ADA, to the point where it cries out for federal intervention to enjoin the NHSC from systemically undermining Congress' objectives in enacting the ADA. Moreover, if it's the case that the NHSC intends to make this the modus operandi for itself and all NH courts, then adequate notice should be given to persons with disabilities seeking ADA accommodations, that their cases will be retroactively dismissed if they dare to seek ADA accommodations and it's not granted.

320.    The 9-4-24 order violated plaintiff's ADA rights by forcing him to give up his ADA request and effectively forego seeking ADA relief entirely, OR otherwise forcing plaintiff to agree to violate his own private medical HIPPA-protected information, that of plaintiff's spouse and another non-party. In forcing plaintiff's to engage in this Hobson's choice, the NHSC not only violated the ADA but also the NHSC's own ADA policy.

321.    The NHSC then ruled against plaintiff's 9-6-24 motion to reconsider/clarify wherein he sought a less drastic alternative to the draconian Hobson's choice, namely to redact or resubmit medical documentation so that the private sensitive medical records pertaining to plaintiff, his spouse and another non-party, could be removed from view by intervenor/other parties. But this reasonable request was evidently ignored/denied.

322.    It is highly unusual and improper for the NHSC to require a person with disabilities to either withdraw their ADA accommodation request or have their private medical information revealed to a non-party interested citizen who is an intervenor. This type of requirement raises serious concerns about potential ADA violations for several reasons.

323.    Requiring someone to choose between their right to seek an accommodation and their medical privacy places an undue burden on individuals with disabilities trying to access the courts. Such a policy could deter people with disabilities from requesting needed accommodations out of fear of privacy violations. This situation appears to deviate significantly from normal ADA accommodation practices and legal requirements

324.    The NHSC didn't have to divulge medical records to other parties. Notwithstanding the court's reframing this as merely a quibble about divulging records to defendants versus the intervenor, and that the intervenor is a full party entitled to disclosure just like defendants, it sidestepped the fact plaintiff requested the medical records be kept ex parte from "all" other parties and that there are sufficient grounds to keep the records ex parte including the extremely sensitive nature of plaintiff's records, his spouse's and another non-party. This fact alone should've caused the NHSC to, at a minimum, consider allowing redaction of records of plaintiff and of another non-party. Other grounds for keeping the records ex parte is the fact defendants indicated that they didn't need to see the records and that defendants assented to this extension request. This goes towards the fact the NHSC could've kept the records sealed ex parte. There was no need for any other party to see the medical records, as that wouldn't change the facts or analysis regarding whether plaintiff has a disability or is entitled to reasonable accommodation as a matter of law.

325.    The NHSC should've kept the records ex parte on grounds that the opposing intervenor already objected to the first ADA request. By re-styling the 9-4-24 medical explanation/documentation, as a renewed request for extension of time, the court re-styled the initial ADA request, as a second request to extend time, to be objected to again by the opposing intervenor. Yet, there was nothing new to really be added to any second objection that wasn't already essentially stated in opposing intervenor's first objection. Unless the court was going to hold evidentiary hearings and/or collect evidentiary materials from intervenor, to rebut plaintiff's medical documentation and statements of plaintiff's doctors (via expert testimony), then it was unnecessary/gratuitous to give the opposing intervenor another opportunity to object to plaintiff's ADA request. And if this elaborate adversarial evidentiary process is what NHSC intended, then it'd be like opening up a federal "murder" case (proverbially) for such a simple ADA request, so much so that it'd show deep-seated bias/discrimination. Either way, the NHSC had enough information/documentation on 9-4-24 to grant the ADA request without further delay/complication. That NHSC chose to subject plaintiff to this harmful circuitous unnecessarily complicated process indicates something is amiss and establishes the 9-13-24 order was erroneously violative of the ADA and of plaintiffs constitutional right to due process. The NHSC also violated the ADA's requirement that ADA requests not be subject to extensive or demanding analysis or burdensome process.

## CREATING HOBSON'S CHOICE TO DISSUADE ADA REQUESTS

326.    It is highly unusual and improper for the NHSC to require a person with disabilities to either withdraw their ADA accommodation request or have their private medical information revealed to a non-party interested citizen. This type of requirement raises serious concerns about ADA violations for several reasons:

327.    The ADA generally requires that medical information obtained during the accommodation process be kept confidential and maintained in separate files

328.    Forcing disclosure of private medical details to an uninvolved third party would likely violate this confidentiality requirement.

329.    Interactive process: The ADA requires employers (and by extension, courts) to engage in an interactive process to determine reasonable accommodations. Forcing withdrawal of an accommodation request disrupts this mandated process

330.    Undue burden: Requiring someone to choose between their right to seek an accommodation and their medical privacy places an undue burden on individuals with disabilities trying to access the courts.

331.    Chilling effect: Such a policy deters people with disabilities from requesting needed accommodations out of fear of privacy violations.

332.    Deviation from standard practice: Typical accommodation procedures involve confidential review by designated ADA coordinators or HR personnel, not disclosure to other parties.

333.    The ADA consistently emphasizes the importance of properly handling accommodation requests and maintaining confidentiality in the process. The situation above deviates significantly from normal ADA accommodation practices and legal requirements, and represents a serious violation of rights under the ADA, and requires federal court intervention secure and protect the individual's rights to both accommodation and medical privacy.

334.    The NHSC forced the disclosure of private medical information:

335.    Potential violation of HIPAA: The Health Insurance Portability and Accountability Act (HIPAA) sets strict standards for protecting patient privacy and confidentiality of medical records. Forcing disclosure of private medical information without proper authorization violates HIPAA regulations.

336.    Conflict with state privacy laws: New Hampshire, like many states, has laws protecting the confidentiality of medical information. Forced disclosure may conflict with these state-level protections

337.    Potential ADA violations: Since the disclosure is related to an ADA accommodation request, forced revelation of medical details violates the ADA's confidentiality requirements for medical information obtained during the accommodation process.

338.    Chilling effect on healthcare: Such a precedent discourages individuals from seeking medical care or being fully transparent with healthcare providers out of fear that their private information could be disclosed.

339.    Erosion of public trust: Forced disclosure of medical information by the state's highest court undermines public trust in the judicial system and healthcare privacy protections.

340.    Precedent-setting concerns: Such a decision could set a troubling precedent, potentially leading to broader erosion of medical privacy protections in future cases.

341.    Given these implications, it is highly unusual and legally problematic for the NHSC to force disclosure of private medical information, especially related to an ADA accommodation request. Such action should face significant legal scrutiny by federal courts.

## DISCOURAGEMENT OF SEEKING ADA ACCOMMODATIONS

342.    An administrative body may not overrule specific statutory language and defy statutory intent by creating regulations which subvert the statute and the intent of the Legislature. As this Court has explained, deference is not abdication. Nuclear Metals, Inc. v. Low–Level Radioactive Waste Mgt. Bd., 421 Mass. 196, 211 (1995), citing Warcewicz v. Department of Envtl. Protection, 410 Mass. 548, 550 (1991). See also BayBank v. Bornhofft, 427 Mass. 571, 577 (1998); Protective Life Ins. Co. v. Sullivan, 425 Mass. 615, 618 (1997).

343.    In their terms and in the predictable effect they have had and will continue to have on the availability of plaintiffs, they reflect at best indifference and at worst outright hostility to the statutory purpose of providing accessibility for disabled persons.

344.    A regulation which permits a single justice to singlehandedly reject an ADA request as inadequate with no further obligation to act, is a regulation which prevents disabled persons qualified for relied under the ADA from receiving the prompt consideration and action on their requests as contemplated by the statute. Extensive delays cannot be reconciled with the goal of ADA. A process which does not respect that concern allows for significant delays in the consideration of ADA petitions and can only discourage such petitions.

345.    By denying the first ADA request, and by not requesting additional information or documentation, and then by setting a 3 business day deadline, the NHSC intended to prevent plaintiffs from seeking accommodation, however cloaked it was at that time. Then the NHSC threatens to divulge to a 3rd party citizen who is not a defendant or a main party, but an interested party who sought to intervene, but who is a crony of the court justices unless the plaintiff withdraws the ADA request. The NHSC effectively then retroactively ruled that because plaintiff did not withdraw the ADA request, the appeal will be dismissed because he did not withdraw the ADA request. This was punishment for seeking accommodations and intended to deter plaintiff from filing ADA requests.

26

346.    Then the NHSC completely unmasked its intentions and denied all ADA requests, struck plaintiff documents from the records, and dismissed one appeal, and effectively permanently barred plaintiff from ever seeking or obtaining ADA accommodations ever again in the NHSC.

347.    Plaintiff is in the unique position of having his doctor verified proven disabilities denied, ignored sidestepped, put aside, and then denied it 3or 4 times, without an interactive process, without a hearing, and denied with no medical basis to do so, while using words in plaintiff's ADA request to mock him, saying since "it can act up at any time", and he cannot be accommodated, and essentially told that he can never seek accommodation again in the courts of NH. Plaintiffs have a permanent future bar on any disability he may have or could develop in the future. Nothing will be considered by the NHSC. The NHSC has become unhinged in its animus towards plaintiff. The plaintiff has 4 other live cases in NH (which are largely related cases), with imminent deadlines impacted by plaintiff's disabilities. It threatens all of them. Plaintiff is in imminent danger of irreparable harm in all cases in NH.

348.    The NH judicial branch has engaged in a comprehensive campaign of discrimination, retaliation and violations of plaintiff's rights.

349.    It has prohibited plaintiff from contacting any trial court in NH. Plaintiff cannot directly call the clerk or clerk staff of any trial court in the state. Plaintiff was told this by NH judicial branch court administrator (Karen Gorham). This is because plaintiff raised concerns about race discrimination in the legal system. Immediately after raising these concerns, plaintiff was contacted by the NH judicial branch and told he was forbidden from speaking to any court staff in any court in NH about his case or cases including any routine matter involving his case or even about filing issues.

350.    This was intended to punish plaintiff for raising concerns about race discrimination in the legal system.

## STEREOTYPING OF DISABILITIES

351.    Again, some of limited ability doesn't mean no disability or no need for accommodation. For example, a blind person may be able to file documents with a court but it doesn't mean that he isn't disabled or doesn't need accommodation. Also, without any accommodation, the coherence and quality of the writings/participation of disabled persons will suffer, and thus they'll be at a disadvantage, not on equal footing. It'd be like forcing a person to compete in a sport, with one hand tied behind their back. They may be able to do some playing of the sport but they'll be at a significant disadvantage and all but guaranteed to lose. See Petition of Rubenstein, 637 A.2d 1131, 1137 (Del. 1994) ("The purpose of the ADA "is to place those with disabilities on an equal footing." D'Amico v. New York State Bd. of Law Examiners, 813 F.Supp. 217, 221 (W.D.N.Y.1993).").

*352.    The above point is supported by ADA regulations, which state: "it is very important for covered entities and their staff to understand that the fact that a person with a disability is able to walk for a short distance does not necessarily contradict a verbal assurance – many people with mobility disabilities can walk, but need their mobility device for longer distances or uneven terrain. This is particularly true for people who lack stamina, have poor balance, or use mobility devices because of respiratory, cardiac, or neurological disabilities." See the credible assurance section of the ADA regulations at: https://www.ada.gov/resources/opdmds/.*

353.    In a reminiscent situation, the MA Disability Rights Center (DRC-MA) sued the Massachusetts parole board because the parole board set up an onerous burdensome process for sick/disabled persons to get medical parole, wherein if such sick/disabled persons don't file a detailed medical parole plan, they can't get medical parole and they die sick in prison. But if they file a detailed medical parole plan, it was used against them that they weren't sick or dying since they could draft such a parole plan. See case Joseph Buckman et. Al. v. Commissioner of Correction, et . al, SJC-12725, 2019. The effect was to dissuade such disabled persons from seeking medical parole. The DRC-MA had to intervene seeking relief on their behalf under the ADA.

354.    Similarly, Plaintiff's spouse (Anderson) has had to seek to intervene in Bisasor's appeal, but she shouldn't have to. Plaintiff should've been afforded a simple process without extensive/demanding analysis. And worse, she was denied intervention, even though intervention was liberally granted and upheld by the hostile intervenor Craig Donais.

355.   Plaintiff's ability to file recent pleadings doesn't preclude the need for accommodation. The ADA recognizes that disabilities may have varying impacts over time and in different contexts (29 C.F.R. § 1630.2(j)(1)(v)).

356.   The NHSC failed to recognize the unpredictable fluid nature of certain disabilities. Moments of productivity don't negate the overall impairment. This portrays a fundamental misunderstanding of how disabilities operate.

357.   As shown by the ADA itself, impairment from a disability degrades ability but doesn't necessarily eliminate ability altogether. The fact there is some ability isn't evidence there is no impairment/disability.

358.   The ADA defines a disability in a way where one doesn't have to be completely disabled but simply suffer some impairment of ability. See Weaving v. City of Hillsboro, 763 F.3d 1106, 1111 (9th Cir. 2014)("An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. 29 C.F.R. § 1630.2(j)(1)(ii).").

359.   29 CFR § 1630.2 provides for broad construction of the ADA and for what it means to have a disability:

   a) "(2) Broad construction. Whether an individual has a record of an impairment that substantially limited a major life activity shall be construed broadly to the maximum extent permitted by the ADA and **should not demand extensive analysis**. An individual will be considered to have a record of a disability if the individual has a history of an impairment that substantially limited one or more major life activities when compared to most people in the general population"

   b) (3)…(i) The principles set forth in paragraphs (j)(1)(i) through (ix) of this section are intended to provide for **more generous coverage** and application of the ADA's prohibition on discrimination through a framework that is predictable, consistent, and workable for all individuals and entities with rights and responsibilities under the ADA as amended. (ii)…Given their inherent nature, these types of impairments will, as a factual matter, virtually always be found to impose a substantial limitation on a major life activity. **Therefore, with respect to these types of impairments, the necessary individualized assessment should be particularly simple and straightforward.**

   c) (iii) In determining whether an individual has a disability under the "actual disability" or "record of" prongs of the definition of disability, **the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve. For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in the major life activity of learning because of the additional time or effort he or she must spend to read, write, or learn compared to most people in the general population.**

   d) (k) (2) Broad construction. **Whether an individual has a record of an impairment that substantially limited a major life activity shall be construed broadly to the maximum extent permitted by the ADA and should not demand extensive analysis.** An individual will be considered to have a record of a disability if the individual has a history of an impairment that substantially limited one or more major life activities when compared to most people in the general population…

360.   These references from ADA law show that plaintiff's ADA request should've been construed broadly/generously, should've been treated in a simple/straightforward manner, and shouldn't have been put through an extensive analysis/process, as it has been, and that a hostile intervenor shouldn't have been allowed multiple chances to object to the ADA request, and shouldn't have been allowed to nitpick, scandalize, oppress, beat down on plaintiff for seeking ADA accommodation, and to essentially mock/scoff at plaintiff's disabilities, subjecting plaintiff to emotional distress/harassing personal attacks. In fact, the court has not protected plaintiff from wanton gratuitous attacks by intervenor. The ADA references an example of someone who may achieve a high level of success, but may nevertheless be substantially limited in the major life activity because of the "additional time or effort he or she must spend to read, write…". In this case, it's error for the NHSC to use recent filings (which primarily are short, simple motions), to determine whether plaintiff is impeded in completing a complex 35-page brief with required appendices containing over a hundred filings with several hundred or 1000's of pages along with 2 lengthy hearing transcripts, all of which must be correctly cited or the brief will be stricken and the appeal dismissed, with no deviation or mistake allowed otherwise the brief will be stricken and appeal dismissed.

361.   These ADA references also show that "the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve." This goes to the heart of what's wrong with the

NHSC's scoffing at Plaintiff's disabilities, insinuating that plaintiff's recent filings long after the brief deadline had passed (outcome achieved) indicate no disability (limitation on major life activity). This is the very opposite of what the ADA states should be used to assess ADA requests.

362. Plaintiff has legitimate disability that hasn't been disproven. There is no medical basis offered to show that plaintiff's doctors are incorrect about plaintiff's disabilities or his need for reasonable accommodations.

363. Plaintiff didn't say he can't do any documents at all. From the beginning, he clearly stated that he can do short simpler documents that don't require extraordinary effort or time because it simply involves describing one's own need for accommodation, which doesn't require extensive legal research, analysis, writing or appendix/transcripts. The NHSC has fallaciously adopted non-sequiturs and strawmen arguments, changing the subject from plaintiff's impairment due to extensive/arduous nature of the brief, to implying that plaintiff cannot file any document at all, which is disingenuous.

364. As stated to the NHSC, a one-page filing, or a short motion, attempting to briefly describe Plaintiff's disabilities and/or any relief related thereto, is in no way comparable to the arduous taxing difficult task of putting together a 35-page brief requiring careful complex legal research/analysis, with thousands of pages of appendix to be cited as the record in the brief, as well as including/citing two lengthy hearings from the lower court. These are apples/oranges; night/day. The NHSC's suggestion otherwise are thus inapposite.

365. Plaintiff's ADA request focused on impediments related to meeting the 8-30-24/9-6-24 deadline. In fact plaintiff stated he could complete the brief by end of October 2024. He just needed a little time to undergo medical care/treatment/recovery to be able to do so. By referencing recent filings (which were made long after the brief deadline has passed and with the assistance of others), it anachronistically applies things being filed now, to the 9-6-24 deadline, a month ago, retroactively. This is totally unseemly and bad faith. It is sleight-of-hand tricky logic.

366. Plaintiff didn't ask for an indefinite accommodation or unlimited extension. He asked for a tightly-defined accommodation by way of a specific finite extension that takes into account time needed to get treatment, which was about 10 weeks as recommended by his doctors.

367. Yet, plaintiff's recent filings have been made with assistance of Plaintiff's spouse[1].

368. Under the ADA, when a qualified individual with a disability requests a reasonable accommodation, the court has an obligation to engage in an interactive process to determine appropriate accommodation. Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252 (1st Cir. 1999)(discussing interactive process for determining reasonable accommodations).

369. The NHSC's denial of plaintiffs' ADA request strikes at the very heart of what the ADA aims to protect. These disabilities are confirmed by medical doctors and proven by medical records.

370. The very accommodation that plaintiff needed in order to participate, he was denied and then told that because he did not receive the accommodation, he must be excluded from further participation in the court's program. The NHSC engaged in blatant failure to accommodate and discrimination, as well as stereotyping of persons with disabilities.

371. See Galloway v. Superior Court of District of Columbia, 816 F. Supp. 12 (D.D.C. 1993)("Without doubt, there exists "the tendency on the part of officialdom to overgeneralize about the handicapped." Shirey v. Devine, 670 F.2d 1188, 1204, n. 45 (D.C.Cir.1985). The policy at issue here is an excellent example of this penchant for overgeneralization. It is furthermore the reason why a court "must look behind the qualifications [invoked by defendants]. To do otherwise reduces the term `otherwise qualified' and any arbitrary set of requirements to a tautology." Pandazides v. Virginia Bd. of Educ., 946 F.2d 345, 349 (4th Cir. 1991).").

372. See Galloway v. Superior Court of District of Columbia, 816 F. Supp. 12 (D.D.C. 1993)(In promulgating the Rehabilitation Act, Congress was concerned not only with "archaic attitudes" held by the general populace, but also with archaic laws. Arline, 480 U.S. at 279, 107 S. Ct. at 1126-1127.).

---

[1] Plaintiff Bisasor's spouse also previously had need for ADA accommodation herself, as stated in the sealed medical records, but recently has been able to assist Bisasor with filings in this appeal, as noted in recent filings.

373.    See Galloway v. Superior Court of District of Columbia, 816 F. Supp. 12 (D.D.C. 1993)(It is readily apparent that the Superior Court jury system falls within the purview of Section 504 of the Rehabilitation Act. First, the Act defines "program" as "all of the operations of ... a department, agency, special purpose district, or other instrumentality of a State or or of a local government." 29 U.S.C. § 794(b) (1) (A) (1988 & Supp.1992). In addition, the Superior Court receives "Federal financial assistance" in the form of grants from the United States Department of Justice.)

374.    See Galloway v. Superior Court of District of Columbia, 816 F. Supp. 12 (D.D.C. 1993)("It is equally obvious that the Superior Court jury system falls within the parameters of the ADA. Title II of the ADA, which *19 became effective on January 26, 1992,[13] provides: [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132 (1992). The Superior Court and the District of Columbia are public entities within the meaning of the Act; "public entity" is defined as "any State or local government" or "any department, agency, special purpose district, or other instrumentality of a State or States or local government." Id. § 12131(1).").

375.    See Galloway v. Superior Court of District of Columbia, 816 F. Supp. 12 (D.D.C. 1993)("The Rehabilitation Act and the ADA were enacted to prevent old-fashioned and unfounded prejudices against disabled persons from interfering with those individuals' rights to enjoy the same privileges and duties afforded to all United States citizens. The policies of the Superior Court of the District of Columbia are inherently self-contradictory. They allow a deaf person to serve as a juror and provide accommodation to those deaf individuals who need it. At the same time, they categorically exclude blind persons without even considering or offering accommodation. Defendants' rationale for this distinction is irrational and cannot withstand scrutiny.").

---

## V. BIAS AND CONFLICTS OF INTEREST

---

## BACKGROUND OF THE STATE OF NEW HAMPSHIRE AND NH JUDICIAL BRANCH

376.    This case tells the story of the NH judicial branch comprising the NH administrative office of the court, NHSC the NH Superior Court and it's justices, the ADO the PCC and NH rules committee and the clerk and it's administrators, secretaries and staff.

377.    The NH judicial branch has been engaging in systematic discrimination and retaliation for several years against the plaintiff and his wife.

378.    It has engaged in retaliation after plaintiff raised concerns about race discrimination in the legal system and court context. (Note: this has been confirmed by its own committee member Julian Jefferson who elevated after I raised concerns about how he was being treated by the CSC.).

379.    It has engaged in disability discrimination

380.    It has targeted the plaintiff for arbitrary and capricious standards and the selective enforcement of its rules, and the adopting of new rules only to be applied to the plaintiff and then after it is applied to me, the rules is changed back to how it was before.

381.    It has circumvented it's rules in order to deprive me of my rights while allowing other white people to benefit from those rules.

382.    It has draconianly applied harsh standards to the plaintiff while relaxing those standards against white people.

383.    It has allowed conflicts of interest to be ignored to go unchecked and to run rampant.

384.    It has engaged in pretext to cover or to hide its tracks.

385.    It has hidden crucial information

386.    It has blocked information that plaintiff is entitled to under the right to know law while giving the same type of information to others.

387.    It blocks the very evidence from seeing the light of day.

388.    It issues orders to provide the information but then erect barriers so that I cannot get the information.

389.    While acting as though it wants to give me the information. Clever high level tactics to trick and trap the plaintiff into giving up rights.

390.    It has engaged in outright cronyism and favoritism covering and covering up for its insiders and fixers.

391.    It allows people who are implicated by a decision to be involved in the decision.

392.    It is the definition of the kind of corrupt rigged legal system that Bernie Sanders has often talked about.

393.    It is a system stacked in favor of white rich influential men who are protected by the good ole boy network.

394.    This lawsuit seeks to hold government accountable in the tradition that the founders of this country envisioned.

395.    They either negligently or intentionally deprived me of access to the court system of records so as to block me from completing the appendix necessary for the brief

396.    Plaintiff ask the court to order the court and it's administrators to restore my access. It has been months and plaintiff still doesn't have access. Plaintiff informed the court administrator and the supreme Court and they have done nothing

397.    Plaintiff will prove each of these in the following pages and in court.

## DONOVAN

398.    Justice Donovan worked for the New Hampshire Attorney General's Office, which is defending the underlying case and current appeal. He has refused to recuse himself despite this conflict.

399.    Justice Donovan has consistently ruled against Plaintiff on even routine procedural matters, often without explanation.

400.    Justice Donovan chairs the Court's Rules Committee and has discriminated against Plaintiff in that capacity as well.

401.    Justice Donovan denied Plaintiff's request for an extension based on major surgery without adequate consideration of the medical evidence.

402.    Justice Donovan refused to allow correction of material errors in the transcript of lower court proceedings, which will likely impact the outcome of the appeal.

403.    The remaining three-Justice panel has demonstrated hostility toward Plaintiff for raising concerns about bias and partiality.

404.    The limited panel creates a systemic disadvantage for Plaintiff as an out-of-state African American litigant before an all-white, nearly all-male bench.

405.    The NHSC has refused Plaintiff's request to add two alternate Justices to the panel to address these issues.

406.    This pervasive bias and refusal to address conflicts of interest violate Plaintiff's due process right to a fair and impartial tribunal.

## BIAS AND CONFLICT OF THE NHSC

407.    The NHSC is biased against the plaintiffs and is not able to adjudicate the cases before it involving the plaintiffs.

408.    NHSC is unnecessarily hostile towards the plaintiffs.

409.    One piece of evidence of this bias comes from the fact that the NHSC has discriminated against Plaintiff Bisasor in violation of Title II. Other evidence has been referenced throughout this complaint and will be further furnished, by way of other exhibits, documents and emails, at hearing or in due course.

410.    Furthermore, the NHSC is biased because it is doing the same thing that is at issue in the underlying litigation. The ADO and PCC are part of the supreme court and are thus essentially the supreme court. The NHSC cannot preside over its own self as both a party and a judge. This is a fundamental self-contraction and firmly establishes a conflict of interest. This fact is further shown by the fact that the AG office currently represents the ADO and PCC. But the AG office will now represent the NHSC before this court. They will have the same lawyers before this court. But the lawyers that represent the supreme court are arguing before the supreme court in a case where the supreme court is a party being represented by the same lawyers that represent the supreme court. When taken to its logical conclusion, the thorny nature of this conundrum

becomes self-evident, in that there is no way around the fact that the NHSC is conflicted and cannot be impartial in this matter. No man can be his own judge.

411.    Also, the NHSC and its committees have shown and continue to show favoritism towards Russell Hilliard. Furthermore, Hilliard is allowed to attack, lie and twist facts, disparage, condescend to the plaintiffs. Justices sit and watch and eat it all up without any objection or warning, and thus the justices indulge the stereotyping offered by Hilliard and thus engage in stereotyping themselves.

412.    Additionally, Russell Hilliard has a conflict of interest in his role as an advisor to the NH advisory committee on rules. He is allowed to participate and give input on NHSC and its committees even where he is not a member of said committees. This is a very strange occurrence and speaks to the tremendous power and clout that Russell Hilliard or his firm wheels both within the NHSC and its committees and without.

413.    Said conflict of interest should be imputed to the advisory committee and the professional conduct committee as both himself and members of his firm have been extensively involved in both the internal rule making machinery of the NHSC and advising the defendants.

414.    Further, said conflict of interest should be imputed to the justices of the NHSC for purposes establishing an independent federal forum.

## FURTHER BACKGROUND & FACTS ESTABLISHING THE BIAS, CONFLICT AND HOSTILITY OF THE NHSC

415.    In or 2015, the plaintiffs entered into a residential rental agreement with an extended stay hotel property in Nashua. A dispute arose regarding how the plaintiffs were treated during their residency, especially as compared to other similarly situated guests. The situation deteriorated until complaints were made to the corporate office/headquarters of the hotel. The matter further escalated until the plaintiffs filed a 540A action in circuit court in Nashua in January 2017 enjoining the hotel defendants from a breach of covenant of quiet enjoyment and violations of 540A. A TRO was entered against the hotel defendants and a hearing was scheduled. The plaintiffs were represented by the NH legal assistance as the NH legal assistance believed that the rights of the plaintiffs needed to be vindicated not only for the plaintiffs but for citizens across NH.

416.    In or around February 2017, the circuit court judge entered a decision against the plaintiffs without awaiting the plaintiffs brief which was not yet due. After plaintiff 's counsel raised concerns, the circuit court judge vacated the order, allowing the plaintiff 's counsel to file a brief. However, the circuit court judge simply regurgitated what he first wrote and furthermore went on to add erroneous facts to support his decision. The judge was clearly biased and making up facts that did not occur. He also applied a lenient standard not requiring the defendants to sign facts under oath/affidavit in violation of the rules and the court's own order at the beginning of the case. The plaintiffs filed a motion to recuse the judge for bias but was denied in bad faith. After the plaintiff filed other post judgment motions and they were denied without good or adequate reason, the plaintiffs filed an appeal to the NHSC regarding the circuit court action.

417.    The circuit court judge also went back and retroactively altered documents in the case record that was on appeal to cover his erroneous and biased decisions. This was further evidence that this judge was biased and had corrupted justice in this case.

418.    Shortly thereafter, the circuit court judge was discovered by his own court staff to be secretly falsifying his performance evaluations, creating fake evaluations. It was then discovered later that Judge Moore further went as far as to solicit favors from certain defendants and their lawyers in cases before him (including the hotel defendants and their lawyers in our case) in order to boost his performance evaluations in aid of a bid for a seat on the NHSC. This meant that this judge was engaged in a kind of pay to play scheme where he would decide cases in favor of such defendants in exchange for favorable performance evaluations from said defendants and their lawyers. An investigation ensued and it was further discovered that the circuit court judge had tampered with his evaluations and falsified them in order to boost his performance evaluations. After further investigation, it was discovered the circuit court judge lied to investigators stating that it was mental illness that caused his lapse in judgment (and wherein he used state funds for treatment

at the time) when in fact it was his own objective of securing a seat on the NHSC. The judge was first suspended, then he resigned, then he was brought up on felony charges, and then he was disbarred. Pursuant to the above investigations and attendant media coverage, this judge was thus exposed to be one of the most corrupt and dishonest judges in the state.

419.    However, in the appeal, when the plaintiffs raised these concerns, the court appeared to be offended that the plaintiff was calling out their own judge in such a straightforward way and they retaliated by blocking the filing of these facts and the record regarding this judge. It was as though only they can say bad things about him but some outsider black couple should not criticize the judge even though he was corrupt. This was the first encounter the plaintiff had with the bias and taintedness of the NHSC.

420.    Thereafter, the NHSC, ruled in favor of the defendants using Judge Moore's decision, and refusing to even take up the issue of bias and recusal of Judge Moore, further cementing the sense of animus that the court had towards the plaintiff in her raising bias and recusal issues concerning Judge Moore. Moreover, the court completely ignored , went out of its way to make illogical statements in its ruling.

421.    It was later discovered that Judge Hanz Marconi was recused from the case but this was never told to the plaintiffs during the case. Judge Marconi evidently had been involved in the deliberations of the case or other decisions of the case prior to her recusal at or near the end of the appeal. If Judge Marconi was biased or conflicted, then her involvement in the appeal for the majority of time rendered that process tainted. When the plaintiffs raised these issues, the court ignored, brushed off or side-stepped the issues and even to this day, neither Justice Marconi nor the NHSC has stated the reason for her recusal which is required by its own rules governing judicial disqualification. This is an example of how the NHSC arbitrarily and capriciously fails to adhere to its own rules, in order to rig outcomes in a disparate manner depending on who is before it, who is making the argument, who the defendant and their lawyer is and who the plaintiff is. The plaintiff was disappointed because prior to this, she had no reason to be skeptical or cynical about the NHSC.

422.    It should be noted that, in or around the same time that the plaintiffs began litigations against the hotel defendants in the Nashua NH circuit court in early 2017, the plaintiffs also filed a superior court action against the said hotel defendants centering on breach of contract, discrimination/retaliation and consumer protection claims, as the circuit court was a court of limited jurisdiction and did not hear those kind of claim. However, after some intense litigation, the defendants approached the plaintiffs for an early mediation, which after some back and forth and after the defendants replaced their lawyers, a settlement MOU was arrived at, in or around late 2018 but became unraveled after the NHSC ruled in favor of the defendants in early Spring of 2019[2].2

423.    It should also be noted here that a well-connected[3] local NH attorney, named Craig Donais, represented the hotel defendants in the circuit court case but was later disqualified due to having previously entered into a prospective attorney-client relationship with the plaintiffs on this same case/issue. After he was disqualified, he continued to be involved in the NH circuit court case and the NH superior court case, even going as far to provide a false affidavit to those courts falsely stating that plaintiff Bisasor had accused him of discrimination because he declined to ultimately take the case, which was utterly and totally false (and ridiculous). He did this evidently as part of a sophisticated strategy to paint the plaintiffs in a negative light

---

[2] NB: After a further circuitous path including after refiling the case with additional defendants and claims in superior court Hillsborough-north, the defendants agreed to restart settlement negotiations and this was finally consummated and completed in early 2022 and the parties agreed to file a stipulation of dismissal pursuant to settlement thus ending the longstanding legal battle among these parties, except for Craig Donais who pulled out of the settlement at the last minute and decided to litigate/defend the case instead.

[3] NB: NH has a small appellant's bar and that Plaintiffs have not been able to find a lawyer in NH, in large part because several lawyers (as well as judges) were conflicted out of assisting plaintiffs because of the intervenor's/his counsel's reach, power and influence and connections in the legal community of NH. On top of that, the intervenor/his counsel has actively sought to interfere with or block plaintiffs' attempts to obtain counsel in NH (which assertion is, in part, the subject of other lawsuits, etc.). Further, it is a financial hardship for plaintiffs to retain paid counsel to litigate this type of case.

racially, in order to obtain an advantage in the superior court case for the hotel defendants concerning their legitimate discrimination/retaliation claim against the hotel defendants. This act both constituted perjury and defamation by Donais and is currently being addressed in the superior court Hillsborough court. As an officer of the court, and an agent licensed by the state of NH, Donais thus violated the plaintiff's civil rights both federally and under state law.

424.    In 2019, the plaintiffs filed an attorney discipline complaint against Craig Donais. In 2020, the plaintiff filed a second attorney discipline complaint against Craig Donais because of additional bad acts that he committed after the filing of the first complaint. However, from very early on, it became evident that Donais was well-known and connected at the ADO and PCC. He was represented by an even more well-connected NH lawyer named Russell Hilliard. Hilliard has well established relationships with the general counsel and deputy general counsel at the ADO and also, on information and belief, with the PCC and/or its then chair David Rothstein.

425.    At least three appeals to the NHSC resulted from the two attorney discipline complaints filed by plaintiffs, two were initiated by the plaintiffs and one initiated by DonaiS.

426.    In almost every instance, the NHSC sided with the ADO and Donais almost every step of the way.

427.    In fact Mark Cornel, deputy general counsel of the ADO, an office of the NHSC, told the plaintiffs that the ADO/PCC are allowed to discriminate against the plaintiffs because the plaintiff has no rights in their system.

428.    Later, after the matter went to the superior court, the Chair of the PCC (David Rothstein) recused himself after refusing to recuse himself from several months to a year or so earlier. This means the entire proceedings before the PCC was potentially or actually tainted.

429.    In 2020, the plaintiff filed a RSA 91A action. This action is currently on appeal before the NHSC (as case #).

430.    During that action, Judge Andrew Schulman was recused based on his disclosure that he knew and had worked with Donais.

431.    In a subsequent superior court case in Hillsborough North, Judge David Anderson recused himself because of a conflict created by the appearance of Russell Hilliard.

432.    Between Hilliard and Donais, several superior court and supreme court judges had to recuse themselves. The situation is untenable. The plaintiffs cannot get a fair trial in state court but especially the state supreme court.

433.    The NHSC has 2 justices recused. One refuses to recuse. They are down to 3 out of 5 justices. These are the same 3 male justices that have been condescending, chiding, harsh and heavy-handed almost at every turn with the plaintiffs. With these three justices, the plaintiffs appear to be persona non grata.

434.    The plaintiffs have been deprived due process, deprived of a fair proceeding, deprived of impartial judiciary and deprived of equal protection and subjected to arbitrary and capricious conduct. The hostility of the NHSC has been evident and palpable and it is evident that these same justices do not like the plaintiffs, particularly Justice Donovan, who refuses to recuse himself and continues to show bias against the plaintiffs.

435.    This situation cries out for relief. This is an example of why there is a federal court, i.e. to protect outsiders from entrenched bias and local unfairness from state entities or state courts.

436.    In 2022, the NHSC blocked the plaintiffs from obtaining a waiver of costs for transcript.

437.    The NHSC refused to allow plaintiffs request to file a motion to recuse.

438.    The NHSC refused to allow plaintiffs an extension of time file brief based on major surgery and based on the need to obtain a correct/propet transcript.

439.    The situation is out of control. At this point, the situation appears to be so hostile, that it does not even make sense for the plaintiffs to ask the NHSC for anything. They will never rule in favor of the plaintiffs. They will find a way to rule against the plaintiffs even when it does not make sense or when it involves routine ministerial issues. The plaintiffs will never get a fair trial with these 3 remaining justices of the NHSC. To add insult to injury, the very judge (Justice Donovan) of whom the plaintiffs has raised concerns about his impartiality, his relationship with Donais and state AG lawyers, was appointed to be the main

justice to rule on almost every or any motion from the plaintiffs and almost without fail, he denies almost every motion or request by the plaintiffs.

440.    The situation is so bad that even Donais and Hilliard evidently have seen this weakness to exploit, where appeals that they would never bring to the NHSC, they bring them when it concern the plaintiffs because they know that the NHSC is hostile to the plaintiffs and may grant their frivolous appeals simply out of their bias against the plaintiffs or as a favor to Donias/Hilliard. NB: Just recently Donais filed a frivolous appeal to the NHSC because a superior court judge (in the hillsborough-north case) denied his premature motion to dismiss for failure to timely serve complaint, for which there is no authority or precedent and for which he has no standing to file such an appeal but yet has done so for the very reasons cited above.

441.    The NHSC is not able to adjudicate the cases before it involving the plaintiffs, and/or Donais/Hilliard.

442.    The NHSC is unnecessarily hostile towards the plaintiffs.

443.    Moreover, unfortunately, it appears also that the NHSC is uninterested in the fairness of the proceedings which Ms. Anderson is involved in or has brought to its attention. This concern is partially buttressed by the track record of the NHSC's dealings with Ms. Anderson.

444.    The NHSC has never granted any relief of substance to the plaintiffs. At almost every turn, this court has ruled against the plaintiffs. In most instances, the NHSC has not provided any reason at all for its decisions. And on the rare occasion when it does provide a reason for its decision, it is a simple one without much explanation or substance.

445.    The NHSC has treated the plaintiffs as though they were "persona non grata". The plaintiffs believe they are not welcomed by the NHSC (at least by the 3 remaining unrecused justices including Justice Donovan) and the plaintiffs do not feel they have been treated impartially by the NHSC. In most instances, the NHSC has ruled against the plaintiffs even on simple procedural issues when it would not have hurt anyone to grant the relief requested.

446.    To the extent that on one or two occasions, the NHSC granted the plaintiffs' request on procedural requests, it was only when it was largely unopposed. Once the opposing party (such as Craig Donais) opposes, or attacks the plaintiffs, or cast aspersions on the plaintiffs (as a scorched earth/ad hominem tactic to try to disparage or undermine the plaintiffs), the NHSC takes their side, virtually without fail. Every benefit of the doubt appears to be given to the opposing party when it comes to us, even when it is a simple one-week extension of time request but opposed. The plaintiffs' word appears to be given no or little weight. All inference appears largely to be made against the plaintiffs and in favor of the opposing parties or other parties. Even when the opposing party has made clear false statements to the NHSC (or engaged in egregious behavior unbecoming of a lawyer) and it was pointed out to this court, this court ignores it or avoids it but yet if we make a minor procedural mistake (such as going over word counts or filing something just pass the deadline in the early morning of the next morning in the AM hours, etc.), this court does not hesitate to chide the plaintiffs or hold it against the plaintiffs in some way.

447.    And, going back even to the first case with the hotel defendants, the NHSC's explanation was illogical, ignored facts, ignored the legislative intent, and gave weight to facts found by a biased judge from the lower court (Judge Paul Moore) who was found to be one of the most corrupt and dishonest judges in NH, and who was disbarred and brought up on felony charges for his outrageous misconduct and dishonesty. When Ms. Anderson brought these things to the attention of the NHSC, the NHSC reacted negatively and/or ignored it altogether, almost as if the NHSC was offended that some outsider pro se person had the gall to criticize a NH judge. But yet this judge (Paul Moore) was found to be thoroughly corrupt and he was the judge on Ms. Anderson's case in the state circuit court and he was found to be soliciting evaluations from landlords (which included the defendant hotel in Ms. Anderson's case), for who Ms. Anderson had moved to recuse but was denied, and after it was brought on appeal to the NHSC, the NHSC ignored the recusal issue altogether even though it was well established beyond a shadow of a doubt that Judge Moore was corrupt, dishonest, compromised and had engaged in biased decisions in order to help his bid for a seat on the NHSC.

448.    Hence, unfortunately, the plaintiffs believe that the NHSC will never rule in their favor, at anything of real substance. The plaintiffs now fear bringing any case to this state supreme court because the plaintiffs

believe that the 3 justices remaining1 on the NHSC, have made up their minds, apriori to be against the plaintiffs, no matter what the issue.

449.    NB: The context for this should be kept in mind. The current NHSC is a hobbled court as it relates to Ms. Anderson. For reasons unknown to the plaintiffs, Justice Marconi appears to be excluded from the current appeal (and any appeal involving the plaintiffs). This is very mysterious as the reason has not been disclosed even though the plaintiffs have requested disclosure of the reason, on more than one occasion. The chief justice is also recused presumably because of a conflict with the defendant lawyers. This leaves 3 judges on the bench for this or any case involving the plaintiffs. This is a highly peculiar situation that the plaintiffs are in. It seems guaranteed that any case the plaintiffs appeal to the NHSC would result in the same hobbling of the NHSC with the same three justices.

450.    The plaintiffs have thus determined that they are in a hostile environment with the NHSC and its committees.

451.    This is not unheard of. People who challenge legal establishments often are treated in a hostile manner. Rarely are they received as pioneers or change agents, but instead as troublemakers, interlopers, agitators, or as "the enemy". This is how many entrenched systems work.

452.    The plaintiffs understand that it is likely that the NHSC will disagree with the above concerns because rarely are people (especially those in power) willing to be self-critical enough to see blind spots or see themselves objectively. This is particularly true of judges, especially supreme court judges who in many instances believe they can do wrong, make no error, or be biased.

453.    With 3 judges left, the plaintiffs are at a major disadvantage. The fact that there is a potential for bias with Justice Donovan increases the risk of unfairness and partiality when it comes to the plaintiffs. The plaintiffs cannot afford any further disadvantages as black pro se litigants from outside of the state of New Hampshire.

454.    However, the concern that the NHSC is hostile and biased can be understood in the context of the larger trend of the politicization of the courts, most notably even the US supreme court. The refusal to even hear from Merrick Garland and the subsequent appointments of Brett Kavanaugh, and Amy Coney Barrett have revealed a clear understanding by the American people that judges are biased and that the name of the game is get one's biased partisan team player in power at all costs because only then it is assured that one's "team" will get the outcomes they want in significant court rulings for the country. Fewer and fewer people today trust that judges will rule based solely on the law and the facts. Never has the institution of the judiciary been so damaged and viewed with a jaded cynicism and skepticism.

455.    This is further reinforced by numerous examples of local judges accepting bribes, engaging in dishonest conduct and in biased rulings across the country i.e., the judge who was paid to send black youth to prison in Pennsylvania and the judge who let the rapist of a high school girl off with probation because he would not fare well in prison and was a good kid with a good future ahead of him.

456.    In the local context, there are examples of the corruption of Judge John Fairbanks, Judge David Brock, and even lately Judge Paul Moore, and recently Judge Julie Introcaso. Even regarding Attorney Brian Snow, who was one of the opposing attorneys on the plaintiffs' prior Hotel case, the plaintiffs found out that he had been removed from the bench as a judge, previously, for serious ethical misconduct. Sadly, the plaintiffs' experience with people in the courts of NH have not been good examples of integrity, honesty, and ethical conduct. NB: Caroline Douglas, who was the wife of a NHSC justice, has written about the corruption of the NH judiciary. The issues with the New Hampshire legal system are well-known and well-documented and so it is not as though the plaintiffs are making up the existence of these issues.

457.    Also, even Julian Jefferson, who works for the NH public defender office, and the only black member of the NHSC's Complaint Screening Committee, recently testified at a police accountability hearing with the NH Governor, citing several personal and other examples of rampant racism in NH courts, and in the NH legal and law enforcement systems.

458.    Then comes Attorney Craig Donais who is a well-connected lawyer in NH. He has been a republican candidate for senator (in 2014). He has sat or continues to sit on the Mayor's ethics conduct board. He sits on the Manchester police crime-line board. He has Been an assistant attorney general for the NH DOJ. He

has worked at well-known law firms in NH including the current one at Wadleigh Starr Peters (which he started working for just after he had been solo practitioner for some time and after Ms. Anderson's case at the ADO had begun). Evidently, he knows or is known by a lot of people in the NH legal community.

459.    The plaintiffs have called several attorneys to seek legal representation in these matters but several of them have been conflicted out before going further because they know or worked with Donais. The plaintiffs essentially thus far cannot obtain legal representation in NH as a result of these and other factors. Beyond that, even most recently, Judge Andrew Shulman, in the initial superior court Right to Know action, recused himself because he knew or worked with Donais. Then Justice Donovan of the NHSC was discovered to have worked at the same place with Donais and knew Mr Donais from interactions during private practice. It seems at almost every turn, Donais has had contact, relationships, or influence with those who would be now in a position to make decisions about Donais. Donais is thus firmly part of the NH legal establishment and it is well-established that the NH legal establishment is a tight-knit close and "clubby" community who evidently do not receive outsiders well, especially who might take on or challenge the system. Moreover, the fact that these issues either involve or relate to or are undergirded by "race" (which was initially raised, introduced, invoked, and manufactured by Donais first as an attack on the plaintiffs and for which he evidently was hoping to rely on any latent, hidden, subtle or implicit racial bias in others, to prevail) does not help matters either. This is a nuanced point that will be further explained in this federal court action except to say for now that race, racial issues, and systemic race issues have been and are unfortunately part of the subtext/backdrop if not the direct issue in these matters. The impact on plaintiffs' civil rights has been palpable and race has played a part in this whole situation.

460.    NB: Moreover, Craig Donais is represented by Russell Hilliard, another well-connected and well-known lawyer in NH. He has been on numerous legal committees in NH. He is a seasoned attorney before the ADO, the PCC, and the NHSC, and has personal relationships with people at the ADO and other such committees. Both Russell Hilliard and Craig Donais together represent a good example of the "good ole boy" network in the legal community of NH. And they both have exploited race issues to gain advantage in legal matters pertaining to the plaintiffs, including using "dog whistle" attacks in order to undermine the plaintiffs with the ADO, the PCC, and the NHSC.

461.    NB: Craig Donais is one of the most dishonest lawyers that the plaintiffs have ever met. He is someone who the NHSC should want to protect the public against. But NHSC has failed and continues to fail to consider the possibility that these dishonesty issues with Craig Donais are going to blow up to be a major embarrassment for the NHSC and the legal system once his race-based felony perjury and hate crimes against the plaintiffs (and other misconduct) is fully revealed, exposed, and proven, in one forum or another at some point, and the NHSC will then have "egg on its face" for "turning a blind eye" to the whistleblower's alarm that the plaintiffs have been sounding about Craig Donais and about his utter, blatant, willful, and unrepentant dishonesty, similar to what happened with Judge Fairbanks and Judge Paul Moore. And when it does, this will likely become the next big scandal in New Hampshire. The NHSC or its committees has had at least 4 attorney discipline cases before it where Craig Donais was a respondent. At least two cases were by persons other than the plaintiffs. In at least one of those cases (the one that the plaintiffs are seeking records for), on information and belief, there was a deal or agreement of some kind that was made to dismiss the case. It appears that this is one of the reasons why both Craig Donais and the PCC or ADO do not want to provide copies of these records to the plaintiffs or make copies available to the public.. The existence of such proceedings would be appropriate subject matter for discovery in this court. There is no reason to believe that the NHSC could adjudicate such matters and maintain an appearance of integrity and impartiality.

462.    This country was founded on dissent and by those who felt obligated to challenge systems i.e., to throw off the shackles of monarchial rule and tyranny. It was also founded on a distrust of those in power thus requiring checks and balances on the power held by men in official roles including those in the courts. It is why we have juries and a legislative branch and an executive branch as a check on the power of those who wield power in the courts. Yet the courts have evolved over time to largely insulate itself from certain "checks and balances" especially at the state supreme court level (and especially in light of the fact that writs

of certiorari are rarely granted by the US supreme court for most state court cases/issues). The only other possible check on a state supreme court is through the injunctive powers of the federal court, which also creates a stronger path to US supreme court review. One of the reasons for the existence of federal courts is to provide protection from the tyranny of state courts especially where they disfavor outsiders over against their own citizens who might enjoy a home court advantage. Additionally, federal courts provide protection in cases where state courts refuse to recognize the civil rights of a certain protected class of people whether based on race, or other protected classes, etc.

463.    In the plaintiffs' case, the plaintiffs are at a disadvantage based on one or more of such reasons and it is why at this juncture the plaintiffs have no other choice but to seek relief from the federal court.

464.    Respectfully, the plaintiffs believe they will obtain a more impartial objective adjudication of the issues by a federal court than from NHSC or its committees or by NH state agencies. The defendants may disagree with this assessment (which is to be expected), but it is the plaintiffs' fundamental right as Americans to be concerned about this or feel this way and to seek relief from federal court in order to assure fairness and impartiality in these matters.

465.    Ultimately, the refusal of this court to provide a stay on this case (and previously to even accept for Ms. Anderson's appeal for review, case LD-2020-0002, and to deny her recent petition, case LD-2020-0008), buttresses our concern that this court is not able to render an impartial decision on these issues, and that it views any issue that the plaintiffs bring to it with a jaundiced eye and rank dismissiveness that deprives the plaintiffs of due process and a fundamental right to be fully and fairly heard and to be free from a biased factfinder and adjudicator. Respectfully, the plaintiffs do not believe this court will believe anything the plaintiffs say or credit any testimony or any evidence the plaintiffs provide or any arguments the plaintiffs advance no matter how correct or how right or how irrefutable. The plaintiffs believe this court will by brute force power (i.e., "might makes right") find against the plaintiffs and side with their opponents because of who the plaintiffs are and because of who the opposing parties are.

466.    Similarly, given that the ADO, and the PCC are committees under the judicial branch of the NHSC, and given the incestuous relationships that exist between and within these committees as well as with the court, the plaintiffs do not believe that this court will ever find any bias from the ADO, or the CSC or the PCC no matter how arbitrary or capricious their actions or statements are, no matter how the plaintiffs are treated or mistreated by them, and no matter how the plaintiffs are deprived of fundamental fairness. This is how entrenched systems work. Entrenched systems create cascading effects that reverberate throughout the system that reinforce the operators and the modus operandi of the system and its actors.

## MORE ON CONFLICT OF JUSTICE PATRICK DONOVAN & VIOLATION OF DUE PROCESS BY NHSC

467.    Patrick Donovan has a history of treating the plaintiffs in a hostile manner.

468.    Plaintiff Bisasor requested an extension of time to file a brief, including based on major surgery but it was denied by Justice Donovan. No real reason was really given.

469.    The proceedings in the NHSC related to Plaintiff's appeal are a sham proceeding in that the 3 justices will dismiss this appeal unfairly on July 20, 2022, not on the merits, even though the plaintiffs requested an extension due to major surgery and other conflicts as well as the need to to correct material errors in the court transcriber produced transcript. Otherwise, it will no doubt dismiss the appeal or rule in favor of the defendants even after the case is briefed.

470.    Plaintiff is thus being denied a fair hearing on the merits of his petition before the NHSC because Justice Donovan has refused to allow a proper/correct transcript to be provided to the plaintiffs.

471.    NB: The plaintiffs hereby also request injunctive relief in terms of ordering that the NHSC not dismiss the appeal and provide a reasonable extension of time to accommodate the plaintiffs' disabilities.

472.    Similarly, this raises concerns about the racial bias implications of white people in power second guessing and undermining the medical issues and medical pain of black people (i.e. which studies have shown that a majority of white folks are more inclined to disbelieve black people when they are in pain or regarding their medical issues. Implicit bias research has shown this conclusively). In the instance, Justice

Donovan had no good reason to doubt the plaintiff's assertion that he had upcoming surgery and attendant medical issues that would hamper the plaintiffs' ability to file a brief.

473.    NB: This was the first extension of time to file a brief in this appeal that was made by the plaintiffs. Moreover, the existence of medical issues for an older non-lawyer person (such as the plaintiffs) or a pro se non-lawyer plaintiff, is not unusual. When medical conditions arise for older folks, they can metastasize easily or quickly or can generate more medical conditions, requiring ongoing medical intervention. The citation of a medical procedure or a medical issue requiring a continuance or an extension of a deadline is a temporary impediment that may require a little more time to meet a deadline, not indefinitely, but for a certain period of time. This is not unusual. It is a fact of life for many regular American folks. It is also a fact for many lawyers who also suffer from chronic or debilitating medical conditions or diseases. Yet when such lawyers request extensions, they are believed. In fact, when lawyers request extensions because of the illness of a family member or child, they are believed. But let a pro se or non-lawyer african american plaintiff say they have a medical need for an extension, then suddenly no benefit of the doubt is given, exacting proof is required and suspicion and skepticism immediately arise and extra disparate scrutiny is applied. This is just another way implicit bias plays out in the justice system. Similarly, the fact that pro se litigants generally need more time is not unusual. Pro se parties do not have law offices, legal staff or assistants or teams of lawyers to assist. The time requirements of the legal system do not account for pro se non lawyers who cannot afford lawyers, who do not get paid for any litigation activities, who have full lives out of court activities and this is not their job, who have to work a full time job in the day, and after dealing with family, kids, and other life obligations, have to squeeze in time to do legal work including legal research which many do not know how to do, do not have access to legal resources to simply do such research and who take a longer time to understand the law, cases or precedents, etc. Justice Donovan gave no consideration or regard to the fact that an African american plaintiff and her African American spouse, who were tremendously impacted by Covid-19, who are economically disadvantaged and who are up against the vast unlimited resources of the state of NH and the vast number of attorneys from the NH AG office inclusive of the 4 or 5 AG lawyers that have been assigned to this case alone, plus the law firms of Craig Donais and Russell Hilliard to boot, may need an extension of time to file a brief. But no such consideration was given. No benefit of the doubt. No instruction to provide more information if that was necessary. Nothing but a summarily blanket denial based on bias against the african american plaintiffs with medical issues including the need for surgery, which is documented by doctors at MGH.

474.    Moreover, Justice Donovan knows Craig Donais from private practice and worked with him on the same cases, representing different parties.

475.    Justice Donovan worked for the entity (AG office of NH) defending the case and appeal (case# 2021-0604).

476.    Justice Donovan has shown bias in his decisions on rudimentary issues.

477.    Justice Donovan has discriminated against the plaintiff in a related matter in which he chairs the proceedings for the rules committee, as noted above.

478.    Justice Donovan has refused to address issues of discrimination and unfair conduct by him and the body he chairs.

479.    Justice Donovan ignores these issues and has not addressed them.

480.    Justice Donovan favors Donais and Hilliard.

481.    Russell Hilliard is working on these subcommittees over which Justice Donovan chairs. The relationships are incestuous and conflicting.

482.    Justice Donovan has refused to allow correction errors of the transcript in appeal (case# 2021-0604) and denied time needed to do so. This results in harm to the plaintiffs because these errors are material and will likely impact the outcome of the appeals (case# 2021-0604 and case# 2023-0520).

483.    Justice Donovan and Justice Countway refused to allow consideration of the plaintiff 's disabilities and medical conditions in callous biased and draconian manner. Justice Donovan believes without question the lies and misleading comments by Russell Hilliard, who has an unfair advantage in the NHSC.

484.    Justice Donovan and the NHSC appears to be angry that the plaintiffs have sought to raise concerns about its partiality, especially about Justice Donovan, even though two other justices have needed to be recused, leaving only three justices on the bench.

485.    Justice Donovan is allowing a party to influence the outcome of the litigation by using channels outside of the litigation.

486.    The NHSC is likely going to dismiss the plaintiffs' appeal (case# 2021-0604). It has already unfairly dismissed the Bisasor appeal, based on trumped up meretricious reasons that clearly violate the ADA and plaintiff's federally protected civil and constitutional rights.

487.    It is futile to ask the NHSC to address these issues. It will fall on deaf ears.

488.    The NH legal community is known to be very clubby and incestuous.

489.    NB: The bias and conflict as alleged and cited herein is sufficient to provide an exception to the abstention doctrine.

490.    This court must take these allegations as true and therefore it must construe the issue of bias in favor of the plaintiffs.

## FURTHER RECENT ISSUES REGARDING BIAS AND CONFLICT

491.    The NHSC operates under a bifurcated policy that is unlawful, as the defendants prevent the head of the NHSC from making decisions on Americans with Disabilities Act (ADA) requests.

492.    This situation is significantly exacerbated by a pervasive cronyism and favoritism.

493.    Notably, on information and belief, there are improper relationships and favoritism between Donovan, and Hilliard and/or Donais. This cronyism appears to have created a system where personal connections trump merit and legal obligations, particularly in handling ADA-related matters. The integrity of the appeals process has been severely compromised as a result. This is buttressed by fairly recent discovery by the plaintiffs that the NH superior court judge in the Anderson appeal's underlying case, Judge John Kissinger, has personal contacts with Craig Donais and his wife every Christmas holiday and other holidays, which was concealed by Judge Kissinger and Donais, during the underlying case even after a motion to recuse was filed. This concealed conflict of interest thereby taints Anderson's appeal and corrupting its judgment.

494.    Similarly, Countway's apparent concealment of contacts with Craig Donais and Rusell Hilliard, and thus conflicts, further illustrates how deeply entrenched this cronyism has become. These interconnected acts of favoritism and disregard for proper procedure have not only undermined the NHSC's ability to fairly address ADA requests but have also compounded the discrimination faced by those seeking equitable treatment, creating a hostile environment for individuals with disabilities within the NHSC system.

495.    There are further acts of Donovan towards plaintiffs in relatively recent rules committee meetings that further reveal bias and conflict.

496.    The rules committee and Donovan changed rules regarding contacting affected parties for any rule proposal, potentially limiting communication channels, which was changed because of the plaintiffs.

497.    Donovan changed the rules concerning copying ADO records and obtaining electronic copies by email, altering accessibility for some participants, because of the plaintiffs.

498.    Donovan created a new rule to limit speaking time in order to target the speech of the plaintiffs, affecting plaintiffs' ability to fully present their arguments or message in the rules meetings.

499.    During rule meetings, certain plaintiffs' speech was squelched and their time was cut off prematurely.

500.    Plaintiff was denied the opportunity to speak while others were permitted to do so, creating an imbalance.

501.    Donovan further conflated the identities of plaintiff and his spouse, which was unfair, and plaintiff was publicly chided for his spouse's actions in submitting a public comment after a certain time, erasing individuality, yet others in the past were allowed to the very same thing without being chided and called out on it. Some parties were allowed to file comments immediately before meetings, while plaintiff was either blocked or reprimanded for similar actions.

## **FAILURE TO RECUSE CONFLICTED JUSTICES**

502.    The New Hampshire Constitution emphasizes the importance of impartial judges, stating "it is the right of every citizen to be tried by judges as impartial as lot of humanity will admit".

503.    The failure of the remaining 3 conflicted and biased justices irreparably harms the plaintiffs.

504.    The plaintiffs have been deprived due process, deprived of a fair proceeding, deprived of impartial judiciary and deprived of equal protection and subjected to arbitrary and capricious conduct. The hostility of the NH supreme court has been evident and palpable and it is evident that these same justices do not like the plaintiffs, particularly Justice Donovan, who refuses to recuse himself and continues to show bias against the plaintiffs.

505.    This situation cries out for relief. This is an example of why there is a federal court, i.e. to protect outsiders from entrenched bias and local unfairness from state entities or state courts.

506.    The only other possible check on a state supreme court is through the injunctive powers of the federal court. One of the reasons for the existence of federal courts is to provide protection from the tyranny of state courts especially where they disfavor outsiders over against their own citizens who might enjoy a home court advantage. Additionally, federal courts provide protection in cases where state courts refuse to recognize the civil rights of a certain protected class of people whether based on race, or other protected classes, etc.

507.    Similarly, the fact that Hilliard and Justice Donovan have worked on the same committee creates the appearance of bias and conflict towards improperly influence plaintiff's appeal. The actions by the rules committee appear to be specifically intended to affect plaintiff's appeal negatively.

508.    Donovan's seeming attempts to obscure Hilliard's involvement on the committee could be relevant to show bias.

509.    The attendant the rule changes from the committee unfairly targeted plaintiff's appeal and case. This constitutes a due process claim.

510.    Conflict of Interest: Hilliard's involvement in rule-making while representing an opposing party constitutes a conflict of interest.

511.    Abuse of Process: The rule changes appear to be made specifically to hinder plaintiffs appeal and case.

512.    NB: There have been concerns raised by others about Justice Patrick Donovan's impartiality, particularly due to his past affiliations and work. There have been calls for Justice Donovan to recuse himself from certain cases, however, he has generally declined to do so, arguing that his past work does not prevent him from being impartial as a justice, which has further raised concerns that the standard for recusals is too high, allowing the appearance of bias in some cases.

513.    It should also be noted that there have also been concerns raised by others about the NHSC's composition and about the ideological makeup of the NHSC, with some arguing that recent appointments have shifted the court in a more conservative direction (4 out of 5 justices are republican and white). This has led to allegations by others of potential bias in certain types of cases.

514.    The Supreme Court has held that evidence of actual bias is not required to demand recusal of a judge. In Rippo v. Baker (2017), the Court ruled that the proper question is whether the probability of actual bias is too high to be constitutionally tolerable, rather than requiring proof of actual bias.

515.    In Williams v. Pennsylvania (2016), the Supreme Court found that a judge's failure to recuse himself from a case in which he was previously involved as a prosecutor violated due process, even without direct evidence of bias. The Court emphasized that an impartial adjudicator is essential to due process.

516.    The case of Judge Ronald Castille in Pennsylvania provides an example of potential judicial bias. Castille refused to recuse himself from a death penalty case in which he had significant prior involvement as a prosecutor. The Supreme Court found this created an unconstitutional risk of bias.

517.    There have been instances where judges made remarks during proceedings that appeared to reflect bias against particular groups or litigants. For example, a judge in California was removed from office for telling an attorney born in Ecuador to "lose the accent" and making other biased comments.

518.    The Supreme Court has established that any intentional use of race by a judge, even for supposedly benign purposes, is subject to strict scrutiny and may indicate bias.

519.    In some cases, judges have been disciplined for making racially or ethnically charged comments that created an appearance of bias, even if not directly related to their rulings.

520.    Judges may need to recuse themselves even without proof of actual bias if their involvement creates a significant risk of perceived bias. The appearance or probability of bias can be sufficient grounds for challenging a judge's impartiality, even without concrete evidence of bias in their rulings.

521.    Liteky v. United States (1994): This case addressed the issue of judicial bias and when recusal is necessary. The Supreme Court ruled that opinions formed by a judge based on events occurring during current or prior proceedings don't necessarily constitute bias requiring recusal, unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.

522.    In re Murchison (1955): This landmark case established that a judge who acts as a "one-man grand jury" cannot then try the same defendants. The Court held that a fair trial in a fair tribunal is a basic requirement of due process, and this requirement is not met when the judge has been involved in the accusatory process

523.    United States v. Cooley (1993): In this case, the First Circuit Court of Appeals ordered a district judge's recusal due to his appearance on national television to discuss a case pending before him. The court found that this created an appearance of partiality

524.    Johnson v. Mississippi (1971): The Supreme Court overturned a contempt conviction because the judge had been a losing party in a previous civil rights suit filed by the defendant. The Court found that the judge should have recused himself due to his personal involvement in the matter.

525.    The courts have consistently held that even the appearance of bias can be grounds for recusal, emphasizing the importance of maintaining public confidence in the judiciary.

526.    In judicial misconduct cases, patterns of behavior or a series of rulings that appear to deviate significantly from normal judicial practice might be considered as evidence of bias or potential retaliation.

527.    The "appearance of impropriety" standard, used in judicial ethics, suggests that even the appearance of bias or retaliation can be grounds for recusal or disciplinary action.

528.    The judicial system relies heavily on the presumption of impartiality.

529.    In re Murchison (1955): This case established the principle that "no man can be a judge in his own case," which is often cited in cases involving judicial bias.

530.    Galloway v. Superior Court of District of Columbia (1993): In this case, a blind man was categorically excluded from jury service. The court ruled that such blanket exclusions violate the ADA, emphasizing the need for individualized assessments of ability rather than stereotypical assumptions.

531.    Keith v. County of Oakland (2013): While not directly about judicial bias, this case from the 6th Circuit Court of Appeals dealt with stereotypical assumptions about disabilities. The court ruled that a deaf lifeguard applicant should have been given an individualized assessment rather than being automatically disqualified.

532.    Doe v. Judicial Nominating Commission for the Fifteenth Judicial Circuit of Florida (2018): This case involved a judicial applicant with a history of depression who was required to disclose her mental health history and treatment. The court found that such broad inquiries could violate the ADA by discriminating against individuals with disabilities.

533.    Donovan and the NHSC defendants are embroiled in a personal and legal dispute with the plaintiffs over issues material to Bisasor's appeal. This personal and legal dispute preceded the filing of Bisasor's

42

appeal. This alone warrants recusal of Donovan at a minimum and warrants federal intervention by the federal court.

### F. Bias and Conflict of Interest
### V. PERVASIVE BIAS EXCEPTION

534.    "A fair trial in a fair tribunal is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136 (1955). This principle applies equally to appellate proceedings. See Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 821-25 (1986). Due process requires recusal where "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." Withrow v. Larkin, 421 U.S. 35, 47 (1975).

535.    The facts alleged demonstrate a probability of actual bias that violates due process:

536.    Two of five Justices have already recused themselves, leaving a limited panel.

537.    Justice Donovan has a clear conflict of interest based on his prior employment with the Attorney General's Office defending the case.

538.    The remaining Justices have consistently ruled against Plaintiff on even routine matters.

539.    The Court has demonstrated hostility toward Plaintiff for raising legitimate concerns about bias.

540.    The limited panel creates a systemic disadvantage for Plaintiff as an out-of-state minority litigant.

541.    These circumstances create an appearance of bias that "would offer a possible temptation to the average... judge to... lead him not to hold the balance nice, clear and true." Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 879 (2009) (quoting Tumey v. Ohio, 273 U.S. 510, 532 (1927)).

542.    While this Court typically abstains from interfering with state court proceedings under the Rooker-Feldman doctrine (Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923); District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983)) and Younger abstention doctrine (Younger v. Harris, 401 U.S. 37 (1971)), the pervasive bias exception applies here due to:

a)    Recusal of multiple judges, including two on the supreme court;

b)    Remaining justices' refusal to address bias concerns;

c)    The small and interconnected nature of the NH legal community.

543.    The pervasive bias exception allows federal court intervention when the state court is so biased against the litigant that there is no chance of a fair hearing. See Gibson v. Berryhill, 411 U.S. 564, 577 (1973).

544.    Plaintiff is therefore likely to succeed on his claim that the NHSC's continued adjudication of his appeal violates due process.

---

### THE NHSC'S BIFURCATED ACCOMMODATION PROCESS IS UNDULY COMPLEX, BURDENSOME, AND INEFFICIENT AND VIOLATES THE ADA

---

545.    The current processes, which require separate channels for administrative and judicial accommodations, are unduly complex and burdensome on people with disabilities, as well as inefficient, leading to redundancies and wastes of resources and time, to prejudice of the plaintiffs.

546.    Further, judges' views on appropriate accommodations and necessary documentation may vary greatly, which will lead to inconsistency in the granting and denial of accommodations.

547.    The current ADA process disproportionately subjects individuals with invisible disabilities to a burdensome capricious process, which includes disclosing their disability to the judge overseeing their own case and to other parties, including adversaries. On the other hand, individuals with visible disabilities—requiring accommodations such as mobility assistance, sign language interpreters, assistive listening devices, or Braille materials—may present their requests to nonjudicial staff without the need to involve either the judge overseeing the case or other parties.

548.    Individuals with invisible disabilities should not be subjected to a more onerous and invasive procedure in order to receive the accommodations to which they are legally entitled. Disability laws do not make such a distinction between individuals with visible versus invisible disabilities, and neither should the NHSC's process.

549. Individuals presenting judicial accommodation requests—again, predominantly those with invisible disabilities—will have their request heard by the judge overseeing their own case. This will inevitably have a chilling effect on people who may choose to not request an accommodation out of fear of having their disability disclosed to others or negatively affect their case.

550. Without a unified process to handle all accommodation requests consistently and without interference by the judges overseeing cases, the risks that prejudices persons with disabilities will materialize, and it will be near-impossible for the NH judicial branch to implement consistency in the handling of judicial accommodation requests.

551. The risks discussed above are exacerbated by the fact that the current process does not provide for an internal appeal system as required by the ADA and its implementing regulations. 42 U.S.C. §§ 12131, 12134, and 12205a; 28 C.F.R. § 35.107. Federal law mandates,

> A public entity that employs 50 or more persons shall designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under [the ADA and its associated regulations], including any investigation of any complaint communicated to it alleging its noncompliance…or alleging any actions that would be prohibited….A public entity that employs 50 or more persons shall adopt and publish grievance procedures providing for prompt and equitable resolution of complaints alleging any action that would be prohibited by [the ADA and its associated regulations].

552. In addition to violating the ADA, this lack of appeal mechanism in this context results in a prejudicial; burden individuals with disabilities, in particular pro se litigants and litigants with intellectual disabilities, as they are forces to have seek relief in federal court or the Supreme Court.

553. They also force individuals with disabilities—again, predominantly those with invisible disabilities—to spend time, effort, and resources navigating extremely difficult external appellate procedures just to receive accommodations to which they are legally entitled and which will allow them to participate fully in the judicial process. This is a burden that non-disabled parties do not have to face.

554. Further, although a state or local government entity may deny an accommodation request that "would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." 28 C.F.R. § 35.164, however,

> The decision…must be made by the head of the public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity and must be accompanied by a written statement of the reasons for reaching that conclusion.

555. Therefore, the current process at the NHSC should provide for a straightforward internal review process so that all individuals with disabilities—no matter what the disability—can have a denied request reviewed quickly and efficiently. Such an internal appeal process already exists for administrative accommodations, and we invite the court system to think through a mechanism to afford the same type of procedural rights to individuals with disabilities requesting judicial accommodations. Plaintiffs in this case were not provided with any opportunity to appeal internally to the head of the public entity, which violates the ADA.

556. The current process requires disclosure of confidential information: namely, the disabilities, the medical conditions and even doctors' letters and medical records to the opposing adversaries.

557. As for the impact of this disclosure on persons with disabilities: in the world of litigation, disclosure of any perceived weakness—which, in our ableist society, includes disabilities—places a party at a disadvantage, particularly if the party is already a member of one or more marginalized groups. A party who is forced to reveal the existence of a disability to opposing counsel as part of an accommodation request will add self-consciousness and additional stress, particularly after being required to disclose to opposing counsel to the accommodation as though it were a favor such as email service. Disability accommodations are not favors or privileges, but rather legal entitlements whose purpose is to "ensure that, to the maximum extent possible, individuals with disabilities receive the benefits or services provided by the public entity" in question. 28 C.F.R. § 35.164. As discussed, elsewhere in this pleading, the impact of requiring disclosure of disabilities to opposing adversaries, has tremendously deleterious effects.

558.    As another possible example, such disclosure would be even more harmful if, for example, a judge revealed the existence of a pro se plaintiff's disability in an order-of-protection proceeding against the plaintiff's abuser or stalker.

559.    The current process should be modified to require all accommodation requests to be filed under seal, even when they do not comply with each and every requirement of the rule.

560.    The ADA does not contemplate that a qualified individual demonstrate how they are limited. Individuals who require reasonable accommodations and have a right to access public spaces need only demonstrate that without the reasonable "modification" or accommodation they would be prevented from accessing public benefits, programs, or activities.

561.    The current ADA process of the NHSC has and will have especially detrimental effects on BIPOC litigants, who already face discrimination and barriers to justice, as they are already more likely to be disbelieved by the judicial system because of racialized beliefs, stereotypes, and implicit racial bias about their untrustworthiness. Requiring BIPOC litigants, who already experience discrimination, to prove how their disability limits their ability to participate in court proceedings invites judges to doubt whether their accommodation request is legitimate. Eliminating this requirement from the proposed rule may prevent BIPOC litigants from being further scrutinized because of their race. This is precisely what has occurred here with the plaintiffs of this case.

---

## V. FEDERAL LAWS

---

## VII. FEDERAL LAW REQUIRES REASONABLE ACCOMMODATIONS OR MODIFICATIONS FOR PERSONS WITH DISABILITIES

1.  Enacted in 1990, among the ADA's purposes was to address "discrimination against individuals with disabilities … in such critical areas as … voting, and access to public services." 42 U.S.C. § 12101(a)(3).

2.  This includes the "failure to make modifications to existing facilities and practices, … [or] relegation to lesser services." 42 U.S.C. § 12101(a)(5). Congress's intent was to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities, … [and] to ensure that the Federal Government plays a central role in enforcing the standards established" in the ADA. 42 U.S.C. § 12101(b).

3.  "Failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion," and therefore "Congress required the States to take reasonable measures to remove … barriers to accessibility." Tennessee v. Lane, 541 U.S. 509, 511 (2004).

4.  "Disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). Disability is "construed in favor of broad coverage," 42 U.S.C. § 12102(4)(A), and includes not only physical impairments, but also diseases that compromise a person's immune system. See Bragdon v. Abbott, 524 U.S. 624 (1998).

5.  New Hampshire citizens or persons who have been denied remote participation in public hearings before or in the NHSC, in their efforts to avoid COVID-19 infection, are disabled for purposes of the ADA.

6.  The ADA covers any "public entity," including "any State or local government" and "any department, agency, special purpose district, or 16 other instrumentality of a State … or local government." 42 U.S.C. § 12131.

7.  "Public entity" is construed broadly, Pennsylvania Dep't of Correction. v. Yeskey, 524 U.S. 206, 212 (1998), and includes, for instance, access to state courthouses and participation in state court proceedings. Tennessee v. Lane, 541 U.S. at 509; Badillo-Santiago v. Naveira-Merly, 378 F.3d 1 (1st Cir. 2004)

8.  Thus, the NHSC and its committees is a covered public entity which must comply with the ADA. The ADA requires that persons with disabilities be provided "reasonable accommodation" of their disability. See Mary Jo C. v. New York State & Local Retirement System, 707 F.3d 144, 153 (2d Cir. 2013) (ADA mandates that "covered entities make reasonable accommodations in order to provide qualified individuals with an equal opportunity … to participate in programs."); see also 29 U.S.C. § 794 ("No … individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in … any

program or activity [which] means all of the operations of … a department, agency, special purpose district, or other instrumentality of a State or of a local government.").

9.  "A modification is reasonable if it is reasonable on its face or used ordinarily … and will not cause undue hardship." National Federation of the Blind v. Lamone, 813 F.3d 494, 507 (4th Cir. 2016).

10. While states may have once been reticent of telecommuting technology as an accommodation, see e.g., Kvorjak v. Maine, 259 F.3d 48 (1st Cir. 2001), that has been largely abrogated by the pandemic, and such technology was in fact implemented during the pandemic by the NHSC.

11. For over three decades, people with disabilities have been guaranteed the right to equal participation in all aspects of community living, including the democratic and public access principles of taking part in state government. Yet, those with disabilities including plaintiff bisasor have been discriminated against by the NHSC's refusal to comply with well-established federal law and related rights to receive reasonable accommodations. Participation in any democratic or public process is constitutionally guaranteed to all citizens.

12. Failure to provide reasonable accommodations violates disabled citizen's' rights. It also perpetuates the bias Congress sought to eradicate in enacting the ADA. When signing the ADA into law in July 1990, President George H.W. Bush stated: [ [N]ow I sign legislation which takes a sledgehammer to another wall, one which has for too many generations separated Americans with disabilities from the freedom they could glimpse, but not grasp. Once again, we rejoice as this barrier falls for claiming together we will not accept, we will not excuse, we will not tolerate discrimination in America. Remarks of President George H.W. Bush at the Signing of the Americans with Disabilities Act (July 26, 1990).] This court should recognize the violation of rights caused by the lack of reasonable accommodations, and grant injunctive relief requested herein.

13.  Furthermore, "State government" — and all its components — is the express target of Title II of the ADA. 42 U.S.C. § 12131(1)(A). A state supreme court is clearly within that definition. Pulliam v. Allen, 466 U.S. 522, 541 (1984) ("[A] State acts only by its legislative, executive, or judicial authorities[.]"); 28 C.F.R. § Pt. 35, App. B § 135.102 ("Title II coverage .. . includes activities of the legislative and judicial branches of State and local governments.").

14. That understanding comports with the statute's declared purpose: "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" by "invok[ing] the sweep of congressional authority." 42 U.S.C. § 12101(b). The Act's objectives were informed by Congress' findings that disabled persons have a "right to fully participate in all aspects of society" and that "individuals who have experienced discrimination on the basis of disability often had no legal recourse." Id. at (a).

15. Moreover, one of the explicit purposes of the ADA is to create "strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(3).

16. To that end, Congress explicitly abrogated the Eleventh Amendment immunity of the states. 42 U.S.C. § 12202 ("In any action against a State for a violation of the requirements of this Act, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State." Id.

17. Moreover, the defendants waived any immunity by accepting federal funds under the Rehabilitation Act. Both statutes provide the same relevant relief here: reasonable accommodations. The statute provides that "[n]o otherwise qualified individual with a disability . . . shall . . . be excluded from participation in . . . any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). The "term" "program or activity' means all of the operations" of any "State or local government." Id. at (b). Like the ADA, the Rehabilitation Act states that "[i]n a suit against a State for a violation of [the] statute" remedies are available "to the same extent" such remedies are available in a suit against all other defendants. 42 U.S.C. § 2000d-7(a)(2). Similarly to the ADA, the Rehabilitation Act also includes an explicit waiver of Eleventh Amendment immunity.

18. "Regarded As" Claim Can Be Raised Even If Actually Disabled

19. Under the ADA, a plaintiff may be disabled in three ways, via: (1) an actual disability, (2) a record of a disability, or (3) being regarded as disabled. 42 U.S.C. §12102(1)(A)-(C). The defendant argued a plaintiff

cannot be both regarded as disabled and actually disabled. The court disagreed, citing a provision of the law amended by the 2008 Americans with Disabilities Act Amendments Act ("ADAAA"). Section 12102(3)(A) says a person is regarded as disabled if subjected to a prohibited action because of either an "actual or perceived" impairment "whether or not the impairment limits or is perceived to limit a major life activity." The regulations also state that whether a person is actually disabled is "not relevant" to coverage under the regarded-as prong. 29 C.F.R. §1630.2(j)(2).

20. The court regarded plaintiff as having a disability but then discriminated against plaintiff for having disabilities.

---

## VI. LEGAL STANDARD FOR INJUNCTIVE RELIEF

---

21. To obtain a preliminary injunction, the moving party must establish: "(1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 171 (1st Cir. 2015). The First Circuit applies a "sliding scale" approach where "the strength of the showing on one factor may warrant a somewhat weaker showing on another." Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013).

---

## VII. LEGAL ARGUMENT

---

### Title II of the ADA

22. Title II of the ADA prohibits discrimination by public entities against persons with disabilities in the provision of public services, programs, or activities. 42 U.S.C. § 12132. To state a claim, a complaint must allege "(1) that [plaintiff] is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." Parker v. Universidad de Puerto Rico, 225 F.3d 1, 5 (1st Cir. 2000).

23. The First Circuit has identified "denial of a reasonable accommodation the plaintiff needed to meaningfully access a public service" as one of three types of discrimination prohibited under Title II of the ADA, in addition to disparate treatment and disparate impact. Snell v. Neville, 998 F.3d 474, 500 n.35 (1st Cir. 2021) (citing Nunes v. Massachusetts Dep't of Correction, 766 F.3d 136, 144-46 (1st Cir. 2014)). For accommodation-based claims, a public entity denies meaningful access if it refuses to "make reasonable modifications . . . when . . . necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." Pollack v. Regional Sch. Unit 75, 886 F.3d 75, 80 (1st Cir. 2018) (citing 28 C.F.R. § 35.130(b)(7)(i)).

### Qualified Individual

24. Persons with disabilities are "qualified" for protection under Title II of the ADA if "with or without reasonable modifications to rules, policies, or practices . . . [they meet] the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). The principal question is therefore whether he suffers from a legally cognizable disability.

### Disability

25. Courts apply a three-prong test to determine whether a disability exists under the ADA, considering (1) whether plaintiff has a physical or mental impairment; (2) whether the life activities plaintiff relies upon are "major"; and (3) whether the impairment substantially limits plaintiff's major life activities. Carroll v. Xerox Corp., 294 F.3d 231, 238 (1st Cir. 2002); see also 42 U.S.C. § 12102(1)(A). An impairment that is sporadic can qualify as a disability "if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D).

26. The complaint alleges alternative bases for establishing the existence of a disability, that plaintiff has a record of an impairment or that he is regarded as having an impairment. 42 U.S.C. § 12102(1)(B), (C).

27. "[E]vidence of a medical diagnosis of impairment, standing alone, is insufficient to prove a disability." Ramos-Echevarria v. Pichis, Inc., 659 F.3d 182, 187 (1st Cir. 2011). There must also be evidence that the impairment substantially limits one or more of an individual's major life activities. The plaintiff is required to specify the major life activity in which he claims to be substantially limited. Id. at 188. Whether an impairment substantially limits major life activities is "not intended to be a 'demanding standard' and should not engender 'extensive analysis'" in light of the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553. Mancini v. City of Providence, 909 F.3d 32, 42 (1st Cir. 2018).

## Reasonable Accommodation

28. The plaintiffs here alleges discrimination in the form of failure to make a reasonable accommodation to plaintiff's disability.

29. The defendants failed to engage in a good faith interactive process, and has failed to offer any form of reasonable accommodation to plaintiffs.

30. This Court should exercise its equitable power under the ADA, particularly 28 CFR § 36.504(a)(1)(a) which specifically grants to the federal court the power to review rules made that violate the "anti-Jim Crow" provisions of 28 CFR §36.201(b) in that rules that impact the protected class of the disabled must "based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities."

31. This lawsuit is based upon the Americans with Disabilities Act of 1990, as Amended, 42 U.S.C. §§ 12131-12165 and its attendant regulations. The ADA "provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity…" See Tennessee v. Lane, 541 U.S. at 513.

32. The defendants accepted the existence of a plausible physical impairment in making an accommodation narrowly tailored to the plausible physical impairment.

33. 28 CFR §36.105(a)(1)(i) contains the definition of "disability" as something which "substantially limits one or more of the major life activities, which are biological, stating that "the definition of 'disability' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA…" which, under §36.105(e)(1)(2) "if the individual has a history of an impairment that substantially limited one or more life activities " and "when compared to most people in the general population.

34. As a matter of statute under the Americans with Disabilities Act, the U.S. District Court has been granted the power to issue declaratory judgments invalidating or modifying "rules, policies, or practices" which impedes access "for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. 12131(2).

35. The Americans with Disabilities Act also identified, as an area of concern, "overprotective rules and policies." 42 U.S.C. 12101(3).

36. The ADA was crafted in part to avoid "forms of discrimination, including outright intentional exclusion" because of "overprotective rules and policies.

37. The ADA, which is a civil rights law, was equally concerned about "Jim Crow" laws that punished the disabled, such that the ADA contains its own anti-Jim Crow provision.

38. In 28 CFR §36.201(b), a policy which is overprotective, overbroad and in violation of the ADA is one not "based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities."

39. This case is an example of an invisible disability becoming activated and acute by "overprotective rules and policies" resulting in "outright intentional exclusion" from "access to public services."

40. The language was carried into Title II, §12131(2), where the definition of Qualified Individual, includes "an individual with a disability who, with or without reasonable modifications to rules, policies…meets the essential eligibility requirements for the receipt of services or the participation in programs or activities by a public entity." The right to seek modification by declaratory judgment against overly broad rules is statutory.

41. The NHSC ignored the law and commonsense protections of the ADA. It is no coincidence that the ADA was crafted and signed in the early 1990s, in response to the dual threat to the rights of AIDS patients and Vietnam Veterans in the late 1980s, which was a motivating factor in the political groundswell that surrounded creation of the ADA. A party excluded by medical classification has every right to ask a court, by specific statute and regulatory guidelines, to examine that policy for its legal and factual soundness, and to seek declaratory judgment accordingly.

42. The plaintiffs note that, in many ways, an action for declaratory judgment under the ADA that removes barriers to access are a form of class action, since the remedy benefits not only the party with immediate standing, as the U.S. District Court found, but for those who cannot come forward, or who will come forward in the future with the same grievance. For example, access ramps are not provided only for the complainant who demands access; the ADA is a proactive statute that makes access invisible to all. In providing a remedy that calls for voiding "overprotective policies," Congress was noting that overzealous regulations, not grounded in any possible reality, could and would create barriers based on disability.

43. 28 CFR 36.105 holds that Title III is construed broadly, and the kind of "extensive analysis" of the underlying condition is deemed improper as an invasion of medical privacy. This is a concept that the Defendants ignored in demanding more analysis of plaintiff's disability.

44. These core principles, which seek to restore dignity, privacy and respect for the disabled, form the core of the ADA: The right to access to the Courts, with particular disadvantage to the disabled, a protected class under the ADA.

45. The recent case of Rivera v. Altranais Home Care LLC 19 cv 30139, in the US District Court for the District of Massachusetts, with a thoughtful decision by Magistrate Judge Robertson dated January 18, 2022, affirms that the obligation of the interactive process is alive and well in ADA doctrine, and the question of whether the process was followed is one of fact for the finder of fact.

46. The Plaintiff's process with the NHSC was not interactive, but demonstrates an arrogant refusal to participate in a formal interaction with the Plaintiff; considering the nhsC's clear understanding of the law. The factual question remains viable as to why the NHSC continues to refuse to do so.

47. See § 35.108(d)(1)(v) ("An impairment does not need to prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.").

48. See also § 35.108(d)(ii) ("The primary object of attention in cases brought under title II of the ADA should be whether public entities have complied with their obligations and whether discrimination has occurred, not the extent to which an individual's impairment substantially limits a major life activity."); see also, e.g., Baughman v. Walt Disney World Co., 685 F.3d 1131, 1134- 35 (9th Cir. 2012).

## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

49. The Plaintiff has a disability as defined under the Americans with Disabilities Act, which has been confirmed by his physician in consultation with, and in review of, the Plaintiff's medical status.

50. Under the Americans with Disabilities Act, the NH Judicial Branch and the NHSC was required to provide a reasonable accommodation to the Plaintiff.

51. The NH Judicial Branch and the NHSC offered no reasonable accommodation which reflected a means of conducting daily activity in the usual and customary manner as required by the ADA.

52. At no time did any individual with any competence or understanding of the medical issues make any effort to understand the medical issue or to make an offer of reasonable accommodation in concert with participation by the Plaintiff.

53. As a result of this failure by the NH Judicial Branch and the NHSC, the Plaintiff was denied his right of access required by the Americans with Disabilities Act and was otherwise harmed.

54. The NH Judicial Branch and the NHSC denied plaintiff's administrative requests for ADA accommodation.

55. The NH Judicial Branch and the NHSC denied plaintiff's judicial requests for ADA accommodation.

56. The NH Judicial Branch and the NHSC will deny, by Tuesday October 15, 2024, the plaintiff's remaining ADA requests.

57. The NH Judicial Branch and the NHSC will permanently dismiss plaintiff's appeal, after by Tuesday October 15, 2024, by denying the plaintiff's remaining ADA requests.

58. The plaintiff has filed last chance requests for relief under the ADA, that are pending in the NHSC/NH Judicial Branch. Without intervention by the federal court to enforce plaintiff's federally protected rights under the ADA, the plaintiffs will suffer permanent and irreparable harmed.

## REHABILITATION ACT
### Violation of Section 504 of the Rehabilitation Act

59. Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The NHSC likely receives federal financial assistance, subjecting it to Section 504. See Prakel, 100 F. Supp. 3d at 679-80 (finding state court system received federal financial assistance).

60. The analysis under Section 504 is substantially similar to that under Title II of the ADA. Theriault v. Flynn, 162 F.3d 46, 48 n.3 (1st Cir. 1998). For the reasons discussed above regarding the ADA claim, Plaintiff is likely to succeed on his Section 504 claim as well.

61. The First Circuit has held that to establish a prima facie case under Section 504, a plaintiff must show: "(1) that he is a 'handicapped individual' under the Act, (2) that he is 'otherwise qualified' for the position sought, (3) that he was excluded from the position solely by reason of his handicap, and (4) that the program or activity in question receives federal financial assistance." Leary v. Dalton, 58 F.3d 748, 752 (1st Cir. 1995).

62. Plaintiff can likely establish each of these elements based on the facts presented.

### Violations of the ADA and Rehabilitation Act

63. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act similarly prohibits disability discrimination by recipients of federal funding. 29 U.S.C. § 794(a).

64. Courts have consistently held that these statutes apply to state court systems and require the provision of reasonable accommodations to ensure equal access. Tennessee v. Lane, 541 U.S. 509, 531-33 (2004); Galloway v. Superior Court of D.C., 816 F. Supp. 12, 19 (D.D.C. 1993).

65. The NHSC has violated the ADA and Rehabilitation Act by:

66. Denying Plaintiff's requests for reasonable accommodations without proper consideration or explanation. See Henrietta D. v. Bloomberg, 331 F.3d 261, 279 (2d Cir. 2003) (failure to make reasonable modifications constitutes discrimination).

67. Imposing unreasonable conditions on the provision of accommodations, such as requiring waiver of privacy rights. See Lovell v. Chandler, 303 F.3d 1039, 1054 (9th Cir. 2002) (imposing improper eligibility criteria violates ADA).

68. Retaliating against Plaintiff for asserting his rights under the ADA. See Weber v. Cranston Sch. Comm., 212 F.3d 41, 48 (1st Cir. 2000) (ADA prohibits retaliation for exercising rights under the statute).

69. Failing to maintain the confidentiality of Plaintiff's medical information as required by 28 C.F.R. § 35.133(b).

70. Given this pattern of violations, Plaintiff is likely to prevail on his ADA and Rehabilitation Act claims

### Violations of Constitutional Rights Under § 1983

71. The NHSC's conduct also violates Plaintiff's constitutional rights, giving rise to claims under 42 U.S.C. § 1983. Specifically:

   a) Due Process: The arbitrary denial of accommodations and threat to disclose confidential medical information violate procedural due process. See Mathews v. Eldridge, 424 U.S. 319, 333 (1976).

   b) Equal Protection: The disparate treatment of Plaintiff compared to non-disabled and white litigants violates equal protection. See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (recognizing "class of one" equal protection claims).

   c) First Amendment: Retaliation for Plaintiff's assertion of rights violates the First Amendment right to petition. See Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 741 (1983).

72. The evidence of bias and disparate treatment supports a finding of intentional discrimination necessary for § 1983 liability. See Washington v. Davis, 426 U.S. 229, 239-40 (1976).

## Violation of Due Process

73. The Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Due process requires that litigants have a meaningful opportunity to be heard. Boddie v. Connecticut, 401 U.S. 371, 377 (1971).

74. By denying Plaintiff's requests for accommodations and dismissing his appeal without allowing him a meaningful opportunity to file his brief, Defendants violated Plaintiff's due process rights. See Rohan, 375 F.3d at 276 (holding that dismissal of case without accommodating plaintiff's mental illness violated due process); Byers v. Illinois State Police, 2012 WL 6622940, at *3 (C.D. Ill. Dec. 19, 2012) (finding colorable due process claim where court denied accommodation requests and dismissed case).

75. The Supreme Court has long recognized that "due process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." Boddie, 401 U.S. at 377.

76. In the context of disability accommodations, the Ninth Circuit has held that "a violation of due process occurs where a party is denied a fair hearing because the party suffers from a disability that the court fails to reasonably accommodate." Higgins v. Carpenter, 258 F.3d 797, 802 (9th Cir. 2001).

## Violation of Equal Protection

77. The Equal Protection Clause of the Fourteenth Amendment requires that similarly situated persons be treated alike. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). Disability-based classifications are subject to rational basis review. Id. at 446.

78. By denying Plaintiff's requests for accommodations while granting similar requests to non-disabled litigants, Defendant has violated the Equal Protection Clause. See Toledo, 454 F.3d at 33 (recognizing equal protection claim based on denial of accommodations to disabled student). Defendant's actions do not appear to be rationally related to any legitimate government interest.

79. The Supreme Court has held that while disability is not a suspect classification warranting heightened scrutiny, laws discriminating on the basis of disability must still have a rational basis and be free from animus.

## VII. THE DEFENDANTS HAVE VIOLATED THE PLAINTIFF'S FEDERALLY PROTECTED FIRST AND FOURTEENTH AMENDMENT RIGHTS UNDER THE US CONSTITUTION

80. The PCC's rulings and policies effectively prevent the plaintiffs from speaking to witnesses in a prior matter in order to marshal evidence in support of her claims, from discussing charges with prior New Hampshire professional conduct committee witnesses who are the victims of alleged misconduct, and from discovering evidence presented to the NH professional conduct committee investigations, if any, nor to utilize information obtained by plaintiffs during the course of their interaction with the committee for use as evidence in a court in pending or future litigation.

81. Furthermore, the plaintiffs are prevented from learning the basis of New Hampshire professional conduct committee conclusions, as the charges filed by the plaintiffs were found to not be sufficient to trigger disclosure under the Rules of the NHSC.

82. It is either an unconstitutional rule or unconstitutional interpretation of the rule to prohibit the plaintiffs from obtaining a copy of the files. This violates the NH constitution and the US constitution. It is a violation of plaintiffs' fourteenth amendment rights and first amendment rights.

83. The public interest in disclosure of records is particularly great when it may potentially expose government misconduct or negligence. See, e.g., Union Leader Corp. v. N.H. Ret. Sys., 162 N.H. 673, 684 (2011) (noting that a public interest existed in disclosure where the "Union Leader seeks to use the information to uncover potential governmental error or corruption"); Prof 'l Firefighters of N.H., 159 N.H. at 709 ("Public scrutiny can expose corruption, incompetence, inefficiency, prejudice and favoritism.").

84. In this case, the NHSC has previously recognized that the public disclosure of ADO records implicates transparency in ensuring that the ADO is not conducting its regulation of the attorney system in a corrupt way. By preventing a copy of the requested file being given to the plaintiffs, the PCC is shielding itself and the ADO (and ultimately the NHSC) from public accountability which violates the spirit and the intent as well as the letter of the NH constitution. See Prof'l Firefighters of N.H., 159 N.H. at 709 ("Public scrutiny can expose corruption, incompetence, inefficiency, prejudice and favoritism."); see also N.H. Const. pt. I, art. 8 ("Government . . . should be . . . accountable…").

85. By subjecting the plaintiffs to unnecessary exposure to Covid-19 and possibly death, the defendants have denied the plaintiffs the right to petition government, as secured by the First and Fourteenth Amendments of the United States Constitution as further secured by 42 U.S.C. § 1983.

86. By restricting plaintiffs' right to free speech, the plaintiffs are inhibited and chilled in the exercise of their right of free speech to reproach government officials, and to petition the government, and thus defendants have violated the plaintiffs' rights secured by the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

## VIII. THE DEFENDANTS ARE NOT ADHERING TO THEIR OWN RULES.

87. The defendants are violating their own rules and not adhering to their own rules.

88. They are behaving like a law unto themselves where they can do whatever they want or please without accountability to the public.

89. The defendants are not allowing reasonable access to public files in violation of the NH constitution.

90. Moreover, it should be noted that there is a common law precedent where public access is mandated for court records and records related to court bodies.

91. By not following their own rules, the defendants are infringing upon the constitutional and substantive rights of the plaintiff.

92. NB: Moreover, the acts and decisions of the defendants have not been rational. A public body must be rational in its decisions. Unreasonableness can include anything which can objectively be adjudged to be unreasonable. It is not confined to culpability or callous indifference. It can include, where carried to excess, sentimentality, romanticism, bigotry, wild prejudice, caprice, fatuousness, or excessive lack of common sense. It is a decision which no sensible authority acting with due appreciation of its responsibilities would have decided to adopt. (Secretary of State for Education and Science v Tameside Metropolitan Borough Council [1977] AC 1014, per Lord Diplock at 1064 E-F).

## IX. FURTHER CONSTITUTIONAL ARGUMENTS

93. Defendant Rules Committee and Defendant PCC are public bodies or agencies created by the NHSC.

94. They are headquartered in Concord, New Hampshire, and conduct business and operations throughout the State of New Hampshire. These defendants are currently enforcing the unconstitutional practices and policies complained of in this action.

### A. The First Amendment

95. These defendants act under color of state law.

96. Under color of state law, these defendants have intruded upon the plaintiff's first amendment rights and the plaintiff's First Amendment rights are irretrievably infringed.

97. Accordingly, Defendants currently maintain and actively enforce a set of laws, customs, practices, and policies that deprive the plaintiffs of rights, privileges and/or immunities secured by the First Amendment.

98. Plaintiffs have no adequate legal remedy by which to prevent or minimize the continuing irreparable harm to their constitutional rights.

99. Plaintiffs are therefore entitled to relief.

### B. Improper Policies and Procedures

100. It is clear from the above, that the defendants have allowed improper policies and procedures that implicate the plaintiffs' First and Fourteenth Amendment rights.

101. For example, the First Amendment requires policies and procedures for protecting the fundamental right to freedom of speech.

102.    But the defendants have adopted policies and procedures that explicitly bar members of the public from obtaining copies of grievances and thus from publicly criticizing the defendants in their work or decisions.

103.    Accordingly, the defendants currently maintain and actively enforce a set of laws, customs, practices, and policies under color of state law that deprive the plaintiffs of rights, privileges and/or immunities secured by the First and Fourteenth Amendments.

104.    Plaintiffs have no adequate legal remedy by which to prevent or minimize the continuing irreparable harm to their constitutional rights.

105.    Plaintiffs are therefore entitled to relief.

### C. Violation of Procedural Due Process

106.    The Defendants have violated plaintiffs' procedural due process rights thus implicating the Fourteenth Amendment.

107.    The Fourteenth Amendment requires the defendants to provide constitutionally adequate procedures in order to protect plaintiffs' rights to procedural due process. Even in the absence of First Amendment interests, minimum procedural safeguards are required under the due process clause.

108.    In the absence of constitutionally adequate procedures, the defendants have violated plaintiffs' Fourteenth Amendment due process rights, where fair procedures are required, apart from any procedural safeguards required by the First Amendment.

109.    Therefore, the plaintiffs have been deprived of their right to procedural due process under the Fourteenth Amendment.

110.    Accordingly, the defendants currently maintain and actively enforce a set of laws, customs, practices, and policies under color of state law that deprive Plaintiff of rights, privileges and/or immunities secured by the Fourteenth Amendment, and, therefore, Defendants are liable to the plaintiffs under 42 U.S.C. § 1983.

111.    The plaintiffs have no adequate legal remedy by which to prevent or minimize the continuing irreparable harm to their constitutional rights.

112.    The plaintiffs are therefore entitled to relief.

---

## JUDICIAL OR SOVEREIGN IMMUNITY DOES NOT BAR RELIEF

---

### Judicial Immunity

113.    Judicial immunity has not been extended to "administrative, legislative, or executive functions." Forrester v. White, 484 U.S. 219, 227 (1988).

114.    Here, the NHSC and the defendants performed an administrative rather than a judicial or quasi-judicial function when it considered and denied plaintiff's request for exemption as part of its ADA accommodation request process.

115.    The process of granting and denying requests for accommodations generally involves the application of statutory and regulatory factors to individual applicants, rather than the adjudication of disputes between parties. See Duvall v. County of Kitsap, 260 F.3d 1124, 1134-35 (9th Cir. 2001) (material issue of fact as to whether trial court administrator who doubled as ADA coordinator acted in an administrative, rather than quasi-judicial, function in implementing accommodation requirements under the ADA).

116.    Also, the acts undertaken by Justice Donovan as chair of the rules committee, and the acts of the rules committee and the ADO and PCC, and the court administrators, and the administrative of the courts, and the NH judicial branch, are all administrative acts, especially relating to handling of plaintiff's ADA requests.

117.    The AGO and the attorney general clearly have no judicial immunity, and neither does Tyler Technologies.

### Sovereign Immunity

118.    In United States v. Georgia, 546 U.S. 151 (2006), the Supreme Court held that Title II of the ADA validly abrogates state sovereign immunity insofar as it "creates a private cause of action for damages against

the States for conduct that actually violates the Fourteenth Amendment." Id. at 159. Title II may also abrogate sovereign immunity if Congress's proscription of a "class of conduct" constitutes a valid exercise of its enforcement powers under Section 5 of the amendment. See id.; see also Tennessee v. Lane, 541 U.S. 509, 533-34 (2004).

119.    Further, while the Eleventh Amendment generally bars suits against states in federal court, there are several exceptions that apply here:

1.  **Ex parte Young Exception:** Under Ex parte Young, 209 U.S. 123 (1908), federal courts may enjoin state officials in their official capacities to prevent ongoing violations of federal law. This exception allows Plaintiff to seek prospective injunctive relief against the individual Justices of the NHSC.

2.  **Congressional Abrogation:** Congress has validly abrogated state sovereign immunity for claims under Title II of the ADA. See Tennessee v. Lane, 541 U.S. 509 (2004). Therefore, Plaintiff's ADA claims are not barred by sovereign immunity.

3.  **Waiver Through Receipt of Federal Funds:** By accepting federal funds, states waive their sovereign immunity for claims under Section 504 of the Rehabilitation Act. See 42 U.S.C. § 2000d-7. To the extent the New Hampshire court system receives federal funding, it has waived immunity for Plaintiff's Rehabilitation Act claims.

---

## VIII. FURTHER ARGUMENT FOR INJUNCTIVE RELIEF

---

### III. Legal Standard

120.    To obtain a preliminary injunction, the moving party must establish: "(1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 171 (1st Cir. 2015). The First Circuit has described this as a "sliding scale" approach where "the strength of the showing on one factor may warrant a somewhat weaker showing on another." Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013).

121.    The Supreme Court has emphasized that a preliminary injunction is "an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). However, courts have recognized that preliminary injunctions play a crucial role in protecting civil rights. As the Ninth Circuit has noted, "The purpose of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits... However, the status quo is not simply any situation which exists prior to the filing of the lawsuit, but rather the last uncontested status which preceded the pending controversy." GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1210 (9th Cir. 2000).

### A. This Court Has Jurisdiction to Grant the Requested Relief

122.    As a threshold matter, this Court has jurisdiction to grant the requested injunctive relief despite general principles of abstention from interfering with state court proceedings. While the Anti-Injunction Act, 28 U.S.C. § 2283, generally prohibits federal courts from enjoining state court proceedings, there are exceptions to this rule.

123.    One such exception is for claims brought under 42 U.S.C. § 1983, which expressly authorizes injunctive relief against state officials. Mitchum v. Foster, 407 U.S. 225, 242-43 (1972). Plaintiff's claims under § 1983 for violations of his constitutional rights fall within this exception.

124.    Additionally, the Supreme Court has recognized exceptions to abstention doctrines where there are extraordinary circumstances, such as when the state court is so biased against a litigant that there is no chance of a fair hearing. Gibson v. Berryhill, 411 U.S. 564, 577 (1973). Plaintiff alleges pervasive bias and conflicts of interest that rise to this level of extraordinary circumstances.

### B. Plaintiff Is Likely to Succeed on the Merits of His Claims
### 1. Violation of Title II of the ADA

125.    Plaintiff is likely to succeed on the merits of his ADA claim because:

a) He is a qualified individual with a disability under 42 U.S.C. § 12131(2);

b) The NHSC is a public entity subject to Title II of the ADA, 42 U.S.C. § 12131(1);

c) He was denied the benefits of the NHSC's services or programs;

d) The denial was by reason of his disability.

126. The NHSC's actions violate the ADA's requirements for reasonable accommodations and non-discrimination. See Tennessee v. Lane, 541 U.S. 509 (2004) (holding that Title II of the ADA applies to state courts and requires them to provide reasonable accommodations to ensure access to the courts).

127. The NHSC's failure to engage in an interactive process to determine appropriate accommodations violates the ADA. See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999).

128. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. State courts are public entities subject to Title II. Tennessee v. Lane, 541 U.S. 509, 531 (2004).

129. To establish a prima facie case under Title II, a plaintiff must show: "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." Toledo v. Sanchez, 454 F.3d 24, 31 (1st Cir. 2006).

130. Plaintiff is likely to succeed in establishing each of these elements:

a) Qualified Individual with a Disability: Plaintiff has submitted medical documentation demonstrating that he has disabilities that substantially limit major life activities, including his ability to prepare legal filings within standard timeframes. This meets the ADA's definition of disability under 42 U.S.C. § 12102(1).

b) Exclusion from Participation: The NHSC has excluded Plaintiff from participating in the appellate process by denying his requests for accommodations and dismissing his appeal. The Supreme Court has recognized that "Title II does not require States to employ any and all means to make judicial services accessible to persons with disabilities... It requires only 'reasonable modifications' that would not fundamentally alter the nature of the service provided." Lane, 541 U.S. at 531-32. Plaintiff's request for an extension of time to file his brief is a reasonable modification that would not fundamentally alter the appellate process.

c) Discrimination by Reason of Disability: The Court explicitly denied Plaintiff's ADA accommodation requests, demonstrating that the exclusion was by reason of his disabilities.

131. Public entities must make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7)(i). Plaintiff's request for an extension of time to file his brief is a reasonable modification that is necessary to accommodate his disabilities and allow him meaningful participation in the appellate process. See Rohan v. Networks Presentations LLC, 375 F.3d 266, 275 (4th Cir. 2004) (holding that "in certain circumstances, time extensions can be a reasonable accommodation").

132. The reasonableness of a requested accommodation is a fact-specific inquiry. As the Seventh Circuit has explained, "Whether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties." Oconomowoc Residential Programs v. City of Milwaukee, 300 F.3d 775, 784 (7th Cir. 2002). Here, Plaintiff's request for an extension of time is reasonable given the nature of his disabilities and the complexity of the legal issues involved in his appeal.

133. The NHSC's denial of Plaintiff's accommodation requests likely violates Title II of the ADA. See Prakel v. Indiana, 100 F. Supp. 3d 661, 684 (S.D. Ind. 2015) (holding that state court's denial of deaf individual's requests for interpreter services violated Title II). The court in Prakel emphasized that "Title II imposes an affirmative obligation on public entities to make their services accessible to qualified individuals with disabilities." Id. at 680.

134. First, Plaintiff has submitted medical documentation demonstrating that he has disabilities that substantially limit major life activities. The ADA defines "disability" as "(A) a physical or mental impairment

that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Major life activities include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

135.    Second, Defendant has excluded Plaintiff from participating in the appellate process by denying his requests for accommodations and dismissing his appeal. The Supreme Court has recognized that "Title II does not require States to employ any and all means to make judicial services accessible to persons with disabilities... It requires only 'reasonable modifications' that would not fundamentally alter the nature of the service provided." Lane, 541 U.S. at 531-32.

136.    Third, this exclusion was by reason of Plaintiff's disabilities, as Defendants explicitly denied Plaintiff's ADA accommodation requests. The First Circuit has held that "to prevail on a Title II claim, a plaintiff must demonstrate that (1) he is a qualified individual with a disability; (2) he was excluded from participating in, or denied the benefits of a public entity's services, programs, or activities or was otherwise discriminated against; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." Buchanan v. Maine, 469 F.3d 158, 170-71 (1st Cir. 2006).

137.    Public entities must make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7)(i). Plaintiff's request for an extension of time to file his brief is a reasonable modification that is necessary to accommodate his disabilities and allow him to meaningfully participate in the appellate process. See Rohan v. Networks Presentations LLC, 375 F.3d 266, 275 (4th Cir. 2004) (holding that "in certain circumstances, time extensions can be a reasonable accommodation").

138.    The reasonableness of a requested accommodation is a fact-specific inquiry. As the Seventh Circuit has explained, "Whether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties." Oconomowoc Residential Programs v. City of Milwaukee, 300 F.3d 775, 784 (7th Cir. 2002). In this case, Plaintiff's request for an extension of time is reasonable given the nature of his disabilities and the complexity of the legal issues involved in his appeal.

139.    Defendant's denial of Plaintiff's accommodation requests violates Title II of the ADA. See Prakel v. Indiana, 100 F. Supp. 3d 661, 684 (S.D. Ind. 2015) (holding that state court's denial of deaf individual's requests for interpreter services violated Title II). The court in Prakel emphasized that "Title II imposes an affirmative obligation on public entities to make their services accessible to qualified individuals with disabilities." Id. at 680.

## 2. Violation of Section 504 of the Rehabilitation Act

140.    Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The NHSC likely receives federal financial assistance, subjecting it to Section 504. See Prakel, 100 F. Supp. 3d at 679-80 (finding state court system received federal financial assistance).

141.    The analysis under Section 504 is substantially similar to that under Title II of the ADA. Theriault v. Flynn, 162 F.3d 46, 48 n.3 (1st Cir. 1998). For the reasons discussed above regarding the ADA claim, Plaintiff is likely to succeed on his Section 504 claim as well.

## Plaintiffs Are Likely to Succeed on their ADA and Section 504 Claims

142.    To establish a violation of Title II or Section 504 claims, Plaintiffs must show (1) that they are "qualified individual[s] with a disability"; (2) that they were "either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or [were] otherwise discriminated against"; and (3) that they were excluded, denied benefits, or discriminated against "by reason of [their] disability." Parker v. Universidad de Puerto Rico, 225 F.3d 1, 5 (1st Cir. 2000); see also 42 U.S.C. § 12132; 29 U.S.C.§ 794(a).

**Plaintiffs are qualified individuals with disabilities.**

143.    Under the ADA,18 a disability is a "physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(1)(A). Plaintiffs have conditions that substantially limit major life activities.

144.    A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable modifications to rules, policies or practices . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for . . . participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2); see also 29 U.S.C. § 794.

145.    As Title II of the ADA is expressly modeled on Section 504 and the two are interpreted interchangeably, Plaintiffs' references to Title II and the ADA incorporate reference to Section 504. See Parker, 225 F.3d at 4; Theriault v. Flynn, 162 F.3d 46, 48 n. 3 (1st Cir.1998).

**Defendants are public entities that must comply with Title II of the ADA and Section 504.**

146.    Title II of the ADA governs the conduct of any "public entity," meaning "(A) any State or local government; [or] (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1). Section 504 of the Rehabilitation Act governs the programs or activities of all recipients of federal financial assistance. 29 U.S.C. § 794(b). The Defendants therefore constitute public entities and/or public officials. Defendants' receipt of federal financial assistance to help administer its elections, including Coronavirus Aid, Relief, and Economic Security Act ("CARES") Act and Help America Vote Act ("HAVA") funds, makes Defendants subject to the Rehabilitation Act. See 29 U.S.C. § 794(a). Defendants are therefore public entities subject to antidiscrimination provisions the ADA and the Rehabilitation Act. See Nat'l Fed'n of the Blind, 813 F.3d at 502-03.

147.    Title II of the ADA applies to all of a public entity's "services, programs, or activities." 42 U.S.C. § 12132; see Doe v. Mass. Dep't of Corr., 2018 WL 2994403, at *8 (D. Mass. June 14, 2018).

148.    The defendants' proceedings and activities are programs or services within the meaning of the ADA that must be made accessible. See Nat'l Fed'n of the Blind, 813 F.3d at 503-05; Parker, F.3d at 5.

**The defendants' programs discriminates against Plaintiffs because of their disabilities.**

149.    Defendants have created a process that makes their program inaccessible to Plaintiffs and many others who need accommodation.

150.    After plaintiffs submitted request for ADA accommodations as person with disabilities, they faced a series of steps that constitute barriers for Plaintiffs and other people with disabilities.

151.    While Plaintiffs and others with disabilities may go without reasonable accommodations, it would be to their detriment; the court's programs are the "appropriate object of scrutiny for compliance with the ADA." Nat'l Fed'n of the Blind, 813 F.3d at 504.

152.    "One of the explicit policies underlying the enactment of Section 504 was to ensure that" federally financed programs were "'carried out in a manner consistent with the principles of…respect for the privacy, rights, and equal access (including the use of accessible formats), of…individuals [with disabilities].'" Nat'l Ass'n of the Deaf v. Harvard Univ., 2016 WL 3561622, at *2 (D. Mass. Feb. 9, 2016) (alterations in original), quoting 29 U.S.C. § 701(c)(2), report and recommendation adopted, 2016 WL 6540446 (D. Mass. Nov. 3, 2016).

153.    By requiring that Plaintiffs go through an inaccessible process, Defendants deny Plaintiffs and others with disabilities an equal opportunity to participate in the court's programs and proceedings, fail to make reasonable modifications necessary to avoid discrimination on the basis of disability, and fail to satisfy the state's obligation to provide equally effective communication "in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." 28 C.F.R. § 35.160(b)(2); see 28 C.F.R. § 35.160(a)(1); 28 C.F.R. §§ 35.130(b)(1)(ii)-(iii), 35.130(b)(7)(i); Nat'l Fed'n of the Blind, 813 F.3d at 506; Disabled in Action v. Bd. of Elections in City of NY, 752 F.3d 189, 198–99 (2d Cir. 2014). Violation of these regulatory obligations constitutes a failure to provide "meaningful access." Pollack v. Reg'l Sch. Unit 75, 886 F.3d 75, 81 (1st Cir. 2018).

154.    The law does not permit Defendants to require that disabled individuals rely upon the kindness, availability, and accuracy of nondisabled third parties in participating in the process required by the court's programs. See, e.g., American Council of the Blind v. Paulson, 525 F.3d 1256, 1267-68 (D.C. Cir. 2008) (the Rehabilitation Act's emphasis on independent living and self-sufficiency ensures that, for the disabled, the enjoyment of a public benefit is not contingent upon the cooperation of third persons.").

155.    Reasonable modifications would allow Plaintiffs meaningful access to the court's program.

156.    Defendants can provide these reasonable modifications by simply doing what it promised it would do in its own ADA policy.

157.    Defendants may also choose other measures to remedy this discrimination.

158.    Based on the foregoing, Plaintiffs are likely to succeed on the merits of their ADA and Rehabilitation Act claims.

### 3. Violation of Due Process

159.    The Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Due process requires that litigants have a meaningful opportunity to be heard. Boddie v. Connecticut, 401 U.S. 371, 377 (1971).

160.    By denying Plaintiff's requests for accommodations and dismissing his appeal without allowing him a meaningful opportunity to file his brief, the NHSC has violated Plaintiff's due process rights. See Rohan, 375 F.3d at 276 (holding that dismissal of case without accommodating plaintiff's mental illness violated due process); Byers v. Illinois State Police, 2012 WL 6622940, at *3 (C.D. Ill. Dec. 19, 2012) (finding colorable due process claim where court denied accommodation requests and dismissed case).

161.    The Supreme Court has long recognized that "due process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." Boddie, 401 U.S. at 377. In the context of disability accommodations, the Ninth Circuit has held that "a violation of due process occurs where a party is denied a fair hearing because the party suffers from a disability that the court fails to reasonably accommodate." Higgins v. Carpenter, 258 F.3d 797, 802 (9th Cir. 2001).

### 4. Violation of Equal Protection

162.    The Equal Protection Clause of the Fourteenth Amendment requires that similarly situated persons be treated alike. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). Disability-based classifications are subject to rational basis review. Id. at 446.

163.    By denying Plaintiff's requests for accommodations while presumably granting similar requests to non-disabled litigants, the NHSC has likely violated the Equal Protection Clause. See Toledo, 454 F.3d at 33 (recognizing equal protection claim based on denial of accommodations to disabled student). The Court's actions do not appear to be rationally related to any legitimate government interest.

### 5. Violation of 42 U.S.C. § 1983

164.    Section 1983 provides a cause of action against any person who, under color of state law, deprives another of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. The NHSC and its Justices, acting in their official capacities, are state actors for purposes of § 1983. See Hafer v. Melo, 502 U.S. 21, 25 (1991).

165.    Plaintiff is likely to succeed on his § 1983 claim based on the violations of his rights under the ADA, Rehabilitation Act, Due Process Clause, and Equal Protection Clause discussed above. The Court's actions in denying accommodations and dismissing Plaintiff's appeal constitute a deprivation of federal rights under color of state law.

## IMMINENT HARM / IRREPARABLE HARM
### A. Imminent Harm

166.    The NHSC intends to or will likely dismiss the appeal by Wednesday October 16, 2024.

167.    The NHSC intends to deny ADA request for accommodation by Wednesday October 16, 2024.

168.    This could make this federal complaint and motion for preliminary injunction largely moot.

169. **The plaintiffs asked the court to issue a TRO temporarily to ensure the status quo until this court can fully review and decide these matters.**

## B. Plaintiff Will Suffer Irreparable Harm Absent an Injunction

170. Plaintiff will suffer irreparable harm if an injunction is not granted. The dismissal of Plaintiff's appeal without allowing him a meaningful opportunity to file his brief constitutes irreparable harm. See Elrod v. Burns, 427 U.S. 347, 373 (1976) (holding that deprivation of constitutional rights "for even minimal periods of time, unquestionably constitutes irreparable injury"); Prakel, 100 F. Supp. 3d at 687 (finding irreparable harm where deaf individual was denied interpreter services in court proceedings).

171. It further constitutes irreparable harm as it cannot be adequately remedied through monetary damages. See Elrod v. Burns, 427 U.S. 347, 373 (1976) (holding that deprivation of constitutional rights "for even minimal periods of time, unquestionably constitutes irreparable injury").

172. The dismissal of Plaintiff's appeal without allowing him a meaningful opportunity to file his brief would further violate his due process rights and deny him access to the courts. As the Supreme Court has recognized, "due process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." Boddie v. Connecticut, 401 U.S. 371, 377 (1971).

173. Moreover, the denial of reasonable accommodations under the ADA constitutes irreparable harm. See Disabled in Action v. Bd. of Elections in City of New York, 752 F.3d 189, 196 (2d Cir. 2014) (finding irreparable harm where plaintiffs were denied meaningful access to voting). The harm to Plaintiff's rights cannot be remedied after the fact if his appeal is dismissed.

174. Plaintiff also faces irreparable harm from the potential disclosure of his private medical information if he is forced to choose between withdrawing his ADA requests or having that information shared with opposing parties. This violates HIPAA and the ADA's confidentiality requirements. See 42 U.S.C. § 12112(d)(4)(C) (requiring that medical information obtained through ADA accommodation requests be maintained in separate files and treated as confidential medical records).

175. The ongoing violations of Plaintiff's statutory and constitutional rights constitute irreparable harm warranting preliminary injunctive relief. See Roe v. Dep't of Defense, 947 F.3d 207, 229 (4th Cir. 2020) ("[A]s a general rule, a violation of a constitutional right constitutes irreparable harm.").

176. Moreover, monetary damages are likely inadequate to remedy the harm caused by the denial of access to judicial proceedings. See Chalk v. U.S. Dist. Court Cent. Dist. of California, 840 F.2d 701, 709 (9th Cir. 1988) (finding that emotional distress caused by discrimination is irreparable harm). The Ninth Circuit in Chalk emphasized that "the balance of hardships tips sharply in favor of the plaintiff who may suffer irreparable harm to his constitutional rights." Id. at 710.

177. The First Circuit has recognized that "irreparable harm is an essential prerequisite for a preliminary injunction." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18 (1st Cir. 1996). In assessing irreparable harm, courts consider factors such as "the nature and degree of the injury, the likelihood of irreparable harm in the absence of an injunction, and the possibility of remediation after the fact." Id. at 19.

178. In this case, the nature of the harm – denial of access to the appellate process – is severe and cannot be adequately remedied after the fact. The loss of the right to appeal itself constitutes irreparable harm. See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott, 734 F.3d 406, 415 (5th Cir. 2013) (recognizing that the "loss of constitutional rights" constitutes irreparable injury).

179. Furthermore, the emotional distress and stigma associated with disability discrimination can constitute irreparable harm. As the Ninth Circuit noted in Chalk v. U.S. Dist. Court Cent. Dist. of California, 840 F.2d 701, 710 (9th Cir. 1988), "emotional and psychological harm" resulting from discrimination is "irreparable" because such injuries "cannot be adequately compensated for by a monetary award."

180. The First Circuit has emphasized that the irreparable harm inquiry "must be conducted on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits." Vaquería Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009). Given the strong likelihood of success on the

merits of Plaintiff's ADA and constitutional claims, a somewhat lesser showing of irreparable harm may suffice to justify preliminary injunctive relief.

181.    Without injunctive relief, Plaintiff faces imminent dismissal of the appeal, constituting irreparable harm. See Elrod v. Burns, 427 U.S. 347, 373 (1976).

182.    Absent a preliminary injunction, Plaintiffs are at imminent risk of suffering irreparable harm "that is not accurately measurable or adequately compensable by money damages," Ross-Simons, 217 F.3d at 13, and is "more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store," Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004).

183.    Interference with a person's fundamental right...constitutes irreparable harm. See, e.g., Harman v. Forssenius, 380 U.S. 528, 537 (1965); League of Women Voters of NC v. NC, 769 F.3d 224, 247 (4th Cir. 2014); Obama for Am. v. Husted, 697 F.3d 423, 436 (6th Cir. 2012); Taliaferro, 2020 WL 5709252 at *5; Nat'l Fed'n of the Blind, Inc. v. Lamone, 2014 WL 4388342, at *15 (D. Md. Sept. 4, 2014), aff'd 813 F.3d 494; Devine v. State of Rhode Island, 827 F. Supp. 852, 866 (D.R.I. 1993).

184.    Absent an injunction, Plaintiffs further will be forced either to risk their health or forfeit their right to seek or obtain ADA accommodations altogether.

185.    Thus, Plaintiffs have demonstrated irreparable harm which can only be remedied by immediate action on the part of Defendants ordered by this Court.

186.    Absent injunctive relief, Plaintiff faces imminent irreparable harm, including:

187.    Imminent dismissal of his appeal, depriving him of access to the courts;

188.    Disclosure of confidential medical information in violation of federal law, ADA and HIPAA;

189.    Exacerbation of disabilities due to stress and lack of accommodations;

190.    Ongoing violations of constitutional and statutory rights.

191.    These harms are irreparable and cannot be adequately remedied through monetary damages. See Elrod v. Burns, 427 U.S. 347, 373 (1976) (deprivation of constitutional rights constitutes irreparable injury).

192.    The loss of constitutional freedoms, "for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976).

193.    Courts have also recognized that violations of federal civil rights, including ADA violations, constitute irreparable harm. See Gresham v. Windrush Partners, Ltd., 730 F.2d 1417, 1423 (11th Cir. 1984); Shapiro v. Cadman Towers, Inc., 51 F.3d 328, 332 (2d Cir. 1995).

## BALANCE OF EQUITIES
### The Balance of Equities Favors Plaintiff

194.    The harm to Plaintiff absent an injunction far outweighs any potential harm to Defendants. Providing reasonable accommodations and maintaining the confidentiality of medical information imposes minimal burdens on the court system. See Henrietta D., 331 F.3d at 280 (noting "relatively light" burden of ADA compliance).

195.    In contrast, Plaintiff faces severe and lasting harm to his legal rights and personal wellbeing if the NHSC's conduct is not enjoined. The balance of equities therefore strongly favors granting an injunction.

196.    The balance of equities strongly favors granting an injunction. Plaintiff faces dismissal of his appeal and denial of access to the judicial system. In contrast, Defendant would face minimal hardship from being required to grant Plaintiff's reasonable accommodation requests and allow him additional time to file his brief. See Prakel, 100 F. Supp. 3d at 687-88 (finding balance of harms favored deaf individual seeking interpreter services in court).

197.    Courts have consistently recognized that the balance of equities favors plaintiffs seeking to vindicate their civil rights. As the Supreme Court stated in Elrod v. Burns, 427 U.S. 347, 373 (1976), "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." The same principle applies to violations of the ADA and other civil rights statutes. See Gresham v. Windrush Partners, Ltd., 730 F.2d 1417, 1424 (11th Cir. 1984) (stating that "irreparable injury may be presumed from the fact of discrimination and violations of fair housing statutes").

198.    Moreover, granting the requested injunction would impose minimal burdens on Defendant. The NHSC routinely grants extensions of time in complex cases, and accommodating Plaintiff's disability-related needs

would not fundamentally alter the nature of its operations. See *Tennessee v. Lane*, 541 U.S. 509, 532 (2004) (noting that Title II "requires only 'reasonable modifications' that would not fundamentally alter the nature of the service provided").

199.    The balance of equities favors granting the injunction, as Plaintiff will suffer substantial harm if relief is denied, while Defendants will merely be required to comply with federal law.

200.    The balance of hardships tips in favor of providing a reasonable modification of the court's program to allow plaintiffs and those with disabilities to participate in its programs. Constitutional rights override the right of a defendant to continue to engage in a discriminatory practice. See *VaqueriaTres Monjitas, Inc. v. Fabre Laboy*, 2007 WL 9717645 (D.P.R. July 11, 2007), aff'd 587 F.3d 464 (1st Cir. 2009), cert. denied, *Aquino v. Suiza Dairy, Inc.*, 563 U.S. 1001 (2011); see also *Firecross Ministries v. Municipality of Ponce*, 204 F.Supp.2d 244, 251 (D.P.R. 2002) ("[T]he balance weighs heavily against Defendants, since they have effectively silenced Plaintiff's constitutionally protected speech."); *Haskins v. Stanton*, 794 F.2d 1273, 1277 (7th Cir. 1986) (finding that an injunction requiring defendants to comply with existing law imposes no burden but "merely seeks to prevent the defendants from shirking their responsibilities"). The proposed injunctive relief must also pose more than mere fiscal and administrative problems to defendants to tip the balance away from the plaintiff who will suffer harm in the absence of relief. See *Todd ex. rel Todd v. Sorrell*, 841 F.2d 87, 88 (4th Cir. 1988). Here, the harm Plaintiffs would suffer by risking their health or forfeiting their fundamental rights if a reasonable modification of the court's programs is not made, outweighs any administrative or monetary costs to Defendants.

201.    The balance of equities favors Plaintiff, as the harm to his rights outweighs any administrative burden on the NHSC to provide reasonable accommodations. See *Gathers v. 1-800-Flowers.com, Inc.*, 2018 WL 839381, at *3 (D. Mass. Feb. 12, 2018) (finding that the burden of providing accommodations was outweighed by the plaintiff's interest in accessing services).

## PUBLIC INTEREST
### A. An Injunction Would Serve the Public Interest

202.    "[U]pholding constitutional rights serves the public interest." *Covenant Christian Ministries, Inc. v. City of Marietta*, 654 F.3d 1231, 1247 (11th Cir. 2011); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002).

203.    Enforcing the ADA and ensuring equal access to the courts are matters of significant public importance. See *Tennessee v. Lane*, 541 U.S. at 533-34. An injunction would vindicate these important public interests.

204.    Ensuring access to justice for individuals with disabilities also serves the public interest. See *Lane*, 541 U.S. at 533-34 (discussing importance of access to courts). An injunction would further these important public interests.

205.    The Supreme Court has long recognized that "the Due Process Clause of the Fourteenth Amendment requires that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." *Boddie v. Connecticut*, 401 U.S. 371, 377 (1971). Granting the requested injunction would serve this fundamental principle of due process and equal access to the courts.

206.    Furthermore, enforcing the ADA's mandate of reasonable accommodations for individuals with disabilities serves the broader public interest in promoting equality and full participation in society for all individuals. As the First Circuit has noted, "Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals. In studying the need for such legislation, Congress found that 'historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem.'" *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 303 (1st Cir. 2003) (quoting 42 U.S.C. § 12101(a)(2)).

207.    Granting the requested injunction would not only vindicate Plaintiff's individual rights but would also send a clear message about the importance of accessibility and equal treatment in the judicial system. This

aligns with the public interest in ensuring that all individuals, regardless of disability status, have meaningful access to the courts.

208.    Granting the injunction serves the public interest by enforcing federal disability rights laws and ensuring equal access to the courts. See Enyart v. National Conference of Bar Examiners, Inc., 630 F.3d 1153, 1167 (9th Cir. 2011) ("The public interest is served by eliminating discrimination against disabled individuals and by ensuring compliance with the ADA.").

209.    Granting the injunction serves the public interest by ensuring compliance with the ADA and protecting access to justice.

210.    A preliminary injunction here is in the public interest.

## A PRELIMINARY INJUNCTION SHOULD BE ISSUED

211.    In enacting the ADA, Congress concluded that "individuals with disabilities…have been…relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals." Nat'l Fed'n of the Blind v. Lamone, 813 F.3d 494, 503 (4th Cir. 2016), quoting Tennessee v. Lane, 541 U.S. 509, 516 (2004); 42 U.S.C. § 12101(a)(7). Likewise, an express purpose of the Rehabilitation Act is "to empower individuals with disabilities to maximize… independence, and inclusion… into society, through… the guarantee of equal opportunity." California Council of the Blind v. Cty. of Alameda, 985 F. Supp. 2d 1229, 1239 (N.D. Cal. 2013), quoting 29 U.S.C. § 701(b)(1)(F). In evaluating a request for a preliminary injunction, the Court must consider four factors:

212.    [T]he movant's likelihood of success on the merits"; "whether and to what extent the movant will suffer irreparable harm" in the absence of injunctive relief; "the balance of [relative] hardships," that is, the hardship to the nonmovant if enjoined as opposed to the hardship to the movant if no injunction issues; and "the effect, if any, that an injunction [or the lack of one] may have on the public interest."

213.    CVS Pharmacy, Inc. v. Lavin, 951 F.3d 50, 55 (1st Cir. 2020), citing Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013).

214.    "The first two factors are the most critical," Respect Maine PAC v. McKee, 622 F.3d 13, 15 (1st Cir. 2010), and the "[l]ikelihood of success is the main bearing wall of the four-factor framework." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996) (citation omitted).

## V. ADDITIONAL GROUNDS FOR INJUNCTIVE OR DECLARATORY RELIEF

215.    In addition to the primary grounds for injunctive relief discussed above, there are several other potential bases for granting injunctive or declaratory relief in this case:

## A. Violation of the Rehabilitation Act of 1973

216.    As noted earlier, Section 504 of the Rehabilitation Act prohibits discrimination on the basis of disability in programs or activities that receive federal financial assistance. 29 U.S.C. § 794. To the extent that the NHSC receives federal funding, it is subject to the requirements of Section 504.

217.    The standards for establishing a violation of Section 504 are substantially similar to those under Title II of the ADA. See Theriault v. Flynn, 162 F.3d 46, 48 n.3 (1st Cir. 1998). Therefore, the same arguments supporting Plaintiff's ADA claim would likely support a claim under Section 504, providing an additional basis for injunctive relief.

## B. Violation of New Hampshire State Law

218.    The New Hampshire Law Against Discrimination, N.H. Rev. Stat. Ann. § 354-A:1 et seq., prohibits discrimination on the basis of disability in places of public accommodation. While state courts are generally immune from suit under the Eleventh Amendment, the Ex parte Young doctrine may allow for prospective injunctive relief against state officials to prevent ongoing violations of federal law. See Ex parte Young, 209 U.S. 123 (1908).

## C. Declaratory Relief Under the Declaratory Judgment Act

219.    The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." A declaratory judgment could

be sought to clarify Plaintiff's rights under the ADA and the Constitution with respect to reasonable accommodations in court proceedings.

### D. Mandamus Relief

220.    In exceptional circumstances, a federal court may issue a writ of mandamus to compel a state court to perform a duty owed to the plaintiff. See 28 U.S.C. § 1651. While mandamus is an extraordinary remedy, it may be appropriate where there is a clear right to relief and no other adequate means to attain it. See Cheney v. U.S. Dist. Court for D.C., 542 U.S. 367, 380-81 (2004).

### E. Civil Rights Act of 1871 (42 U.S.C. § 1983)

221.    To the extent that Defendant's actions violate Plaintiff's constitutional rights, a claim under 42 U.S.C. § 1983 may provide an additional basis for injunctive relief. While state courts themselves are not "persons" subject to suit under § 1983, individual state officials acting in their official capacities may be sued for prospective injunctive relief to prevent ongoing violations of federal law. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 n.10 (1989).

---

## IX. ADDITIONAL LEGAL ARGUMENTS

---

### A. ABSTENTION DOCTRINES DO NOT BAR RELIEF

222.    While federal courts generally abstain from interfering with ongoing state court proceedings under various abstention doctrines, such as Younger abstention (Younger v. Harris, 401 U.S. 37 (1971)), there are exceptions that apply in this case.

### 1. Extraordinary Circumstances Exception

223.    The Supreme Court has recognized that abstention may not be appropriate in cases of "extraordinary circumstances" where the state court is "incapable of fairly and fully adjudicating the federal issues before it." Kugler v. Helfant, 421 U.S. 117, 124 (1975). The pervasive bias and conflicts of interest alleged in this case rise to the level of extraordinary circumstances that justify federal intervention.

### 2. Bad Faith Exception

224.    Federal courts may intervene in state proceedings where there is evidence of bad faith or harassment by state officials. See Younger, 401 U.S. at 54. The repeated denials of reasonable accommodations and the apparent hostility towards Plaintiff's disability-related needs could be construed as bad faith enforcement of state court rules.

### 3. Flagrantly Unconstitutional Exception

225.    Where a state law or procedure is "flagrantly and patently violative of express constitutional prohibitions," abstention is not required. See Younger, 401 U.S. at 53-54. The NHSC's actions in denying ADA accommodations and threatening to dismiss Plaintiff's appeal may rise to this level of flagrant unconstitutionality.

### C. STANDING AND RIPENESS

226.    Plaintiff has standing to bring this action and his claims are ripe for adjudication. He has suffered an injury in fact (denial of accommodations and threatened dismissal of his appeal), which is fairly traceable to Defendant's conduct and likely to be redressed by a favorable decision from this Court. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

227.    The issues are ripe for review because Plaintiff faces an imminent threat of harm if his appeal is dismissed. See Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967). Waiting until after dismissal would force Plaintiff to suffer the very harm he seeks to prevent.

## E. EQUAL PROTECTION CLAUSE

228.    The NHSC's actions may also violate the Equal Protection Clause of the Fourteenth Amendment. While disability is not a suspect classification, the court's conduct may fail even rational basis review if it is found to be arbitrary or irrational. See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 446 (1985).

## F. FIRST AMENDMENT RIGHT OF ACCESS TO COURTS

229.    In addition to his ADA and due process claims, Plaintiff's right of access to the courts is protected by the First Amendment. See Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 741 (1983). By denying reasonable accommodations and threatening to dismiss Plaintiff's appeal, Defendant is effectively denying Plaintiff his First Amendment right to petition the courts for redress of grievances.

230.    The Supreme Court has recognized that the right of access to the courts is a fundamental right protected by the Constitution. See Bounds v. Smith, 430 U.S. 817, 828 (1977). This right "assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights." Wolff v. McDonnell, 418 U.S. 539, 579 (1974).

231.    By denying Plaintiff's requests for reasonable accommodations and threatening to dismiss his appeal, the NHSC is effectively blocking Plaintiff's access to the judicial system. This raises serious First Amendment concerns that further support granting the requested injunctive relief.

## G. ADDITIONAL CONSIDERATIONS
### 1. Public Interest in Ensuring Equal Access to Justice

232.    Granting the requested injunction would serve the public interest by ensuring that individuals with disabilities have equal access to the judicial system. As the Supreme Court noted in Tennessee v. Lane, "The unequal treatment of disabled persons in the administration of judicial services has a long history, and has persisted despite several legislative efforts to remedy the problem of disability discrimination." 541 U.S. at 531. This case presents an opportunity to reaffirm the importance of accessibility in the courts.

### 2. Potential for Systemic Reform

233.    By granting injunctive relief, this Court could prompt broader reforms in how state courts handle ADA accommodation requests. This could have far-reaching benefits for other individuals with disabilities seeking access to the judicial system.

### 3. Importance of Federal Oversight

234.    Federal court intervention in this case would underscore the importance of federal oversight in ensuring that state courts comply with federal disability rights laws. This aligns with the ADA's goal of providing "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(2).

### 4. Intersection of Disability Rights and Access to Justice

235.    This case highlights the critical intersection between disability rights and access to justice. By granting the requested relief, this Court would affirm that having a disability should not be a barrier to fully participating in the legal system.

### 5. Potential Impact on Other Litigants

236.    A favorable ruling could benefit not only Plaintiff but also other litigants with disabilities who may be hesitant to request accommodations due to fear of retaliation or dismissal of their cases.

## INADEQUATE FORUM

237.    The state court is an inadequate forum to hear these federal claims, as a basis for seeking federal court intervention, injunction, or stay on state court proceedings, because of the following:

238.    Lack of expertise: State court lack the necessary expertise or experience in handling complex federal issues, particularly in specialized areas of federal law.

239.    Bias or hostility: The state court has shown bias and hostility towards federal claims or federal rights.

240.    Procedural limitations: State court procedures are inadequate to fully address or protect federal rights in this instance, in particular with respect to the ADA. There is no case law or precedent in the state of NH dealing with Title II ADA law applicable to the court. The court literally has little or no experience dealing

with these types of claims. The court also has no proper coherent or consistent policy. It only recent adopted an ADA policy in 2022 but it does not follow it and also makes up the law haphazardly.

241.    Inconsistent application: The state court engages in inconsistent application of federal law across its own state courts.

242.    Preclusion of federal review: Without federal intervention at this juncture, the state court proceedings may preclude subsequent federal review of important federal questions if the matter proceeds any further.

243.    Urgency or irreparable harm: Federal intervention is necessary to prevent immediate and irreparable harm to federal rights.

244.    The examples where federal courts have intervened tend to involve exceptional circumstances or clear showings of inadequacy in state proceedings.

245.    Here are some circumstances where federal courts have intervened in state court cases:

246.    To protect federal jurisdiction: In Public Service Co. v. Patch, the First Circuit affirmed the district court's decision not to abstain from hearing a federal case challenging state utility regulations. The court found that the case involved significant federal interests and that the state proceedings did not provide an adequate opportunity to address the federal claims.

247.    To prevent irreparable harm to federal rights: In Dombrowski v. Pfister, 380 U.S. 479 (1965), the Supreme Court allowed federal intervention to enjoin state criminal proceedings that were allegedly brought in bad faith to harass civil rights activists and chill First Amendment rights.

248.    To enforce federal judgments: In Mitchum v. Foster, 407 U.S. 225 (1972), the Supreme Court held that federal courts could enjoin state court proceedings to prevent relitigation of issues already decided in federal court.

249.    In civil rights cases: The Court in Mitchum also recognized that the Civil Rights Act of 1871 (42 U.S.C. § 1983) is an "expressly authorized" exception to the Anti-Injunction Act, allowing federal courts to intervene in state proceedings to protect federal civil rights.

250.    In bankruptcy cases: Federal courts may stay state court proceedings that interfere with federal bankruptcy jurisdiction under the "necessary in aid of jurisdiction" exception to the Anti-Injunction Act.

251.    To prevent violations of federal law: In some cases, federal courts have intervened when state court proceedings would result in a clear violation of federal law or constitutional rights.

252.    The Supreme Court has consistently emphasized that federal courts can or should be intervene when there are exceptional circumstances or clear statutory authorization.

253.    This case meets the above criteria.

254.    The state court proceedings will result in a clear violation of federal law or constitutional rights, and already has. It threatens the rights of more than one plaintiff.

255.    This matter involves federally protected civil rights, and Civil Rights Act of 1871 (42 U.S.C. § 1983) allows an "expressly authorized" exception to the Anti-Injunction Act, allowing this federal court to intervene in these state proceedings to protect federal civil rights.

256.    Federal intervention to enjoin state proceedings is necessary here to prevent irreparable harm, and to prevent further discrimination/retaliation, and the chilling of First Amendment rights.

### NHSC'S Inadequacy and Inexperience With Title II of the ADA as Applied to Courts

257.    The NHSC showed inexperience with applying the ADA by applying Title I to themselves as a court. The NHSC thus misapplied the title 1 standard.

258.    The NHSC subjected plaintiffs to extensive demanding analysis on their ADA requests.

259.    The NHSC evidently believes because they denied plaintiff in the past that plaintiff cannot file new ADA requests in the future.

260.    The NHSC literally said they won't consider new ADA issues or new ADA requests with new issues.

261.    The NHSC won't even consider pro bono counsel under the ADA.

262.    The NHSC treats this matter like it is an employment ADA claim.

263.    The NHSC treats this matter like plaintiff is filing a lawsuit for disability discrimination and they are using a discrimination standard for a simple ADA request...the standard is am I disabled, is it substantial limiting, and is the accommodation reasonable and the test there is will the accommodation fundamentally

alter the court program., not whether they like it or, if they don't like it, they are obligated to suggest an alternative accommodation. None of which happened. They confused their roles.

264.    Their role is not to treat an ADA request like a lawsuit that they are defending or preparing a defense for. They are supposed to treat plaintiff with respect and dignity, and as a protected class,

265.    Once plaintiff has a disability, he is in a protected class, but they treated plaintiff worse than someone who has no such class protection.

266.    The NHSC subjected plaintiff to a demanding, grueling, demeaning, burdensome, arbitrary process that violated due process and his ADA rights

267.    The NHSC knew plaintiff had certain medical conditions but they did things to exacerbate these conditions and allowed others to take advantage of the confidential information to even subjectplaintiff to more harm and injury.

268.    The NHSC used the disclosure of plaintiff's confidential information as a tool of harassment. This cannot stand.

269.    The NHSC know plaintiff had disabilities but they played games with it, dragged it out, to set a trap and used plaintiff's response(and that of his spouse) to court orders and objections, after the fact, as indication that plaintiff had no disability the previous month.

270.    The NHSC thinks it's all or nothing. Either plaintiff is fully incapacitated or plaintiff has no disability. This shows a fundamental misunderstanding of disabilities and the ADA law. The defendants can't be allowed to do this to plaintiff and to other similarly situated people.

271.    The NHSC mocked the nature of plaintiff's disability.

272.    The NHSC used plaintiff's spouse filing, which they denied as moot because they denied her intervention, to say that plaintiff's disability can act up at any time, as a basis to say they can't accommodate any disability that is permanent or not temporary or that can flare up at any time.

273.    The NHSC are supposed to decide that plaintiff has a disability. The NHSC has a pending lawsuit against them by plaintiffs, and they don't want to admit that plaintiff has a disability and so, they are behaving like defendants and not like a court that is supposed to uphold and adhere to the law.This is totally reprehensible.

## Judicial Conflicts

274.    Two judges are new, one brand new, was a circuit judge with on little experience on the ADA and the one time she was sued in federal court

275.    Only 3 judges left

276.    One has recused in other cases but not this case.

277.    One worked with a party at the same time as the party and later worked together in private practice. But he doesn't want to reveal the details so that the party and the public can be assured.

278.    One justice admits that they have contacts or connections but won't reveal what those are.

279.    The only time that a justice can hide the contacts is if they recuse, if they stay they must reveal the details of the contacts.

280.    The ethics rules state this. Again they change the rules for me.

281.    One judge sealed records and the new judge unsealed records and revealed an entire medical letter online.. showing confidential information from a doctor including private information that could be used to do identity theft and which forbidden by their own rules.

## NO ADEQUATE REMEDY AT LAW

282.    Plaintiffs have no adequate legal remedy by which to prevent or minimize the continuing irreparable harm to their federal, civil and constitutional rights.

283.    Plaintiffs are therefore entitled to relief.

# X. INTERSECTION OF IMPLICIT BIAS AND DISABILITY DISCRIMINATION FOR BLACK LITIGANTS SUCH AS PLAINTIFF

284.    There is substantial evidence that the pain of Black people is often underestimated in healthcare settings. Studies have shown that physicians are twice as likely to underestimate the pain of Black patients compared to other ethnic groups. This underestimation is partly due to false beliefs about racial differences in pain tolerance and physiological characteristics, such as thicker skin or less sensitive nerve endings in Black individuals. These misconceptions lead to disparities in pain management, with Black patients receiving less appropriate pain treatment than their White counterparts.

285.    For example, racial bias in healthcare providers' assessments can affect jurors' decisions regarding pain and suffering damages in tort cases. The article "The Color of Pain: Racial Bias in Pain and Suffering Damages" discusses how these biases infiltrate tort damages calculations, leading to lower awards for Black plaintiffs.

286.    These highlight broader issues of racial bias in pain perception. For example, research indicates that implicit biases among healthcare providers lead to underestimation of Black patients' pain, potentially affecting legal outcomes related to medical treatment and tort damages for pain and suffering. These biases are systemic and can permeate various aspects of the legal and healthcare system.

287.    Studies further show that Black patients often receive inadequate pain treatment due to implicit biases, impacting their quality of life and potentially influencing legal decisions related to medical care. These systemic disparities are recognized as significant public health issues that require comprehensive solutions.

288.    The disbelief in pain claims because the requester was Black are highlighted by broader issues of racial bias in pain perception and treatment:

289.    Racial Bias in Pain Assessment: Studies have shown that both laypeople and medical professionals often assume that Black individuals feel less pain than White individuals, leading to disparities in pain management and treatment recommendations.

290.    Healthcare Disparities: Research indicates that Black patients are systematically undertreated for pain compared to White patients, partly due to false beliefs about biological differences.

291.    Racial bias also occurs in court settings. Studies, such as those conducted in the Cook County-Chicago criminal courts, reveal that implicit racial biases influence the behavior of judges, prosecutors, and defense lawyers. These biases can transform due process protections into tools of racial punishment, resulting in discriminatory treatment of people of color. This includes mocking speech patterns, using racially charged language, and subjecting individuals to degrading treatment. Such biases contribute to systemic inequities within the legal system.

## Examples of racial bias in courts include:

292.    Jury Selection: Black individuals are often underrepresented in jury pools and unfairly removed through peremptory strikes, leading to unrepresentative juries and biased verdicts.

293.    Mocking and Degrading Treatment: In Cook County, courtroom actors have been reported to ridicule defendants with stereotypically Black names and use racially charged language, transforming courts into sites of racialized punishment.

294.    Implicit Bias in Judgments: Judges may hold implicit biases that affect their decisions, contributing to disparate outcomes for Black defendants compared to white defendants.

295.    ADA/Racial Claims in Law Enforcement: Courts have addressed ADA claims related to wrongful arrests and failure to accommodate disabilities as well as racial aspects.

## Examples of courts and judges underestimating or ignoring the pain of Black people include:

296.    Tort Damages: In tort cases, Black plaintiffs often receive lower pain and suffering awards compared to white plaintiffs. This is partly due to implicit biases that lead jurors to undervalue the severity of Black plaintiffs' injuries

297.    Courtroom Treatment: In Cook County, Illinois, courtroom actors have been documented mocking Black defendants' speech and using racially charged language, which can undermine the seriousness of their claims and experiences.

298.    Implicit Bias: Judges, like the general population, may hold implicit biases that affect their judgment, leading to racially disparate outcomes in legal proceedings.

**The underestimation or disbelief of Black people's pain by courts can be seen in several cases and articles that highlight related issues of racial bias in legal settings:**

299.    Cummings v. Premier Rehab Keller: This Supreme Court case involves whether victims of discrimination, including those in healthcare, can seek damages for emotional distress under federal civil rights laws.

300.    Racial Bias in Tort Damages: An article in the Georgia Law Review discusses how racial bias affects the calculation of pain and suffering damages, with Black plaintiffs often receiving lower awards due to biases in injury assessment and juror decisions.

301.    Cook County Criminal Courts: Ethnographic studies reveal systemic racial biases in these courts, where defendants of color face ridicule and degrading treatment, indirectly affecting their legal outcomes.

302.    The above highlights systemic issues of racial bias in the legal system:

303.    Racial Disparities in Treatment Courts: Studies indicate that Black participants have lower graduation rates in treatment courts compared to White participants, even after controlling for various factors.

304.    Racialized Punishment in Cook County: Research reveals that people of color, including Black individuals, face degrading treatment and racialized punishment in courtrooms, which may extend to those with mental health issues.

305.    General Racial Bias: The Massachusetts Trial Court acknowledges systemic racism and bias, which affect how black individuals with disabilities are treated within the legal system.

306.    These examples illustrate broader patterns of racial bias that impact the treatment of Black individuals with disability issues in courts.

307.    Massachusetts Supreme Judicial Court has also addressed the issue of racial disparities in how Black individuals' anxiety and stress responses are perceived, particularly in situations involving law enforcement. The court recognized that Black individuals might experience heightened anxiety during police encounters due to historical and systemic racism, which can lead to actions like fleeing. This acknowledgment aims to provide a more nuanced understanding of their behavior in legal contexts, emphasizing the need for courts to consider these psychological factors when assessing such cases.

308.    Racial trauma significantly impacts anxiety levels in Black Americans. Racial trauma, stemming from experiences of racism and discrimination, can lead to heightened anxiety, hypervigilance, and chronic stress. These experiences create a physiological stress response, increasing cortisol production and potentially leading to anxiety disorders. Black Americans may also suppress emotions due to racial discrimination, contributing to psychological distress. The stigma around mental health in the Black community can further exacerbate these issues by discouraging individuals from seeking help.

309.    In the Community Loans of America, Inc. case, a Black employee in South Carolina faced racial harassment and was denied accommodations after taking time off for disability-related surgery. The employer did not allow her to return to work using crutches and instead placed her on unpaid leave until she was fired. The company settled the lawsuit by agreeing to pay $60,000 and revising its policies to prevent race- and disability-based harassment.

310.    Monk v. United States: This lawsuit alleges racial discrimination in the Department of Veterans Affairs' disability benefits system, claiming that Black veterans' applications for disability benefits were rejected at a higher rate than those of white veterans. The case argues that this pattern of discrimination has persisted for decades, affecting the outcomes for Black veterans seeking disability compensation.

## IV. Application To The Present Case

311.    Plaintiff, an individual with documented disabilities, previously requested reasonable accommodations under the ADA, including an extension of time to file a brief. The NHSC denied these requests.

312.    Plaintiff submitted comprehensive medical documentation from healthcare providers outlining disabilities and recommending accommodations, including a 10-week extension for filing the brief.

313.    These recommendations were based on well-documented medical conditions that significantly impact Plaintiff's ability to meet court deadlines.

314.    The New Hampshire Attorney General's office assented to the ADA accommodation request.

315.    Plaintiff has additional government certification of disabilities.

316.    Other courts, including a New Hampshire Superior Court and the Massachusetts Appeals Court, have granted similar ADA accommodations to the Plaintiff.

317.    Plaintiff indicated that no further extensions would be sought if the requested accommodation was granted.

318.    Plaintiff specified that the requested extension was definite, not indefinite.

319.    The NHSC denied Plaintiff's requests for accommodations without providing a detailed explanation.

320.    Subsequently, the NHSC barred Plaintiff from filing a brief and then dismissed the case for failure to file said brief.

321.    Plaintiff has requested reconsideration of that decision in light of relevant legal precedents, scientific research, and the fundamental principles of equal access to justice.

## XII. FURTHER LEGAL ARGUMENT

### A. The Americans with Disabilities Act Mandates Reasonable Accommodations.

322.    The ADA requires public entities, including courts, to make reasonable modifications to policies, practices, and procedures to avoid discrimination on the basis of disability. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(7). In Tennessee v. Lane, 541 U.S. 509 (2004), the Supreme Court held that Title II of the ADA applies to state courts and requires them to provide reasonable accommodations to ensure access to justice for individuals with disabilities.

### B. The "Regarded As" Prong of the ADA.

323.    Given that other courts have recognized and accommodated Plaintiff's disabilities, this Court is required to treat Plaintiff's condition under the "regarded as" prong of the ADA. As established in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999), an individual can be protected under the ADA if they are "regarded as" having a disability, even if there is disagreement about the extent of the disability.

### C. Implicit Bias and Its Potential Impact on Judicial Decision-Making

324.    Research has demonstrated that implicit bias can affect decision-making processes, including in legal settings. In "Implicit Bias in the Courtroom" (UCLA Law Review, 2012), Professors Jerry Kang et al. discuss how these unconscious biases can influence judicial decisions. The article emphasizes the importance of awareness and proactive measures to mitigate such biases.

### D. The Intersection of Race and Disability in Legal Proceedings

325.    The concept of intersectionality, as articulated by legal scholar Kimberlé Crenshaw in "Mapping the Margins: Intersectionality, Identity Politics, and Violence Against Women of Color" (Stanford Law Review, 1991), highlights how the interaction of multiple identities can lead to unique forms of discrimination. This framework is particularly relevant when considering the experiences of individuals with disabilities who also belong to racial minority groups.

### E. The Importance of Medical Evidence in ADA Accommodations

326.    In Geness v. Cox, 902 F.3d 344 (3d Cir. 2018), the Third Circuit emphasized the importance of giving due weight to medical evidence when considering ADA accommodations. The court held that disregarding or minimizing medical recommendations without sufficient justification could constitute a violation of the ADA.

### F. Proper Construction of Pro Se Pleadings.

327.    The Supreme Court has long held that pro se pleadings should be construed liberally. In Haines v. Kerner, 404 U.S. 519 (1972), the Court stated that pro se complaints should be held "to less stringent

standards than formal pleadings drafted by lawyers." This principle should extend to ADA accommodation requests made by pro se litigants.

## G. Consistency in Application of ADA Policies

328.    Courts must apply their ADA policies consistently. In this case, the Court's own ADA policy states that extensions of time are an acceptable form of accommodation. The denial of such an accommodation without clear justification appears to contradict this policy.

## H. Consideration of Unpredictable Disabilities

329.    The unpredictable nature of some disabilities should not preclude accommodation. In School Board of Nassau County v. Arline, 480 U.S. 273 (1987), the Supreme Court recognized that individuals with unpredictable medical conditions are protected under disability law and should not be excluded based on speculation about future impairments.

## B. Implicit Bias and Racial Stereotyping in Pain Assessment

330.    Extensive research demonstrates that racial bias can affect perceptions of pain and disability, particularly among Black individuals. A landmark study published in the Proceedings of the National Academy of Sciences found that both laypeople and medical professionals often assume that Black individuals feel less pain than White individuals, leading to disparities in pain management and treatment recommendations (Hoffman et al., 2016).In the legal context, such biases can unconsciously influence judicial decisions. The Harvard Law Review article "Pain and Race: A New Understanding of Racialized Bodies and the Implications for Law and Policy" (2021) explores how these biases manifest in legal settings, potentially affecting decisions about accommodations for disabilities.

## C. Systemic Discrimination in Disability Claims

331.    The case of Monk v. United States, No. 3:14-cv-00260 (D. Conn. filed Mar. 3, 2014), highlights systemic racial discrimination affecting disability claims for Black individuals. While focused on veterans' benefits, this case underscores the need for courts to be vigilant against implicit biases that may influence decisions regarding disability accommodations.

## D. Judicial Responsibility to Address Implicit Bias

332.    Courts have a responsibility to ensure that all individuals receive fair treatment under the law. In State v. Saintcalle, 178 Wash. 2d 34 (2013), the Washington Supreme Court acknowledged the pervasive nature of implicit bias and its potential impact on judicial decision-making. The court emphasized the need for judges to actively work to identify and overcome these biases.

333.    The denial of Plaintiff's ADA accommodation requests, particularly in light of the submitted medical documentation, raises concerns about the potential influence of implicit bias. The Court's decision may have inadvertently perpetuated systemic inequalities faced by Black individuals with disabilities in accessing justice.

## Implicit Bias and Racial Stereotyping

334.    Research consistently shows that racial bias can affect perceptions of pain and disability, particularly among Black individuals. Studies indicate that both laypeople and medical professionals often assume that Black individuals feel less pain than White individuals, leading to disparities in pain management and treatment recommendations (Hoffman et al., 2016). These biases can unconsciously influence judicial decisions, as seen in various contexts.

## Healthcare Disparities

335.    In healthcare settings, Black patients are systematically undertreated for pain compared to White patients (Anderson et al., 2009). This disparity is partly due to false beliefs about biological differences between races. Such biases can extend beyond healthcare into legal settings, affecting decisions about accommodations for disabilities.

## Education and Employment Settings

336.    Similar patterns of implicit bias have been observed in education and employment settings. For example, Black students with disabilities often face harsher disciplinary actions compared to their peers (Skiba et al., 2011). In employment, cases like Community Loans of America, Inc. highlight systemic issues of racial and

disability discrimination, where a Black employee faced both racial harassment and denial of accommodations after surgery.

### Legal Precedents

337.    The Americans with Disabilities Act (ADA) mandates reasonable accommodations for individuals with disabilities to ensure equal access to legal processes. Denying such accommodations without thorough consideration may contravene these principles

### Current Situation of Present Case

338.    The denial of Plaintiff's ADA accommodation requests raises several concerns:

339.    Disregard for Medical Evidence: The Court appears to have given insufficient weight to the medical documentation provided, including recommendations from healthcare providers.

340.    Inconsistent Application of ADA Standards: The Court's decision contradicts its own ADA policy regarding time extensions as a form of accommodation.

341.    Potential Influence of Implicit Bias: The denial of accommodations, particularly in light of the assent from the Attorney General's office and accommodations granted by other courts, raises questions about potential unconscious biases. Plaintiff contends that this denial may have been influenced by implicit bias or racial stereotyping, resulting in an underestimation of Plaintiff's pain and medical conditions.

342.    Misinterpretation of Pro Se Pleadings: The Court's interpretation of Plaintiff's statements about the unpredictable nature of disabilities appears to have been construed against the Plaintiff, contrary to the principle of liberal construction for pro se litigants.

343.    Procedural Unfairness: Barring the Plaintiff from filing a brief and then dismissing the case for failure to file said brief raises serious concerns about due process and access to justice.

---

## XIII. PRIOR RESTRAINT

---

### F. FIRST AMENDMENT VIOLATION AND PRIOR RESTRAINT

344.    The Supreme Court has consistently held that prior restraints on speech come with a "heavy presumption" against their constitutional validity. This principle was established in Near v. Minnesota (1931) and reaffirmed in subsequent cases. Prior restraints are considered the "most serious and least tolerable infringement on First Amendment rights" because they prevent speech before it occurs, rather than punishing it after the fact.

### Intertwined Content:

345.    Since parts of the motion for reconsideration that relate to the 10-4-24 order are intertwined with parts relating to prior orders, the court's blanket refusal to consider the entire motion could potentially suppress protected speech. This becomes problematic by preventing  plaintiff's addressing new issues raised in the 10-4-24 order.

### Word Limit and Content Management:

346.    The 3000-word limit, while a common procedural rule, could be seen as content management rather than purely docket management when combined with other restrictions. This limit might prevent plaintiff from fully presenting his arguments, especially since complex issues are involved.

### Prohibition on Proposed Replies:

347.    The order preventing plaintiff from filing even a proposed reply as an attachment to a motion could be interpreted as managing content rather than just procedure. This restriction limits plaintiff's ability to present potential arguments in advance.

### Analysis of Prior Restraint Doctrine

348.    Prior restraint typically refers to government actions that prohibit speech before it occurs. In this case, the court's order does have elements that could be construed as limiting plaintiff's ability to present certain arguments or information to the court.

349.    The cumulative effect of these restrictions amounts to an impermissible limitation on plaintiff's ability to petition the court for redress.

350.    The restrictions go beyond reasonable docket management and significantly impair plaintiff's ability to present his case, and are not narrowly tailored to serve a compelling government interest.

351.    The doctrine applies not just to outright prohibitions on speech, but also to regulations that may have a chilling effect on protected expression.

352.    The overall trend shows courts maintaining a strong presumption against prior restraints on speech, while recognizing narrow exceptions in extreme circumstances. Any attempt to impose a prior restraint faces a high constitutional bar.

### Federal Intervention in State Court Prior Restraints

353.    Machesky v. Bizzell (1970): In this case, the Fifth Circuit Court of Appeals enjoined a state court injunction that prohibited certain forms of civil rights protests. The federal court found that the state court's order was an overbroad prior restraint on First Amendment rights.

354.    Bernard v. Gulf Oil Co. (1980): The Fifth Circuit, sitting en banc, vacated a district court's order that had upheld a state court's prior restraint on communications between parties and potential class members in a civil rights case. The federal court found the state court's order to be an unconstitutional prior restraint.

355.    In re Providence Journal Co. (1986): The First Circuit addressed a situation where a federal district court had issued a temporary restraining order against a newspaper, prohibiting publication of certain information. While not directly involving a state court, this case established principles that could apply to state court prior restraints.

356.    Erwin Chemerinsky v. Superior Court of Los Angeles County (2013): A federal district court enjoined a state court gag order that prevented Chemerinsky from discussing a case publicly. The federal court found the state court's order to be an unconstitutional prior restraint.

### Analysis of Federal Intervention

357.    These cases demonstrate that federal courts can and do intervene in state court proceedings to prevent unconstitutional prior restraints. Such interventions often occur in cases involving First Amendment violations.

358.    Federal courts generally want a showing of irreparable harm and a clear violation of constitutional rights.

359.    In the case of the NHSC order, though it appears to be primarily procedural in nature, the cumulative effect of the court's restrictions amounts to an unconstitutional prior restraint on plaintiff's speech, which supports federal court intervention. The state court's order goes beyond reasonable docket management and significantly impairs plaintiff's ability to present his case or exercise his First Amendment rights.

360.    This is not an isolated problem. This is part of a pervasive and comprehensive troubling pattern of abuse and infringement on the plaintiff's rights. The abuse further stems the limited hobbled court with 3 justices and their blatant disregard for federal law, and gambling that as a pro se, plaintiff will not be able to do anything about it and gambling on the fact that they will get away with it and that no one will hold them accountable.

### A. Substantial Likelihood of Success on the Merits

361.    The restrictions imposed by the NHSC create a chilling effect on the ability to freely express legal arguments and petitions. As such, the substantive constitutional right to petition the courts remains infringed by their order. The denial of Bisasor's request for an extension of time to file a motion for reconsideration as an ADA accommodation further exacerbates this infringement, as it fails to provide reasonable accommodation for his disability and effectively limits his ability to fully participate in the judicial process.

362.    The combination of the word limit, restrictions on new arguments and reconsideration issues, and limitations on replies creates a situation where Bisasor is "boxed in" and unable to fully present his case. This not only infringes on his First Amendment rights but also potentially violates his due process rights under the Fourteenth Amendment.

363.    Furthermore, the court's order creates a precarious situation where Bisasor risks being sanctioned for violating the restrictions, including the possibility of the court refusing to rule on his entire motion if any

part of it is deemed to violate these restrictions. This potential for sanctions creates an additional chilling effect on Bisasor's speech and ability to petition the court.

364.    Americans with Disabilities Act (ADA) Consideration.

365.    While courts have generally held that there is no requirement to appoint counsel in civil cases under the ADA, as noted in Tveter v. Pinkerton Academy, Case No. 16-cv-329-PB, 2019 WL 13143745 (D.N.H. March 29, 2019), the denial of pro bono counsel in this case, combined with the other restrictive measures, creates a cumulative effect that may violate the spirit of the ADA's mandate for reasonable accommodations.

366.    The Supreme Court has recognized in Tennessee v. Lane, 541 U.S. 509 (2004), that the ADA applies to state courts and requires them to make their services accessible to individuals with disabilities. The NHSC's refusal to provide any accommodation, including the denial of an extension of time to file a motion for reconsideration, coupled with its stringent restrictions, may run afoul of this requirement.

367.    The denial of Bisasor's request for an extension of time as an ADA accommodation, combined with the strict word limit and other restrictions, effectively denies him meaningful access to the court. This is particularly problematic given the complexity of the issues involved and Bisasor's claimed disability.

368.    Given the First Amendment's underpinning in protecting against prior restraints, courts are particularly vigilant about such judicial actions and the potential harms they pose to free expression.

369.    As established in Near v. Minnesota, 283 U.S. 697 (1931), prior restraints on expression are presumptively unconstitutional and may only be justified in exceptional circumstances where clear and compelling reasons are presented.

370.    Bisasor is likely to succeed on the merits of his First Amendment claim as established precedent indicates that prior restraints are generally impermissible. The Supreme Court has ruled that any government or state action aimed at censoring speech before its expression must meet a stringent standard.

371.    In Nebraska Press Assn. v. Stuart, 427 U.S. 539 (1976), the Court emphasized that prior restraints on speech and publication are the most serious and least tolerable infringement on First Amendment rights. The restrictions imposed by the NHSC, while not direct censorship, create a chilling effect on Bisasor's ability to fully express his legal arguments and petitions.

372.    The cumulative effect of the NHSC's restrictions creates an unconstitutional burden on Bisasor's right to petition. As noted in BE&K Construction Co. v. NLRB, 536 U.S. 516 (2002), the right to petition extends to all departments of the government, including the courts. The severe limitations imposed on Bisasor's ability to present his case effectively infringe upon this fundamental right.

373.    The denial of pro bono counsel, coupled with the strict word limits and prohibition on replies, creates a particularly burdensome environment for Bisasor as a pro se litigant. While courts have held that there is no absolute right to counsel in civil cases, the combination of these restrictions with Bisasor's claimed disability raises serious due process concerns. In Mathews v. Eldridge, 424 U.S. 319 (1976), the Court established a balancing test for due process claims, considering the private interest affected, the risk of erroneous deprivation, and the government's interest. Here, the balance tips strongly in favor of Bisasor's right to meaningfully participate in his appeal.

374.    The restrictions imposed by the NHSC go beyond reasonable case management. In Procunier v. Martinez, 416 U.S. 396 (1974), the Court recognized that overly broad restrictions on prisoners' correspondence could violate the First Amendment. By analogy, the restrictions imposed on Bisasor's ability to communicate with the court are similarly overbroad and unconstitutional.

375.    While the Anti-Injunction Act, 28 U.S.C. § 2283, generally prohibits federal courts from enjoining state court proceedings, there are exceptions to this rule. In Mitchum v. Foster, 407 U.S. 225 (1972), the Supreme Court held that 42 U.S.C. § 1983 is an "expressly authorized" exception to the Anti-Injunction Act. Given that Bisasor's claim involves the deprivation of constitutional rights under color of state law, § 1983 provides a basis for this Court to issue an injunction against the state court proceedings.

### B. Irreparable Harm

376.    The doctrine of prior restraint is characterized by its inherently irreparable nature, as it prohibits expression before it occurs, rendering subsequent attempts to remedy the restraint ineffective. "The loss of

First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976).

377.    Here, Bisasor faces a real and immediate threat of irreparable harm if the injunction is not granted because the ongoing restrictions preclude him from fully advocating for his rights within the judicial process. Each day that passes under these restrictions further entrenches the violation of his constitutional rights.

378.    The Supreme Court has consistently held that prior restraints on speech come with a "heavy presumption" against their constitutional validity. Near v. Minnesota, 283 U.S. 697 (1931). This presumption underscores the severity of the harm inflicted by such restraints and the urgency of remedying them.

### C. Balance of Equities

379.    The balance of equities strongly favors Bisasor. Enjoining the NHSC from enforcing its unauthorized prior restraints serves to vindicate First Amendment rights, while imposing no significant burden on the court's procedural integrity.

380.    The constraints currently enforced by the NHSC impair Bisasor's right to participate in his appeal meaningfully. Thus, the net effect of maintaining the status quo not only protects Bisasor's rights but also promotes judicial efficiency and fairness in the appeal process.

381.    While comity between federal and state courts is an important consideration, the Supreme Court has made it clear that "only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States." Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 813 (1976). The present case, involving fundamental First Amendment rights, presents such exceptional circumstances.

### D. Public Interest

382.    Granting the requested injunction serves the public interest by safeguarding the constitutional principles underpinning the First Amendment and ensuring open access to the courts for redress and advocacy.

383.    As established in Globe Newspaper Co. v. Superior Court, 457 U.S. 596 (1982), the First Amendment serves to foster public discussion and scrutiny of judicial proceedings. The public has a vested interest in maintaining the integrity of the judicial process and ensuring that all parties have a fair opportunity to present their case.

384.    Therefore, the public's interest in preserving the integrity of First Amendment freedoms and preventing systemic judicial overreach weighs heavily in favor of issuing this injunction.

### E. Exceptions to the Anti-Injunction Act

385.    While the Anti-Injunction Act generally prohibits federal courts from enjoining state court proceedings, this case falls squarely within the recognized exceptions to the Act.

386.    First, as established in Mitchum v. Foster, 407 U.S. 225 (1972), actions brought under 42 U.S.C. § 1983 constitute an "expressly authorized" exception to the Anti-Injunction Act. Bisasor's claim, rooted in the deprivation of his constitutional rights under color of state law, falls within this exception.

387.    Second, the "necessary in aid of its jurisdiction" exception may apply here. While traditionally limited to in rem actions, some courts have expanded this exception to cases where the federal court's ability to adjudicate a matter is threatened by state court proceedings. See, e.g., In re Diet Drugs, 282 F.3d 220 (3d Cir. 2002).

388.    Third, the "protect or effectuate its judgments" exception, also known as the relitigation exception, could potentially apply if this Court issues a declaratory judgment in Bisasor's favor. As noted in Smith v. Bayer Corp., 564 U.S. 299 (2011), this exception allows a federal court to enjoin state proceedings to prevent relitigation of an issue that was previously presented to and decided by the federal court.

### F. The Younger Abstention Doctrine Does Not Apply

389.    The Younger abstention doctrine, established in Younger v. Harris, 401 U.S. 37 (1971), does not bar federal court intervention in this case. While Younger generally counsels federal courts against interfering with ongoing state proceedings, the Supreme Court has recognized exceptions to this doctrine.

390.    In Dombrowski v. Pfister, 380 U.S. 479 (1965), the Court held that federal injunctive relief may be appropriate in cases involving a statute that is flagrantly and patently violative of express constitutional prohibitions in every clause, sentence, and paragraph. The restrictions imposed by the NHSC, in their cumulative effect, present such a case.

391.    Moreover, the Supreme Court has held that Younger abstention is not appropriate when the state proceeding is motivated by a desire to harass or is conducted in bad faith, or when the challenged statute is flagrantly and patently violative of express constitutional prohibitions. Huffman v. Pursue, Ltd., 420 U.S. 592 (1975). The severe restrictions imposed on Bisasor's ability to present his case effectively suggest bad faith and flagrant violation of his constitutional rights.

## G. The All Writs Act Provides Additional Authority

392.    The All Writs Act, 28 U.S.C. § 1651(a), provides that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." This Act provides an additional basis for this Court to issue an injunction to protect its jurisdiction over Bisasor's federal claims.

393.    In United States v. New York Telephone Co., 434 U.S. 159 (1977), the Supreme Court held that the All Writs Act is a residual source of authority to issue writs that are not otherwise covered by statute. This residual authority could be invoked to address the unique circumstances of this case, where traditional exceptions to the Anti-Injunction Act may not fully capture the constitutional urgency at hand.

## H. Americans with Disabilities Act (ADA) Considerations

394.    While courts have generally held that there is no requirement to appoint counsel in civil cases under the ADA, as noted in Tveter v. Pinkerton Academy, Case No. 16-cv-329-PB, 2019 WL 13143745 (D.N.H. March 29, 2019), the denial of pro bono counsel in this case, combined with the other restrictive measures, creates a cumulative effect that may violate the spirit of the ADA's mandate for reasonable accommodations.

395.    The Supreme Court has recognized in Tennessee v. Lane, 541 U.S. 509 (2004), that the ADA applies to state courts and requires them to make their services accessible to individuals with disabilities. The NHSC's refusal to provide any accommodation, coupled with its stringent restrictions, may run afoul of this requirement.

396.    The denial of plaintiff's ADA request for accommodation further is a form of prior restraint in the following ways:

a) **Chilling Effect:** The denial of plaintiff's ADA accommodation request, combined with the strict word limits and other restrictions, creates a chilling effect on plaintiff's ability to fully express his legal arguments. This is similar to the concept that "if the possibility of punishment might discourage someone from expressing themselves, a prior restraint prevents that expression from occurring at all."

b) **Gatekeeping Function:** By denying plaintiff's request for an extension of time and imposing strict word limits, the NHSC is effectively acting as a gatekeeper to plaintiff's free expression. This aligns with the definition of prior restraint as "anytime the government acts as a gatekeeper to free expression."

c) **Preventing Speech Before It Occurs:** The combination of denying plaintiff's ADA accommodation and imposing strict limitations on plaintiff's filings prevents plaintiff from fully articulating his arguments before they can be heard. This fits the general definition of prior restraint as restricting speech before it happens, as mentioned.

d) **Lack of Adequate Procedural Safeguards:** The NHSC's denial of plaintiff's ADA accommodation request, coupled with the other restrictions, fails to provide adequate procedural safeguards for plaintiff's right to petition the NHSC. This relates to the Supreme Court's requirement for adequate procedural safeguards in prior restraint cases.

e) **Irreversible Harm:** The denial of accommodation and strict limitations could cause irreversible harm to plaintiff's ability to present plaintiff's case, which is one of the key concerns with prior restraints.

f) **Disproportionate Impact:** While the NHSC's rules may appear neutral on their face, they have a disproportionate impact on plaintiff due to his disability, effectively restraining plaintiff's speech more severely than other litigants. This connects to the concept of disparate impact, although in a different

context. The cumulative effect of the NHSC's actions, including the denial of plaintiff's ADA accommodation request, creates a situation that is functionally equivalent to a prior restraint on plaintiff's ability to petition the NHSC for redress. This goes beyond reasonable case management and significantly impairs plaintiff's ability to present his case due to plaintiff's disability.

g) **Denial of Pro Bono Counsel:** The NHSC's denial of plaintiff's request for pro bono counsel due to disability under the ADA could be seen as limiting plaintiff's access to justice. While courts have generally held that there is no requirement to appoint counsel in civil cases under the ADA, this denial in combination with other restrictions could be argued to cumulatively impair plaintiff's ability to effectively present plaintiff's case.

h) <u>Strict Word Limit:</u> The 3,000-word limit imposed on one, to be filed, motion for reconsideration, especially in light of the other restrictions as well as the complexity of the issues and the denial of counsel and intervention by spouse, could be argued to unduly restrict plaintiff's ability to fully present plaintiff's arguments.

i) <u>Limitation on New Evidence or Issues:</u> The NHSC's statement that plaintiff should not assume that further evidence or new issues in the motion will be considered by the NHSC, could be seen as an overly broad restriction on plaintiff's ability to present relevant information, especially if new issues have arisen since the original order.

j) **Prohibition on Consecutive Motions:** The NHSC's refusal to consider any parts of plaintiff's motion that seek reconsideration of portions of the October 4 order that denied reconsideration of September 4 or 13 orders could be seen as an overly rigid application of the rule against consecutive motions for reconsideration, potentially limiting plaintiff's due process rights, especially in light of the intertwinement of multiple orders in one omnibus order by the NHSC.

k) <u>Restriction on Replies:</u> The prohibition on attaching a proposed reply to any motion to reply, could be argued to unfairly limit plaintiff's ability to respond to any objections raised against plaintiff's motion.

397.   While these restrictions individually might not rise to the level of impermissible prior restraint, their cumulative effect, especially in light of plaintiff's pro se status and claimed disability, creates an undue burden on plaintiff's ability to access the NHSC and present plaintiff's case effectively. This implicates plaintiff's First Amendment right to petition the government for redress of grievances and plaintiff's due process rights under the Fourteenth Amendment.

398.   The arguments for federal court intervention is thus further grounded by the cumulative effect of the restrictions, including the denial of pro bono counsel, and how they collectively amount to an unconstitutional burden on plaintiff's rights.

## FAILURE TO PROVIDE PRO SE LIBERAL CONSTRUCTION OF PLEADINGS

399.   The NHSC is not constructing the plaintiff writings liberally. It is construing plaintiff's words rigidly and narrowly and against the plaintiffs in a most unnatural manner.

400.   The NHSC believes it is not bound by the US supreme court law.

401.   The NHSC believes it can do whatever it wants to do.

402.   The NHSC has misused the principle that pro se should generally be held to the same rules to somehow mean that the pro se plaintiffs in this case should be treated harshly and in draconian manner, and lesser than how represented parties and their counsel are treated.

403.   The NHSC has further misused the principle that pro se should generally be held to the same rules to somehow mean that the pro se plaintiffs in this case should receive no liberal construction or latitude when it comes to their pleadings.

404.   This Court should provide or instruct that the NHSC provides liberal construction to pro se pleadings in accordance with precedent set federally by the US supreme court as law of the land.

## XIV. CONCLUSION

405.    Plaintiff submits that the extraordinary circumstances of this case, including the clear violations of federal law and the imminent threat of irreparable harm, justify the broad injunctive and declaratory relief requested herein. The public interest in ensuring equal access to justice for individuals with disabilities further supports the granting of this motion.

406.    Plaintiff has alleged facts that show that the NHSC has infringed or attempted to infringe upon Plaintiff's rights under the first and fourteenth amendments of the United States Constitution and under federal law; and that the NHSC and its justices and committees are biased and conflicted.

407.    It is evident from the claims and allegations that the defendants do not care about the welfare of the plaintiffs. The defendants have injured the plaintiff further causing medical harm and injury.

408.    Plaintiffs will suffer irreparable injury if an injunction is not granted in this case.

409.    Important federal rights guaranteed by Section 504 and Title II of the ADA are at stake in this suit and Plaintiffs demonstrate a likelihood of success on the merits. The injunction merely seeks to require Defendants to comply with federal law. If granted, the injunction poses little, if any, financial risk to Defendant. See Ligotti v. Garofalo, 562 F.Supp.2d 204, 227 (D.N.H.2008).

410.    Plaintiffs are likely to succeed on the merits of their claims under Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131 et seq., and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794 et seq. that Defendants discriminate against them.

411.    Absent a preliminary injunction, Plaintiffs will suffer immediate, irreparable harm.

412.    The issuance of a preliminary injunction enjoining Defendants will provide such remedy pending a determination on the merits.

413.    The plaintiffs have informed the defendants of this lawsuit in this court and have provided a courtesy copy of the filings herein to the defendants, though formal service has not yet been made.

414.    If the Court requires further argument or clarification of these important issues, Plaintiffs request an opportunity to be heard in oral argument.

### PRAYER FOR RELIEF

415.    WHEREFORE, Plaintiffs respectfully requests that this Honorable Court grant this motion for a preliminary injunction, enjoining the NHSC from imposing prior restraints on his First Amendment rights, including the removal of the restrictive conditions placed on his ability to file motions and participate in the appeal process, and grant such other relief that the Court deems just and proper.

416.    NB: The plaintiff asks the court to grant a liberal construction to these pro se/non-lawyer words in a light most favorable to the plaintiff, in accordance with the best practices of modern jurisprudence and in compliance with the US supreme court's directive to all lower courts and tribunals, in Haines v Kerner, 404 U.S. 519 (1972). The plaintiff requests that this court tries its best to understand what it is that the plaintiff is hereby seeking from the court, and to interpret it in the best way and best light possible, in order to provide appropriate relief and justice as is necessary and required.

417.    For the foregoing reasons, Plaintiff respectfully requests that this Court grant this motion and enter immediate injunctive relief and a preliminary injunction to:

a)    Determine that the Defendants violated the Plaintiff's rights under the Americans with Disabilities Act.

b)    Determine that the Defendants refused to provide reasonable accommodation under the Americans with Disabilities Act.

c)    Determine that the Defendants must respond to the Plaintiff's ADA demand with an interactive and meaningful process as required by federal law.

d)    Enjoin Defendant from denying Plaintiff's requests for reasonable accommodations under the ADA, including his request for an extension of time to file his appellate brief;

e)    Require Defendant to reinstate Plaintiff's appeal in Case No. 2023-0520 and grant Plaintiff a 60-day extension from the date of this Court's order to file his appellate brief, or within reasonable time after

this court issues it's orders; order the case be reinstated and Plaintiff be allowed to file the brief with the requested accommodation.

f) Enjoin Defendant from taking any further action to dismiss/permanently dismiss or prejudice Plaintiff's appeal based on the September 6, 2024 filing deadline;

g) Require Defendant to engage in an interactive process with Plaintiff to determine appropriate accommodations for his disabilities in connection with his appeal;

h) Order the previously submitted medical documentation be reviewed; order the "regarded as" prong of the ADA in light of accommodations granted by other courts be considered; and order a detailed explanation of its decision-making process regarding ADA accommodations to ensure transparency and accountability be provided;

i) Declare that Defendant's actions in denying Plaintiff's requests for accommodations violate Title II of the ADA, Section 504 of the Rehabilitation Act, and Plaintiff's constitutional rights to due process and equal protection;

j) Order Defendant to implement policies and procedures to ensure compliance with the ADA and Section 504 in all court proceedings;

k) Awarding Plaintiff his costs and reasonable attorneys' fees pursuant to 42 U.S.C. §12205 and 29 U.S.C. §794a;

l) Award the Plaintiff his damages, costs and attorney's fees in an amount to be determined;

m) Order Defendants to restore his access to the NH Judicial branch's records system; and to

n) Require Defendants to follow US supreme court requirement of affording liberal construction to pro se pleadings;

o) Require Defendants to not engage in arbitrary and capricious actions towards plaintiff; and refrain from engaging in disparate treatment, discrimination and/or retaliation; and

p) Granting such other and further relief as this Court deems just and proper.

Respectfully submitted by:

/s/Natalie Anderson

Plaintiff Natalie Anderson

679 Washington Street, Suite # 8-206

Attleboro, MA 02703

Tel. 617-710-7093

Email: liberty_6@msn.com


/s/andre bisasor

Andre Bisasor

679 Washington Street, Suite # 8-206

Attleboro, MA 02703

Tel. 781-492-5675

Email: quickquantum@aol.com

Dated: October 15, 2024

NB: This pleading was primarily drafted by plaintiff's spouse pro se, and with other assistance. The plaintiffs apologize if there are any typos or other errors as this was done without being able to properly proofread given the time sensitivity of the matter at hand.