To: The Federal Court of Maine
156 Federal Street, Portland, ME 04101
Case Name: Bisasor et. al v. New Hampshire Judicial Branch et. al
Case No: 1:24-cv-00360

## LETTER TO THE CHIEF JUDGE OF THE FEDERAL COURT OF MAINE

Dear Chief Justice Lance E. Walker,

I am writing to seek your assistance with a number of issues including but not limited to understanding the procedures applicable to our case (Case No. 1:24-cv-00360-NT) that has been transferred from the District of New Hampshire to the District of Maine. As pro se plaintiffs, we are facing challenges in navigating the complexities of federal court procedures.

I understand that the Maine court has a duty to preside over this case, as assigned by Chief Judge Landya McCafferty of the New Hampshire District Court. I also understand that you then appointed Judge Nancy Torresen to oversee our case.

On January 27, 2025, we filed an emergency motion for a TRO, which Judge Torresen denied the same day. Judge Torresen gave a few reasons for denying the TRO:

1. **She stated that the formatting of the filing was not correct/didn't comply with the rules.**
   a. NB: The emergency motion was about 15 pages single-spaced but plaintiffs are pro se and did not know these formatting requirements were required here. At most, the pleading is maybe 10 pages over the limit if it were to be double-spaced. Yet, this should not be decisive for denying the motion and if anything it would be an invitation to re-file it.

2. **She stated that it is near impossible for her to read a hundred single-spaced pages, in the short time requested for a ruling.**
   a. NB: She arrived at this page count by combining the 15 pages of the emergency motion with the 78 pages of the complaint. It should be noted that although the complaint is 78 pages, there are no page limit requirements for complaints, but only for motions, so it is the emergency motion alone that is technically over the 20 page limit. Moreover, the original complaint was filed in Massachusetts federal court, not NH federal court.

3. **She suggested the emergency request for same day ruling was bothersome to her. She also, further questioned why we could not have emailed or mailed the motion so that the request was not the same day the ruling was requested.**
   a. This is notwithstanding the court's own role in delaying the granting of efiling access, i.e., because it erroneously collated an efiling access motion (filed by plaintiffs on 1-8-25) behind the motion to extend time to serve defendants that was conventionally filed the same day (on 1-8-25), which was only granted on 1-24-25 at the close of the court even though it had been filed 16 days before. Please note that the deadline for which the TRO motion seeks relief was only announced on 1-10-25. It should be noted that the motion to extend time to serve the defendants was ruled on on Wednesday 1-15-25. Because we were not permitted to efile or receive enotices, notice of this ruling was sent by mail on or about 1-15-25, and we did not receive notice in the mail until after the long MLK holiday weekend, on Tuesday 1-21-25. I was not sure if the ruling on the efiling access was to be forthcoming separately thereafter. Once I realized that the efiling access motion was not ruled on and that none was forthcoming, I contacted

the court to inquire of the problem and was then informed, after investigation, of the error by the court. This was not resolved until after the close of the court on Friday 1-24-25. There is no way that the plaintiffs should be blamed for any of this and for the same day filing of the motion. This was not of our own making.

4. **She suggested that there appears to be contradiction in our assertions with respect to appeal case 2023-0520 thus making her not sure of the likelihood to succeed on the merits.**

   a. NB: She factually confused one case for which plaintiffs is not seeking the emergency TRO (#2023-0520) with the 2021-0604 case for which the emergency TRO is being sought. There is no contradiction. See motion to reconsider for further points.

5. **She stated that the defendants are not yet served and have not had an opportunity to respond.**

   a. NB: The defendants are not served because the case was only recently transferred twice and settled in Maine in December 2024, and plaintiffs did not receive notice of the Maine transfer until the time period approaching the holidays. The plaintiffs acted to seek efiling access as soon as they could in the early part of January 2025 shortly after the holiday period ended. Moreover, the court has not provided plaintiffs with a summons. Moreover, plaintiffs complied with Rule 65 for ex parte relief by both providing notice to the defendants of the motion but also providing reasons why the court should issue ex parte relief. See motion to reconsider for further points.

6. **She stated the plaintiff did not address the abstention issues regarding federal court intervention in state court.**

   a. NB: This is factually incorrect. The plaintiff did do so and spent considerable effort in addressing the anti-injunction act, the abstention doctrines, etc. She perhaps overlooked this fact. The plaintiffs are left without any reasoning or clarification on that. Now, she may want to reserve room to address this later after the defendants are served, but she should not say that plaintiffs did not address this issue.

We subsequently filed a motion for reconsideration, pointing out the misapprehension of facts as noted above as well as other points. [See docket for these filings.] But she denied the reconsideration stating that these misapprehensions are immaterial to her ruling. So although the plaintiffs provided several critical examples of where the court engaged in plain error of fact as a basis for her decision, the court gave a blanket response stating that these errors are immaterial. The plaintiffs are thus confused. If the factual building blocks for the court's decision were based on factual errors, and then the plaintiffs pointed out that these factual errors, then it is unclear what the court is basing its decision on. This is confusing to us. If she based her ruling on 5 things but all 5 things are factually wrong, then what is the ruling based on? Unless the court is saying there is no set of circumstances that could afford the relief requested in the TRO motion.

It might be that the judge has held it against us for asking her to review and rule on lengthy papers so quickly in one day (which she emphasized both in the original ruling and the ruling on reconsideration). Yet, iIn the motion for reconsideration, we stated that the judge could take more time as necessary, but Judge Torresen appears to have maintained her original decision without fully explaining the underlying reasons.

It simply could be the fact that the court does not believe it has enough time to make a proper decision and does not want to issue a TRO or stay in that circumstance of having to make a rushed decision. But yet the plaintiffs have indicated that they have adjusted their relief in terms of the timing of a requested ruling citing that the court could take the time needed to review the pleadings properly and

carefully. Plaintiffs therefore do not understand the ruling. It is the plaintiffs' understanding that they are entitled to having a clear understanding of rulings by the court and that they are entitled to seek clarification.  In light of the above, Plaintiffs respectfully submit that clarification is needed on several points to ensure a full and fair consideration of their claims and to prevent potential irreparable harm.

We also have certain procedural questions that remain unanswered despite our attempts to address them in our filings. We have asked these questions to Judge Torresen, but they have not been addressed. We are also uncertain about the proper procedure to obtain clarification and we are hesitant to directly ask Judge Torresen for clarification on these matters due to concerns about potential annoyance or exasperation, which could inadvertently prejudice our case.

[NB: I am already sensitive to the fact that pro se litigants tend to have a difficult time with many judges in various courts, who may become easily annoyed with them because they require more time and patience than represented parties. Additionally, I am aware that as African-American pro se plaintiffs, we may be subject to unconscious or implicit bias from judges who sometimes may treat us as less credible or offer less accommodation than they would to other parties or lawyers. Research has shown this to be a valid concern. These are delicate issues that are unfortunately a fact of life in the American justice system. Given this backdrop, we are presumably already at a disadvantage from the start. While I am not suggesting that Judge Torresen has this issue necessarily (I do not know anything about her), it is not unreasonable to be concerned that she could easily or quickly become annoyed. Signs of annoyance are already present in her two orders thus far, where she indicated some level of exasperation with the plaintiffs for requesting emergency relief on the same day[1]. This is further evidenced by the reiteration of this point in her order on reconsideration, citing the "six-hour" window to rule on the same day. I am concerned that Judge Torresen may be becoming locked into that annoyance impulse and not open to truly hearing what we are saying. The bottom line is that we would like to ask for clarification but are hesitant to do so for fear of annoying or exasperating the judge. Under the canons of judicial conduct, it is my understanding that judges are supposed to be patient and understanding, particularly with pro se litigants. However, this is not always followed, as pro se parties are often mistreated in courts across this country. Judge Richard Posner, who retired from the federal bench, expressed concern about how pro se parties are often mistreated by federal judges and started an organization (the Posner Center of Justice) dedicated to addressing that concern. See also excursus attached as **Exhibit 1**, which is an excerpt from another matter which cites these issues in more detail.]

We are thus acutely aware of the challenges faced by pro se litigants, particularly those from minority backgrounds, in navigating the federal court system. Our intention is not to be difficult, but to ensure that we fully understand and comply with all necessary procedures while advocating for our rights.

Given these circumstances, we are seeking your guidance to ensure that we can effectively present our case and that it receives fair consideration, especially given the complexities involved in federal court proceedings, and especially with the unique situation of our case being transferred between districts.

Hence, as pro se litigants, we need additional clarity to navigate this process effectively as follows:

> Pleading Requirements: In our motion for reconsideration, we asked about the specific local rules imposing margin and font requirements, as we were unable to locate them in the cited New Hampshire Local Rules 7.1(a) and 5.1(a). NB: The plaintiffs searched the rules cited by

---

[1] It is worth noting that it is our understanding that judges sometimes have to deal with same-day emergency TROs and be prepared to read and properly rule on everything involved with such TRO motions, as part of their job.

the court and could not find any reference to margin or font requirements for pleadings. The only requirement is double-spaced and 20 pages. We asked the court to clarify whether the NH rules impose more than that or do the margin/font requirement pertain to Maine's rules. This clarification remains unaddressed. We thus would like to clarify the pleading requirements for our case. Given that the case was transferred from New Hampshire and is now being overseen by a Maine federal judge, we are uncertain which local rules apply. Could you please provide guidance on this matter?

Sealed Information: We need guidance on how to properly present sealed materials for the Court's consideration, especially regarding ADA accommodation issues. We need clarification on the procedure for providing sealed information in a motion for a Temporary Restraining Order (TRO). Are we allowed to email such sealed pleadings to the court? If not, what is the proper procedure for submitting confidential information?

ADA Accommodations: We need clarification on how to seek ADA accommodations from the court. Both plaintiffs have disabilities that affect our ability to fully participate in these proceedings without accommodation. What is the process for requesting and obtaining such accommodations? NB: As the head of the court, it is our understanding that ADA letters can or should be directed to the administrative head of the public entity, which in this situation ostensibly is the chief judge of the court. See 28 C.F.R. § 35.164 ( *the decision…must be made by the head of the public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity and must be accompanied by a written statement of the reasons for reaching that conclusion.*

Service of Process: We are uncertain how to proceed given that we cannot serve the defendants without a summons from the Court. The plaintiffs have sought permission from the court to receive the summons to serve the defendants but the court has stated that it will delay providing the summons until after certain events take place. I understand that the magistrate judge gave permission to serve the defendants in April but would only provide the summons after an amended complaint is filed by a certain date (which we indicated, in the motion to extend time, that we intend to amend the complaint). But the magistrate's ruling was made before Judge Torresen's ruling. Given that Judge Torresen's ruling states that she will schedule a conference after the defendants are served, I would like to know if we can get the summons now and serve the defendants now, so that they can be on notice and appear at a TRO hearing shortly (but still reserve the right to amend the complaint thereafter as is allowed by rule i.e. amendment allowed once as a matter of course without permission of the court or other parties).

Pro Se Leniency: We seek confirmation that our pro se pleadings will be treated with liberal construction and leniency, as mandated by Supreme Court jurisprudence. Will the court apply less stringent standards to our filings compared to those expected of lawyers?

Renewed Motions: We are uncertain about the process for seeking further relief after a motion has been denied, as is the case with the TRO motion. Are we allowed to file a renewed motion if we believe there have been misunderstandings or confusion regarding an originally filed motion? What is the procedure for seeking new, different, or adjusted relief? Similarly, we would like to re-file the TRO motion not as an emergency even though it is our understanding that TRO motions are by definition to be treated on an expedited basis. We are concerned that the original TRO motion has been tainted by the emergency designation (as seems to have

been emphasized by Judge Torresen) and that we have not been able to obtain a fair review of the motion given certain technicalities which can be corrected in a renewed TRO motion. However, we do not want to exasperate the judge or run afoul of any rule or custom. Hence, the need for clarification.

Administrative Bottlenecks: As this case was transferred to Maine due to the full recusal of the New Hampshire federal court, there has been or may be delays in transmitting motions between the two courts. This creates a potential bottleneck situation where there will likely be delays in transmitting emergency motions to the Maine court. We would like clarification on how to address such potential bottlenecks due to the transmittals needed between the two courts. Also, if we have a deadline that is coming up, how much time in advance of the deadline, do we need to provide a motion affecting that deadline such as an extension of time, so that there is adequate time for the court to review, rule on it and docket it. This has come onto our radar as an issue that might affect us in the future, given the emphasis by Judge Torresen on being troubled by a motion filed same day as the attendant/affected deadline.

Regarding the substance of the TRO, the plaintiffs further would like clarification on the following:

Distinction between Cases: Plaintiffs seek clarification on whether the Court has distinguished between Case No. 2021-0604 and Case No. 2023-0520 in its rulings. The motion for stay/TRO was intended to apply to Case No. 2021-0604, which has a different procedural history and posture than Case No. 2023-0520. Case No. 2021-0604 involves Plaintiff Anderson as the appellant, with Plaintiff Bisasor as her non-lawyer representative.

Irreparable Harm: Plaintiffs request clarification on the Court's assessment of irreparable harm, specifically regarding: a) The potential closure of Case No. 2021-0604 by the New Hampshire Supreme Court (NHSC) before the resolution of relevant ADA issues by this Court; b) The imminent threat of record destruction by the defendants, which could permanently deprive Plaintiffs of access to crucial public records.

The plaintiffs would also like to know if the court will hold it against the plaintiffs if the NHSC acts adversely to the plaintiffs, deny their ADA requests and then close the case? Will the court then say its hands are tied and it can do nothing or that plaintiffs should have sought injunctive relief to preserve the status quo, if in fact it is found that the plaintiffs' rights have in fact been violated under the ADA, or other federal laws by the defendants? OR will the court undo the adverse acts of the NHSC/ the defendants if it finds that the plaintiffs rights have been violated under the ADA or other federal laws? Plaintiffs are concerned that it is better to preserve the status quo rather than to seek to undo adverse acts but perhaps plaintiffs misunderstand the power of the federal court to address violations under federal law.

Destruction of Records: Regarding the destruction of records, the plaintiffs would like an opportunity to further explain the facts and grounds for a TRO on that issue by itself, as the conflation with the TRO regarding the adverse acts of the NHSC might not be helpful and create confusion. In other words, the plaintiffs would like to file a renewed motion for TRO, one of which is directed to the AG office or the ADO, not the NHSC, seeking that they not destroy records that are part of the subject of this proceeding under the ADA. This issue does not involve any state court proceedings. See email in Exhibit 3 to the 1-27-25 emergency motion where plaintiff outlines some of the issues regarding this and highlighting that it is not

before any state court at this time. Thus, this is a direct federal ADA issue that does not implicate abstention issues.

This clarification is crucial for Plaintiffs to determine their next steps and to prevent potential irreparable harm while their claims are pending before this Court.

Thank you for your time and consideration. We look forward to your guidance on these matters. Because of the time-sensitivity of some of these matters, we ask that you respond as soon as you can but without sacrificing a proper review of the matter. I trust that makes sense.

Respectfully,
Plaintiff Andre Bisasor
Date: 1-29-25

# **EXHIBIT 1**

## BIAS IN THE AMERICAN JUSTICE SYSTEM
### Pro Se Bias

Extensive research on the American legal system has shown that there is a systemic bias against pro se litigants both in civil and criminal cases. This bias is both systemic and subtle or implicit. This goes to certain fundamental problems in general.

The first is the bias against the poor. The powerful, influential, wealthy and privileged in our society enjoy an advantage of credibility. The poor, vulnerable, the small guy, the average joe possess a disadvantage when it comes to credibility.

The second is the bias against the pro se plaintiff. This is why study after study finds that there is a bias against the non-lawyer pro se litigant. They are too often presumed to be crazy, uneducated, frivolous and not credible[2]. This presumption is sometimes rooted in the presumption that if pro se litigants had a viable claim or complaint, then a lawyer would take their case.

But this presumption ignores the cost of a lawyer in our day. Even US Supreme Court Justice Neil Gorsuch wrote a book where he acknowledged and lamented the fact that most people can't afford lawyers today. It is primarily the wealthy or corporations (and those who can leverage insurance) that can do so for the most part. And even if contingency lawyering is factored, law firm economics after the 2009 recession significantly reduced law firms willing to take on a case full contingency, even if the case is a very good one. Law firms are just not willing to take on the risk. An average case today from complaint through trial can cost anywhere from $150,000 to $250,000 in legal fees/costs. And this may not even account for litigation costs such as depositions, transcripts, filing fees, service fees, printing and mailing costs, experts and other such costs. The average American cannot afford $150,000 to $250,000 dollars for any cost. This leaves many citizens either having to forego valid legal claims or to go it alone pro se. The rise in pro se action on dockets across the country bears testimony to this.

But this increase carries with it an unintended consequence: the stigmatization of the pro se plaintiff. Admittedly there are some pro se plaintiffs who through their lack of education or knowledge make terrible mistakes that result in the unfortunate dismissal of their cases. Some presumably are even frivolous cases. But many pro se plaintiffs today are educated, literate and are somewhat quick leaners of the law. And in many cases, pro se plaintiffs do have strong cases and have the ability to at least minimally articulate those claims, though not as a trained lawyer would. The problem comes when courts and other tribunals lump them all together in the same box, rather than treat them individually on their own merits, and apply a certain stigma to all of them resulting in harsher treatment than even represented parties are afforded.

Thus, pro se plaintiffs are often allowed less leeway, and held to a standard of more rigidity and of more form over substance because courts presume the pro se plaintiff is not credible, is frivolous, or their case is trash simply because their credibility is already judged to be trash (and this is further compounded if the pro se litigant is indigent and even worse if he/she is black). This is simply a fact of life in the American legal system, which has been shown by study after study. In fact, the great Justice Richard Posner retired in protest over how pro se plaintiffs were being treated[3]. NB: He even

---

[2] See article on Justice Richard Posner's explication of this issue: https://abovethelaw.com/2018/03/judge-posner-files-first-brief-since-leaving-the-bench-lights-into-federal-judiciary/.

[3] See also article on the reasons for Justice Richard Posner's retirement: https://abovethelaw.com/2017/09/the-backstory-behind-judge-richard-posners-retirement/ .

started an organization dedicated to research and advocacy to improve access to justice for pro se litigants.

This sentiment is reflected in the following quotes of notable people: a) Jonathan Swift: "Laws are like cobwebs, which may catch small flies, but let wasps and hornets break through." b) Anacharsis: "Written laws are like spiders' webs, and would catch the weak and poor, but easily be broken by the mighty and rich." c) Derek Bok (former Harvard president): "There is far too much law for those who can afford it and far too little for those who cannot.".

### Implicit Racial Bias

Research has demonstrated that implicit bias can affect decision-making processes, including in legal settings. In "Implicit Bias in the Courtroom" (UCLA Law Review, 2012), Professors Jerry Kang et al. discuss how these unconscious biases can influence judicial decisions. The article emphasizes the importance of awareness and proactive measures to mitigate such biases.

Racial bias also occurs in court settings. Studies reveal that implicit racial biases influence the behavior of judges, prosecutors, and defense lawyers. These biases can transform due process protections into tools of racial punishment, resulting in discriminatory treatment of people of color. Such biases contribute to systemic inequities within the legal system. Examples of racial bias in courts include:

Implicit Bias in Judgments: Judges also have been found to harbor implicit biases that affect their decisions, contributing to disparate outcomes for Blacks compared to Whites. Judges, like the general population, hold implicit biases that affect their judgment, leading to racially disparate outcomes in legal proceedings. For example, Julian Jefferson, who works for the NH public defender office, and the only black member of the NH Supreme Court's Complaint Screening Committee, recently testified at a police accountability hearing with the NH Governor, citing several personal and other examples of rampant racism in NH courts, and in the NH legal and law enforcement systems.
See 20200727-julian-jefferson-testimony.pdf

Also, the Massachusetts Supreme Judicial Court has recently acknowledged systemic racism and bias as permeating its court system. See: https://www.mass.gov/news/letter-from-the-seven-justices-of-the-supreme-judicial-court-to-members-of-the-judiciary-and-the-bar-june-3-2020. See also: https://hls.harvard.edu/wp-content/uploads/2022/08/Massachusetts-Racial-Disparity-Report-FINAL.pdf .

Racial Disparities in Treatment Courts: Studies indicate that Black participants have lower graduation rates in treatment courts compared to White participants, even after controlling for various factors.

Racial Bias in Tort Damages: An article in the Georgia Law Review discusses how racial bias affects the calculation of pain and suffering damages, with Black plaintiffs often receiving lower pain and suffering awards compared to white plaintiffs due to biases in injury assessment and juror decisions. This is partly due to implicit biases that lead jurors to undervalue the severity of Black plaintiffs' injuries.

Jury Selection: Black individuals are often underrepresented in jury pools and unfairly removed through peremptory strikes, leading to unrepresentative juries and biased verdicts.

These examples illustrate broader patterns of racial bias that impact the treatment of Black individuals in courts and highlights systemic issues of racial bias in the legal system. NB: Similar patterns of implicit bias have been observed in education and employment settings. For example, Black students with disabilities often face harsher disciplinary actions compared to their peers (Skiba et al., 2011).

## The Intersection of Race and Disability in Legal Proceedings

Extensive research demonstrates that racial bias can affect perceptions of pain and disability, particularly among Black individuals. A landmark study published in the Proceedings of the National Academy of Sciences found that both laypeople and medical professionals often assume that Black individuals feel less pain than White individuals, leading to disparities in pain management and treatment recommendations (Hoffman et al., 2016)[4]. In the legal context, such biases can unconsciously influence judicial decisions.

Further, the concept of intersectionality, as articulated by legal scholar Kimberlé Crenshaw in "Mapping the Margins: Intersectionality, Identity Politics, and Violence Against Women of Color" (Stanford Law Review, 1991), highlights how the interaction of multiple identities can lead to unique forms of discrimination. This framework is particularly relevant when considering the experiences of individuals with disabilities who also belong to racial minority groups.

- In EEOC v. Community Loans of America and Carolina Title Loans, Inc., a Black employee in South Carolina faced racial harassment and was denied accommodations after taking time off for disability-related surgery. The employer did not allow her to return to work using crutches and instead placed her on unpaid leave until she was fired. The case eventually was settled.

- In Monk v. United States (D. Conn. 2024), the lawsuit alleges racial discrimination in the Department of Veterans Affairs' disability benefits system, claiming that Black veterans' applications for disability benefits were rejected at a higher rate than those of white veterans. The case argues that this pattern of discrimination has persisted for decades, affecting the outcomes for Black veterans seeking disability compensation.

- In Geness v. Cox, 902 F.3d 344 (3d Cir. 2018), the Third Circuit emphasized the importance of giving due weight to medical evidence when considering ADA accommodations. The court held that disregarding or minimizing medical recommendations without sufficient justification could constitute an ADA violation.

## Judicial Responsibility to Address Implicit Bias

Courts have a responsibility to ensure that all individuals receive fair treatment under the law. In State v. Saintcalle, 178 Wash. 2d 34 (2013), the Washington Supreme Court acknowledged the pervasive nature of implicit bias and its potential impact on judicial decision-making. The court emphasized the need for judges to actively work to identify and overcome these biases.

---

[4] "Racial bias in pain assessment and treatment recommendations, and false beliefs about biological differences between blacks and whites." By Kelly M Hoffman. 2016.